UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **KINGS DODGE, INC. d/b/a** ) <br> **KINGS DODGE/CHRYSLER/JEEP** ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **CHRYSLER GROUP, LLC** ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 1:12-cv-445 <br> Judge Timothy S. Black |

### CHRYSLER GROUP LLC'S MEMORANDUM IN OPPOSITION TO KINGS DODGE INC.'S MOTION FOR SUMMARY JUDGMENT

Defendant Chrysler Group, LLC ("Chrysler Group"), by and through its attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby files its Opposition to Plaintiff, Kings Dodge Inc.'s ("Kings") Motion for Summary Judgment. Chrysler Group's Response to Kings' Proposed Undisputed Facts is attached.

### INTRODUCTION

The Court should deny Kings' Motion for Summary Judgment; Kings has failed to demonstrate the absence of any genuine issue of material fact or that it is entitled to judgment in its favor as a matter of law. Fed. R. Civ. P. 56. First, Kings erroneously interprets ORC 4517.52 as governing the length of time it takes to repair a vehicle under warranty ("repair time"), when in fact, the statute makes no mention whatsoever of repair time. Instead, the parties themselves agreed in their dealer agreements and accompanying warranty manuals and bulletins on the length of time to allot to each type of warranty repair based on the actual time it takes to make

each repair.  Second, even assuming that ORC 4517.52 could be interpreted to include repair time, Kings has failed to come forward with any evidence demonstrating that it ever submitted a particularized claim to Chrysler Group for a specific amount of repair time and that Chrysler Group denied that claim.  The submission and denial of a warranty claim is an essential element of a cause of action under ORC 4517.52 that Kings has failed to satisfy.  Third, Kings has injected numerous genuine issues of material fact into the case by arguing that the estimated repair time that it would like to use—from a commercial manual that is not even intended for use by dealers or for warranty work—is more "reasonable" than the actual repair time that Chrysler Group and Kings have used for years in the submission and payment of warranty labor claims.  The issue of "reasonableness" is inherently factual in nature and cannot be resolved on summary judgment.

Similarly, Kings' claim that it is being underpaid for parts that it uses in warranty repairs cannot be resolved in its favor on summary judgment because Kings failed to declare to Chrysler Group the particularized rate of reimbursement that it desired, a declaration which is an essential element of a cause of action under ORC 4517.52.

Kings' Motion should be denied and judgment should be entered in Chrysler Group's favor as requested in Chrysler Group's previously filed motion for summary judgment.

## FACTUAL BACKGROUND

Chrysler Group and Kings have operated under Chrysler, Jeep and Dodge Sales and Service Agreement (the "Dealer Agreement") for years.  (*See* Sales and Service Agreements, Addendums, and Additional Terms, attached as Ex. 1 to the Affidavit of Kurt R. Hunt accompanying Chrysler Group's Motion for Summary Judgment ("Chrysler Group MSJ Ex. 1").)  The Dealer Agreement grants Kings the right to sell and service Chrysler Group vehicles

and obligates Kings to provide warranty repair and service free of charge to purchasers of Chrysler Group vehicles. (*Id.* at CG-KINGS001593, CG-KINGS001596; Complaint, ¶ 1; Chrysler Group Dealer Policy Manual, Chrysler Group MSJ Ex. 2, at CG-KINGS001177.) In return, Chrysler Group agrees to reimburse Kings for the labor and parts that Kings uses in its warranty repairs and services. (Manual, Chrysler Group MSJ Ex. 2, at CG-KINGS001178, CG-KINGS001188.)

For over 25 years, Kings has submitted claims to Chrysler Group for payment for the labor and parts it uses in warranty service and repairs, and Chrysler Group has paid these claims at an hourly rate agreed on by the parties. (Declaration of Ralph Vargo ("Vargo Dec."), attached to Chrysler Group MSJ, at ¶¶ 5.) However, in August 2011, Kings alleged for the first time that Chrysler Group was underpaying it for warranty labor in violation of ORC 4517.52 and demanded an increase in its hourly rate of reimbursement from $77.00 to $92.00. (Complaint, Ex. A.) Kings increased its requested hourly rate demand to $95.00 in the Complaint that it filed with this Court on June 7, 2012. Kings now appears to have abandoned its requested labor rates in lieu of the hourly rate of $86.19 that Chrysler Group has been paying it since January 1, 2013.[1]

Kings, however, continues to insist that, in addition to the hourly labor rate that Chrysler Group pays to it for warranty work, Chrysler Group should accept the length of time that Kings asserts is required on similar repairs that it performs for its nonwarranty customers. Kings alleges that it relies on repair time estimates published by a commercial time manual that, according to its publisher, is intended for use by aftermarket repair shops, like Midas and

---

[1] After Kings' request for a labor rate increase and submission to Chrysler Group of customer pay repair orders to support this increase, Chrysler Group increased Kings' warranty labor rate from $77.00 per hour to $84.07 per hour effective November 27, 2011. Chrysler Group then unilaterally increased Kings' warranty labor rate to $84.50 on January 1, 2012 and again to $86.19 on January 1, 2013 pursuant to automatic annual labor rate increases provided in the Dealer Agreements and Manual. Chrysler Group has continued to pay Kings at the hourly rate of $86.19 from and after January 1, 2013. (Vargo Dec. at ¶¶ 6-8.)

Meineke, for nonwarranty work, but not for dealerships like Kings that specialize in the service and repair of a particular manufacturer's vehicles under warranty.

With regard to reimbursement for parts used in warranty repairs, Kings initially asserted that Chrysler Group was violating ORC 4517.52 by failing to reimburse it for parts at the rate it charges to its nonwarranty customers for like service and repairs. Kings now appears to have abandoned that claim and apparently is willing to accept the reimbursement increased rate of cost plus 59.13% that Chrysler Group has paid to Kings since July 2013. The only dispute regarding the rate of parts reimbursement appears to be the effective date of this the 59.13% rate. Chrysler Group submits that the 59.13% markup rate should be effective from and after July 14, 2013; Kings, however, contends that the effective date should be December 1, 2011.

## ARGUMENT

**I.      Kings Is Not Entitled To Summary Judgment Because The Statute Upon Which It Relies, ORC 4517.52, Does Not Govern The Length Of Time It Takes To Perform A Repair.**

ORC 4517.52 requires a manufacturer to reimburse a dealer for labor and parts used in the dealer's warranty repairs at "*rates not less than the rates* charged [by the dealer] to nonwarranty customers for like service and parts." (emphasis added). While Kings appears to have accepted the parts and labor reimbursement rates of 59.13% and $86.19 per hour, respectively, as calculated by Chrysler Group, Kings continues to argue that ORC 4517.52 also requires Chrysler Group to pay Kings for a fixed amount of time—*regardless of the actual time it takes to complete the repair*—that Kings obtains from a commercial manual that is not intended for use by dealers or for warranty work. Kings' attempt to stretch 4517.52 to cover the length of time it takes to perform a repair ("repair time") is incorrect as a matter of law and, if accepted, would override the parties' contractual agreements and course of conduct in compliance with those agreements over the last two decades.

The plain language of ORC 4517.52 governs the rates for labor and parts that a manufacturer, like Chrysler Group, is required to pay its dealers for warranty work.  The statute, however, nowhere regulates the *length of time* that it takes to complete a repair.  Despite the plain language of the statute, Kings argues that, since it assigns a fixed amount of time to each repair for which it charges its nonwarranty customers, Chrysler Group should be compelled to accept the same fixed time when paying Kings for warranty labor.  The plain language of ORC 4517.52, however, provides no basis for Kings' argument, and Kings has failed to identify any case decided under Ohio law that supports such an interpretation.

The cardinal principle of statutory interpretation is to give effect to the intent of the legislature, *In re Collier*, 85 Ohio App. 3d 232, 236-237 (1993), and the clearest indication of such intent is the plain language of the statute.  *State v. Waddell*, 71 Ohio St. 3d 630, 631 (1995).  Here the plain language of the statute requires reimbursement at a *rate*, i.e. $x per hour.  Kings, however, seeks to transform the word "*rate*" into the very different word "*amount*," as it not only demands its rate, but also seeks to have Chrysler Group multiply this rate by the fixed time estimates for each repair that it obtains from a manual that is not even intended for use by dealers or for warranty work.  Such a calculation results in the *total amount* charged for the repair rather than the *rate charged* for the repair as provided by the statute.

The dictionary definition of the word "rate" is typically the ratio between two differing units (here that rate is dollars per hour) whereas "*amount*" is defined as a fixed price (here the total charged for a repair).  (*See, e.g.*, Webster's Encyclopedic Unabridged Dictionary of the English Language (1989) (defining "rate" as "certain quantity or amount of one things considered in relation to a unit of another thing and used as a standard or measure: *at the rate of 60 miles an hour*"; defining "amount" as "quantity; measure" or "the full effect, value, or

significance").) Kings itself expressly acknowledged that the fundamental distinction between "rate" and "amount" in a contemporaneous email dated November 18, 2011 where Kings' president, general counsel and majority owner, thanked Chrysler Group for increasing Kings' warranty labor rate to $84.07 per hour but pointed out to Chrysler Group that, while the ***labor rate*** "meets part of the requirement [it] does not address the **time allowed for nonwarranty work**." (Nov. 18 Email, Chrysler Group MSJ Ex. 6 (emphasis added).) Had Kings, prior to commencing this lawsuit, truly believed that *"rate"* as used in the statute means the same thing as "*amount*," it would never have drawn such a distinction.

Kings also ignores the statutory history of ORC 4517.52 in equating the very different concepts embodied in the words "rate" and "amount," which further demonstrates the fallacy of the statutory construction that Kings is urging on the Court. Before the statute was amended in 1987, ORC 4517.52 included provisions regarding the "time of repair," which were deleted by the Ohio legislature in the revised version of the statute that was promulgated in 1987 and that is in effect today. The prior version of ORC 4517.52, enacted in 1979, provided the following regarding repair time: "The [warranty and recall reimbursement] schedule or formulas shall include a *reasonable allowance of time for the diagnosis and performance of repairs by a technician of ordinary skill*." Am. S.B. No. 206 (approved Dec. 14, 1979), a true and accurate copy of which is attached hereto as Ex. 1 (emphasis added). It was this language that the Ohio legislature deleted from the 1987 amendment. Accordingly, it is clear that the legislature intended to eliminate the regulation of repair time from the statute in the context of warranty reimbursement and this amendment must be viewed as purposeful and should be given effect by this Court. Indeed, this Court, in attempting to determine how the Ohio Supreme Court would interpret ORC 4517.52, must refrain from reading the deleted concept of "repair time" back into

the statute, particularly where the legislature expressly deleted the "repair time" provision from a prior version of the statute. *See Lynch v. Gallia Ct. Bd. Of Commrs.*, 79 Ohio St.3d 251, 254; 680 N.E. 2d 1222, 1224 (1997) ("When confronted with amendments to a statute, an interpreting court must presume that the amendments were made to change the effect and operation of the law. However, a reviewing court must not construe a statute so as to supply words that are omitted.").

Furthermore, in addition to deleting the "repair time" provisions from ORC 4517.52, the legislature retained, and did not delete, the reference to "repair time" in the succeeding section (ORC 4517.53) which regulates the delivery and preparation of new vehicles. Section 4517.53(A) provides in pertinent part:

> Each franchisor shall specify to its franchisee in writing the delivery and preparation obligations of the franchisees prior to the delivery of new motor vehicles to retail buyers … The schedule of compensation shall be *reasonable with respect to the time and compensation allowed* … the board shall determine to be unreasonable any schedule that does not compensate the franchisee at the franchisee's customary *retail labor rate for the actual time required by a technician of ordinary skill to perform each function* that the franchisee is obligated to perform. (emphasis added)

The fact that the legislature elected to retain the repair time language in section 4517.53, but deleted it from section 4517.52, is an additional indication of the legislative intent <u>not</u> to regulate repair time in the context of warranty reimbursement as set forth in section 4517.52. *See* 2A Sutherland Statutory Construction 46:6 (7th Ed.) ("where the legislature has employed a term in one place and excluded it in another, it should not be implied where excluded." Accordingly, based on plain language and statutory history of ORC 4517.52, the Court should deny Kings' motion for summary judgment and instead enter summary judgment in Chrysler Group's favor

7

dismissing Kings' claim relating to the fixed repair time that Kings insists should be applied to each and every claim for warranty labor submitted by Kings to Chrysler Group.[2]

However, even if ORC 4517.52 somehow could be interpreted to govern repair time, Kings has failed to submit the type of particularized claim to Chrysler Group necessary to put Chrysler Group on notice of the claim and enable Chrysler Group to evaluate and verify the claim. As Kings itself admits, an essential element of a cause of action under ORC 4517.52 is the submission of a claim to the manufacturer and a rejection by the manufacturer of that claim. *See Jim White Agency Co. v. Nissan Motor Corp. in U.S.A.*, 126 F. 3d 832, 836 (6th Cir. 1997); *R & R, Inc. v. Volvo Trucks N. Am.*, 2007 WL 709780, *4 (N.D. Ohio 2007). The only instance that might qualify as a "claim" related to repair time is a single email to Chrysler Group dated November 18, 2011 wherein Kings alleges that it relies on repair times published in a manual by Motor/Alldata. (Nov. 18 Email, Chrysler Group MSJ Ex. 6.) This email does not include a particularized claim, i.e. a claim for a specified amount of time per repair, but simply refers to the time estimates published in the Motor/Alldata Manual. As the Second Circuit explained when discussing a similar statute in New York, the statute "requires that dealers submit claims not in the *abstract*, but for *specific amounts*. Otherwise it is hard to fathom how a manufacturer might approve or disapprove the claim." *Tom Rice Buick-Pontiac GMC v. General Motors Corp.*, 551 F.3d 149, 156 (2d Cir. 2008). Kings has come forward with no evidence that it made any claim for the specific amount of repair time it now seeks. Without a specific claim that includes an actual amount of repair time sought, Chrysler Group would be forced to guess as to

---

[2] The Court should reject Kings' attempt to justify its erroneous interpretation of the statute by arguing that ORC 4517.52 was enacted to protect dealers and therefore should be "construed liberally in favor of dealers." See Kings' Brief at 22. First, the "liberal" construction urged by Kings provides no justification for departing from established standards of statutory construction relied on by Chrysler Group. Second, ORC 4517.52 was not enacted just to protect dealers. In fact, the Sixth Circuit emphasized in interpreting this section that its protections are not intended solely to protect dealers but instead are extend to consumers as well. *See Jim White Agency Co. v. Nissan Motor Corp. in U.S.A.*, 126 F. 3d 832, 836 (6th Cir. 1997). In Jim White, the Court focused on the consumer's interest, not the dealer's interest, in noting that the manufacturer, as the dealer's largest and captive, has the ability to assert market pressure on the dealer to lower its rates for the good of all its customers. *See id.* at 836.

the repair times Kings was seeking; the very speculation the Sixth Circuit sought to prohibit in *Jim White*. *See* 126 F. 3d at 836

### A. The Contract Between the Parties Governs Warranty Repair Time

Unlike the statute, the Dealer Agreement between the parties expressly provides a process for establishing the repair time for warranty repairs performed by a dealer and reimbursed by Chrysler Group. This process is described in detail in the Dealer Policy Manual that is incorporated by reference in the parties' dealer agreements and has been followed by the parties for over two decades. The Dealer Policy Manual provides that:

> [The Dealer] must apply only the time limits published in Chrysler Group's current Labor Operation Time Schedule and authorized Service Bulletins. Published time allowances are developed from repair procedures outlined in the applicable Service Manual, Technical Service Bulletin or Recall. [The dealer] must also keep a full accounting of the actual time spent on warranty and non-warranty work.

(Chrysler Group MSJ Ex. 2 at CG-KINGS001193.)

Chrysler Group provides its dealers, including Kings, with repair times for each warranty repair as well as the steps a technician should follow when conducting that repair. (Quick Labor Operations, Exhibit 7 to July 11, 2013 Deposition of Ralph Vargo, attached as Tab B to Kings Motion for Summary Judgment, at CG-KINGS001222.) These repair times are based on actual time studies conducted on Chrysler Group vehicles, plus additional contingency time to account for unforeseen issues that may arise during the repair. (*Id.* at CG-KINGS001222-23.) The repair times determined by the time studies are reviewed and audited prior to publication to Chrysler Group dealers. (Expert Report of David R. Merta, Exhibit 2 to August 21, 2013 Deposition of David R. Merta, attached as Tab E to Kings Motion for Summary Judgment, at Section V ¶ 3.) Additionally, in the event that a dealer believes that a repair cannot be performed within the time allotted for the repair, Chrysler Group provides a procedure where the dealer can request

9

supplemental repair time and/or ask Chrysler Group to re-study the repair time. (*Id.* at Section V ¶ 4.)

Kings followed the repair time procedure described in the Dealer Agreement and Dealer Policy Manual for over 20 years before alleging in November 2011 for the first time that ORC 4517.52 requires Chrysler Group to pay for the repair times published in the commercial labor manual utilized by Kings. Kings has come forward with no evidence that, at any time during this over 20-year period, it ever asserted that Chrysler Group's payments for warranty labor based on the actual repair time determined by Chrysler Group violated ORC 4517.52.

> **B. Kings' Contention That The Estimated Repair Time Published In The Motor/Alldata Manual Are Reasonable Is Based On Triable Factual Issues That Cannot Be Resolved On Summary Judgment.**

Kings argues erroneously that the estimated repair times published by Motor Information Systems in the Motor/Alldata Manual are reasonable and therefore should be accepted by Chrysler Group in lieu of the actual repair times provided by Chrysler Group. Chrysler Group disagrees and instead submits that the actual repair times it develops from time studies are reasonable. The issue of "reasonableness" is clearly a disputed issue of fact and that can only be resolved by a fact finder, and not as a matter of law. Accordingly, assuming *arguendo* that ORC 4517.52 governs the length of time it takes to complete a repair and that such time allotments must be reasonable, the issue of "reasonableness" as posited by Kings is inherently factual in nature and cannot be resolved on summary judgment.

Kings asserts that the metric for reimbursement of repair time should be the Motor/Alldata Manual; however, the unrebutted evidence from the publisher of the Motor/Alldata Manual is that the estimated repair times contained in that publication are not intended for use by automotive dealers, but instead only by "after-market" repair shops like Midas and Meineke. In contrast to the average after-market shop technician, the skilled dealer-

technician works on the same vehicle models day-after-day, has access to specialized training offered by the manufacturer, and has ready access to the specialized tools necessary to repair these vehicles in the most efficient and effective manner. (*See* July 23, 2013 Deposition of Kevin Carr ("Carr Depo."), excerpts attached as Chrysler Group MSJ Ex. 8, at pp. 93:6-16, 102:13-17.) Thus, the use of the time estimates published in the Motor/Alldata Manual in submitting warranty claims to Chrysler Group is neither fair nor reasonable; indeed, these estimates were never intended for use by dealerships in their warranty work.[3] (*Id.* at pp. 92:25-93:16, 102:5-104:4.)

Furthermore, the unrebutted evidence of record is that the time estimates published by Motor/Alldata are not based on actual time studies of the repairs, but instead on mere estimates. (Carr Depo. at pp. 29:19-31:6 (labor editor evaluates operation and "make[s] an estimate of how long it will take to do that operation" without performing time study.) Indeed, it is undisputed based on Motors' testimony, that its published estimates reflect the amount of time a Motor/Alldata analyst believes the average aftermarket repair shop technician, without any specialized training, tools, or experience in repairing the vehicle at issue, would take to make the repair. (*Id.* at pp. 93:9-16, 102:13-17.) And, Motors concedes that its time estimates are based on the length of time it takes to perform the repair on a nonwarranty vehicle, which is generally older and has more road grime than a "younger" vehicle under warranty. Accordingly, the repair

---

[3] Kings' reliance on a case decided by a Maine trial court is misplaced and should be disregarded by this Court. In *Darling's d/b/a Darling's Auto Mall v. Daimler Chrysler Motors Co. LLC*, Cases No. AP-2003-17 through -20, 2004 Me. Super. LEXIS 132 (Me. Sup. Ct. May 10, 2004), the court ruled under the Maine dealer act that so long as the dealer posted its hourly labor charges and informed consumers of its use of "flat rate pricing," as required by the statute, that the use of the Motor manual was "legally permissible" when calculating its retail labor charges to Chrysler. The court reasoned that if consumers were aware of the use of "flat rate pricing," and felt they were being charged too much then "market forces will make the appropriate correction." In contrast, ORC 4517.52 has no such labor or time posting requirements and consumers have no knowledge that they are charged—and potentially overcharged—for repairs based on a fixed amount of time rather than the actual time it takes to perform the repair. Furthermore, the decision by the Maine court is not binding on this Court and does not reflect decisions from other jurisdictions, like *Marler Ford Co. Inc. v. Ford Motor Co.*, No. 04-CA-342 (5th Cir. Ct. App. La), where the use of actual time as determined by the manufacturer was determined to be "neither unfair nor unreasonable."

time estimate for a nonwarranty vehicle is necessarily longer that the actual time it takes to make the same repair on a vehicle under warranty.

In contrast, the actual repair time as determined by Chrysler Group is based on the time it should take a trained dealer technician to repair a Chrysler model vehicle under a Chrysler Group warranty.  Unlike the Motor/Alldata estimated repair times on nonwarranty vehicles in general, the Chrysler Group repair times are based on actual time studies of repairs on Chrysler Group vehicles, and include contingency time to take into account factors like diagnosing the repair and selecting and gathering tools that Kings argues erroneously are not covered by Chrysler Group's repair times.  Kings also disingenuously suggests that Chrysler Group does not pay for diagnostic time, when Kings is aware that Chrysler Group includes minor on-the-spot diagnostic time in its time allowances and provides additional diagnostic time when needed.  Moreover, should Kings find that it needs more repair time, it can request such time from Chrysler Group— as it has in the past and for which Chrysler Group has paid Kings.

Kings seeks to brush aside these facts by arguing that Motor/Alldata estimated time is the "industry standard" and that fact alone makes it reasonable for use in warranty repairs.  This argument is inherently flawed as it is irrelevant whether the Motor/Alldata time is the "industry standard"; the statute does not govern repair time and even if it did, it has already been established that the Motor/Alldata time is not meant for dealerships or warranty repairs.

And, it is far from clear that the Motor/Alldata Manual is the "industry standard" as asserted by Kings.  In support of its argument, Kings relies on deposition testimony of Ralph Vargo that is taken completely out of context, as Mr. Vargo made clear during his testimony that there is no industry-approved and recognized labor time guide (Vargo Depo. at p. 86:3-14). Even Kings' own President, Robert Reichert admitted that the basis for his belief that the

Motor/Alldata Manual is the "industry standard" is nothing more than his review of the Alldata website and a so-called, but deeply flawed, "survey" by the Ohio Automobile Dealers Association (OADA) that was undertaken at Kings' request specifically for use in this litigation. As described in more detail in "Defendant's Motion in Limine to Exclude Plaintiff's Proposed Expert Reports," the OADA "survey" was impermissibly suggestive in its questioning and had only a 12% response rate.

## II.     Kings Is Not Entitled To Summary Judgment On Its Parts Claims Because It Failed To Satisfy An Essential Element Of Its Claim Under ORC 4517.52—Declaring The Rate Charged For Parts To Its Nonwarranty Customers.

Kings has failed to satisfy an essential element of its claim that it is entitled to a higher markup for parts used in its warranty repairs from December 1, 2011 to July 14, 2013, and therefore Kings is not entitled to judgment as a matter of law. As Kings itself admits, the burden is on the dealer to declare the rate it charges its retail customers for parts and then it shifts to the manufacturer to pay it. *See Jim White*, 126 F. 3d at 836. As made clear by the *Jim White* Court, as discussed *supra*, the manufacturer cannot possibly know what the dealer's rates are until the dealer declares them. Here, Kings failed to meet this burden and therefore its claim fails as a matter of law.

Kings has now advised the Court in its motion for summary judgment that it is willing to accept the reimbursement rate of cost plus 59.13% that Chrysler Group has been paying to Kings since July 2013. (Kings MSJ at pp. 5-6.) The only dispute at this point appears to be the effective date of this reimbursement rate. Chrysler Group submits it is effective July 14, 2013, the date by which Chrysler Group was able to verify Kings' rate based on the retail repair orders Kings belatedly provided to Chrysler Group.[4] Kings, however, contends that the effective date

---

[4] After Kings filed this lawsuit, Chrysler Group approached Kings' counsel to understand what parts markup Kings was requesting. Kings informed Chrysler Group that it sought "MSRP" or a 67% markup.

13

should be December 1, 2011 as Kings maintains that its August 30, 2011 letter to Chrysler Group where it mentioned charging "retail" for parts was tantamount to a request for a markup and Chrysler Group ignored its request.  (*See* Kings MSJ at pp. 13-15.)  However, the mere mention of the word "retail" in a request that was focused almost entirely on a request for a labor rate increased cannot reasonably be understood as the type of particularized claim for an increase in parts reimbursement envisioned by ORC 4517.52 and the case law construing this statute.  And, after mentioning the word "retail" in its August 30, 2011 letter, Kings never mentioned its desire for an increase in parts reimbursement again until it filed this lawsuit in June 2012.  At the very least there is a factual dispute as to what the parties understood the word "retail" to mean in the August 30, 2011 letter, and the issue of the effective date is also clearly a factual issue that cannot be resolved on summary judgment.

## CONCLUSION

For the foregoing reasons, Chrysler Group respectfully requests that Kings' Motion for Summary Judgment be denied.

Respectfully submitted,

/s/  Kurt R. Hunt
Patrick D. Lane (0012704)
Kurt R. Hunt (0084362)
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio  45202
Telephone:  (513) 977-8200
Fax:  (513) 977-8141
Email:  pat.lane@dinsmore.com
Email:  kurt.hunt@dinsmore.com

---

Thereafter, Chrysler Group offered to review the repair orders that Kings already submitted to determine if they supported a rate of 67% but suggested that more recent repair orders might result in a higher rate for Kings.  Kings provided more recent repair orders to Chrysler Group and Chrysler Group determined, based on these repair orders, that it would reimburse Kings for parts used in warranty work at the rate of cost plus 59.13%.  Chrysler Group began paying this rate on July 14, 2013 and Kings has accepted payment at this rate since that date.

and

Robert D. Cultice (*pro hac vice* 8/15/12)
Lucy Heenan Ewins (*pro hac vice* 8/15/12)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA  02109
Telephone:  (617) 526-6000
Fax:  (617) 526-5000
Email:  robert.cultice@wilmerhale.com
Email:  lucy.ewins@wilmerhale.com
***Attorneys for Defendant Chrysler Group, LLC***

**CERTIFICATE OF SERVICE**

I certify that on October 30, 2013, a true and correct copy of the foregoing was filed electronically via the United States District Court for the Southern District of Ohio's CM/ECF electronic filing system, which will send notification of the filing to the following:

Curtis L. Cornett, Esq.
CORS & BASSETT, LLC
537 East Pete Rose Way, Suite 400
Cincinnati, OH  45202

/s/ Kurt R. Hunt