## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **KINGS DODGE, INC. d/b/a** | ) | |
| **KINGS DODGE/CHRYSLER/JEEP** | ) | Civil Action No. 1:12-cv-445 |
| | ) | Judge Timothy S. Black |
| Plaintiff, | ) | |
| | ) | **DEFENDANT CHRYSLER** |
| v. | ) | **GROUP LLC'S RESPONSE TO** |
| | ) | **PLAINTIFF'S STATEMENT OF** |
| **CHRYSLER GROUP, LLC** | ) | **PROPOSED UNDISPUTED** |
| | ) | **FACTS** |
| Defendant. | ) | |
| | ) | |

Pursuant to the Court's Standing Order governing Civil Motions for Summary Judgment Section (A)(2), Defendant Chrysler Group, LLC ("Chrysler Group") submits its Response to Plaintiff Kings Dodge, Inc.'s ("Kings") Statement of Proposed Undisputed Facts:

1.      The relationship between Chrysler and Kings Dodge is governed by a Franchise Agreement.  (Deposition of Robert C. Reichert ("Reichert Dep."), Doc. No. 24 and Appendix. Tab A, at 41.)

**RESPONSE:** Chrysler Group denies this proposed fact.  The relationship between Chrysler Group and Kings Dodge is governed by a series of Dealer Agreements, as described in Paragraph 1 of Chrysler Group's Statement of Proposed Undisputed Facts in Support of Its Motion for Summary Judgment ("Chrysler Group's Proposed Facts").

2.      The Franchise Agreement, and all of the policies promulgated by Chrysler under it, including policies relating to warranty claims and reimbursement, can be changed by one party (Chrysler) at any time and without agreement by the other party (the dealer).  (*Id.* At 45-47).

**RESPONSE:** Chrysler Group denies this proposed fact.  The Dealer Agreements contain no such provision.  (*See* Dealer Agreements, attached as Ex. 1 to the Declaration of Kurt Hunt accompanying Chrysler Group's Motion for Summary Judgment ("Chrysler Group MSJ Ex. 1").)

2566206v4

3.      This Franchise Agreement, as well as Chrysler's Dealer Policy Manual, requires all Chrysler dealers to perform warranty repairs on behalf of Chrysler on all vehicles manufactured by Chrysler, regardless of whether the dealer sold the particular vehicle on which the warranty repairs must be performed.  (Deposition of Ralph Vargo ("Vargo Dep."), Doc. No. 31 and Appendix Tab B, at 59-60; Ex. 4, p. CG-Kings 001177.)

**RESPONSE:** Chrysler Group admits this proposed fact.

4.      Chrysler's policies further prohibit the dealer from charging the customer for these warranty repairs.  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 59-60; Ex. 4, p. CG-Kings 001177.)

**RESPONSE:** Chrysler Group admits this proposed fact.

5.      "Flat rate time" is a practice utilized throughout the automobile industry and determines all of the following:   warranty reimbursement amounts to dealers from manufacturers, technician pay, and consumer retail labor prices.  (Reichert Dep., Doc. No. 24 and Appendix Tab A, at Ex. 23, Deposition of Mark Pittman ("Pittman Dep."), Doc. No. 32 and Appendix Tab C, at 27-28; Deposition of William Jones ("Jones Dep."), Doc. No. 28 and Appendix Tab D, at 39-40; Deposition of David Merta ("Merta Dep."), Doc. No. 33 and Appendix Tab E, at 10.)

**RESPONSE:**  Chrysler Group has no basis to admit or deny this proposed fact.  Chrysler Group states that Kings' citations to the Deposition of William Jones (Doc. 28) and the Deposition of David Merta (Doc. 33) do not support this proposed fact.  Neither Mr. Jones nor Mr. Merta used the phrase "flat rate time," and neither opined as to whether "flat rate time" is "utilized throughout the automobile industry" with respect to specific pricing methods.

2

6.    Under "flat rate time," the technician is paid the hourly rates that he has negotiated with his employer but he is paid that rate only for an established time for each repair, regardless of the amount of time that the repair actually takes to perform.  (Pittman Dep., Doc. No. 32 and Appendix Tab C, at 27-28; Jones Dep., Doc. No. 28 and Appendix Tab D, at 39-40; Merta Dep., Doc. No. 33 and Appendix Tab E, at 10.)

**RESPONSE:** Chrysler Group has no basis to admit or deny this proposed fact.  Chrysler Group is aware that some dealerships choose to compensate their technicians for a flat time per repair for certain repair work, but such technician compensation decisions by a dealership are separate from Chrysler Group's warranty reimbursement system, as described in Chrysler Group's response to Proposed Fact 45 below.

7.    Assigning a flat rate time for each retail repair is necessary for the dealer to be able to comply with Ohio law and provide each consumer with a reliable estimate before a retail repair procedure is performed.  (Reichert Dep., Doc. No. 24 and Appendix Tab A, at Ex. 23.)

**RESPONSE:** To the extent this "proposed fact" seeks to dictate the requirements of Ohio law, it is a proposed statutory interpretation, not a proposed factual finding.  Nevertheless, Chrysler Group disagrees with Kings' interpretation of Ohio law, as no such requirement is set forth in ORC 4517.52.  With respect to Kings' assertion that flat repair times are "necessary for the dealer to . . . provide each consumer with a reliable estimate," Chrysler Group has no basis to admit or deny this proposed fact.  Chrysler Group has no information as to whether Kings is capable of providing its customers reliable estimates based on other information available to it, such as actual repair times.

8.    Chrysler assigns an amount of time for each and every warranty repair and Chrysler only reimburses the dealer for the time Chrysler assigns to each repair, regardless of the amount of time it actually takes the technician to perform the repair.  (Deposition of Gregory Jankowski (Jankowski Dep."), Doc. No. 34 and Appendix Tab F, at 41.)

**RESPONSE:** Chrysler Group denies this proposed fact.  Chrysler Group pays its dealers for the actual completion time for each warranty repair and service, as determined by Chrysler Group's time studies, as described in Paragraph 32 of Chrysler Group's Proposed Facts.  Chrysler Group further allows a dealership to request additional time allowances in the event of "abnormal and

3

unusual conditions" or the need for diagnostic time "over and above minor on-the-spot diagnosis." (Vargo Depo., Ex. 7, CG-KINGS 001222-23.)

9.     If a repair has a warranty flat rate time of 1 hour, but the repair actually takes the technician 2 hours to complete, Chrysler pays the dealer only 1 hour of warranty reimbursement for that repair, and the technician receives only 1 hour of pay for the 2 hours he worked. (*Id.*)

**RESPONSE:** Chrysler Group denies this proposed fact. See Chrysler Group's response to Proposed Fact 8 above. In addition, as described in Chrysler Group's responses to proposed facts 45 and 46 below, dealers are responsible for establishing their own "pay plan and benefits" for technicians independent of Chrysler Group's warranty reimbursement system.

10.     Chrysler arrives at the flat times that it assigns to each warranty repair based on time studies that it performs on its vehicles. (*Id.* At 37-38.)

**RESPONSE:** Chrysler Group admits this proposed fact.

11.     To calculate the flat time Kings Dodge charges for repairs to its retail customers, Kings Dodge utilizes a time guide published by two companies:  Motor Information Systems ("Motor") and Alldata, Inc. ("Alldata"). (Reichert Dep., Doc. No. 24 and Appendix Tab A, at 78-79; 221; Pittman Dep., Doc. No. 32 and Appendix Tab C, at 58.)

**RESPONSE:** Chrysler Group admits this proposed fact based on the information provided by Kings.

12.     The repair times in both the Motor time guide and the Alldata time guide are identical. (Deposition of Timothy Dietler, Doc. No. 35 and Appendix Tab G, at 21-22, 27; Deposition of Kevin Carr, Doc. No. 25 and Appendix Tab H, at 41-45.)

**RESPONSE:** Chrysler Group admits this proposed fact.

13.     The times allotted for repairs by the Alldata/Motor time guide average approximately twice as long as the Chrysler warranty times. (Reichert Dep., Doc. No. 24 and Appendix Tab A, at 33-34; Ex. 23; Pittman Dep., Doc. No. 32 and Appendix Tab C, at 31.)

4

**RESPONSE:** Chrysler Group admits this proposed fact. However, the flat times published in the Motor/Alldata Manual are not intended to be used for automotive dealership repair and service work. (Carr Depo. at 92:25-93:16, 102:5-104:4.)

14.     Chrysler's own outside expert, retained for purposes of this litigation, agrees that the Alldata/Motor time guide provides, on average, twice as much time for the dealer to perform repairs than Chrysler's warranty time. (Merta Dep., Doc. No. 33 and Appendix Tab E, at 86-87; Ex. 2.)

**RESPONSE:** Chrysler Group admits this proposed fact. However, Mr. Merta also explained that "the time allotments published by Alldata/Motor are designed for vehicles post-warranty," and "the time it takes to complete a post-warranty repair is typically longer than the time it takes to complete a warranty repair." (Merta Report, Exhibit 2 to August 21, 2013 Deposition of David R. Merta, attached as Tab E to Kings Motion for Summary Judgment, at Section VI ¶ 5.)

15.     On August 30, 2011, over 9 months before plaintiff commenced the instant litigation, Kings Dodge's majority owner, president, and general counsel Robert Reichert ("Reichert"), wrote Chrysler's Parts and Service Area Manager Maria Barrow and expressly placed Chrysler on notice that plaintiff believed Chrysler was not reimbursing it for parts and labor used in warranty work at the same rate as plaintiff charged its retail customers. (Vargo Dep., Doc. No. 31 and Appendix Tab B, at Ex. 8.)

**RESPONSE:** Chrysler Group denies this proposed fact. The letter, sent with the subject line of "Kings Dodge, Inc. Warranty Labor Rate," notified Chrysler Group that Kings believed Chrysler Group was "not compensating [Kings] for warranty work at the rate that the dealership charges retail customers for similar non-warranty work." (Complaint, Ex. A.) The letter sought an increase in the hourly warranty labor rate but did not request a specific rate increase in its parts markup reimbursement rate. (*See* Chrysler Group's Proposed Facts, ¶ 37.)

16.     In response to this letter, Chrysler required plaintiff to verify the hourly labor rate it charged its retail customers by submitting 200 consecutive retail repair orders to Chrysler and by completing a spreadsheet that Chrysler provided plaintiff. (*Id.* at Exs. 3, 10.)

**RESPONSE:** Chrysler Group admits that it asked Kings to provide 200 consecutive customer pay service repair orders, as agreed in the Dealer Agreements and Manual, to support Kings'

5

request for an increased labor rate of $92.00, as described in Paragraph 13 of Chrysler Group's Proposed Facts.

17.    Kings Dodge fully complied with Chrysler's request in this regard as Chrysler's own witnesses have acknowledged that, with respect to plaintiff's warranty labor rate increase, plaintiff provided Chrysler all of the documentation that Chrysler requested.  (*Id.* at 39; Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 29-30, Ex. 18.)

**RESPONSE:** Chrysler Group denies this proposed fact.  Kings submitted 200 customer repair orders as required by the Dealer Agreements and Manual, but that documentation supported neither the $92.00 labor rate Kings requested in its August 30, 2011 letter nor the $84.78 labor rate Kings requested in its September 30, 2011 letter.  (*See* Chrysler Group's Proposed Facts, ¶¶ 15-16.)

18.    After reviewing the materials submitted by plaintiff, Chrysler determined what plaintiff's "average effective retail labor rate" equaled and Chrysler increased plaintiff's warranty hourly labor rate accordingly.  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 38.)

**RESPONSE:** Chrysler Group admits this proposed fact.

19.    Chrysler did not adjust the time it allotted for warranty repairs in any respect.  (*Id.* at 31.)

**RESPONSE:** Chrysler Group admits this proposed fact.

20.    On November 18, 2011, Reichert again wrote Chrysler after he was notified of the hourly rate increase and expressly informed Chrysler that Chrysler's practice in this regard still violated Ohio law, even after the hourly increase was given.  (Jankowski Dep., Doc. No. 34 and Appendix Tab F, at Ex. 19.)

**RESPONSE:** Chrysler Group admits that, in the email in question, Mr. Reichert informed Chrysler Group that it was his position that "[t]he labor rate meets part of the requirement," but that "[i]n order to fully comply with Ohio law we must use the retail time for warranty repairs." (Nov. 18 Email, Chrysler Group MSJ Ex. 6.)  Chrysler Group disagrees with Mr. Reichert's interpretation of the law.  To the extent that this proposed fact suggests that Kings previously notified Chrysler Group that Kings believed that Chrysler Group's repair times violate Ohio law,

6

Chrysler Group denies this suggestion. November 18, 2011 was the first time that Kings objected to the labor repair times it received from Chrysler Group.

21. As noted in Reichert's November 18, 2011 letter, the 200 consecutive repair orders provided to Chrysler by plaintiff contained the labor times that plaintiff charged for its retail repairs, thereby providing Chrysler with verification that plaintiff does, in fact, charge those times. (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 22.)

**RESPONSE:** Chrysler Group admits that consecutive repair orders provided by Kings contain information related to time charged to retail customers by Kings. However, Chrysler Group denies that this information "provid[ed] Chrysler with verification that plaintiff does, in fact, charge those times." Because Kings had not requested any alteration to repair time calculations, Chrysler Group had nothing to "verify." Furthermore, proper verification of specific repair times may have required more information than was present in that limited set of repair orders, such as multiple repair orders related to specific kinds of repairs.

22. Chrysler did absolutely nothing in response to Reichert's November 18, 2011 letter. (*Id.* at 118-19; Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 37.)

**RESPONSE:** Chrysler Group denies this proposed fact. Gregory Jankowski forwarded the communication to Ralph Vargo in Chrysler Group's warranty group. (Jankowski Depo. at p. 37:6-11.) Mr. Vargo and Mr. Jankowski discussed the communication, and Mr. Vargo forwarded it to Chrysler Group's legal department. (Vargo Depo. at pp. 117:17-118:9.)

23. Chrysler never responded to the portion of Reichert's August 30, 2011 letter which requested a parts reimbursement increase. (Reichert Dep., Doc. No. 24 and Appendix Tab A, at 90-91, 94; Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 20, 61.)

**RESPONSE:** Chrysler Group denies this proposed fact. As described in Chrysler Group's response to Proposed Fact 15 above, the letter in question did not request a specific rate increase in Kings' parts markup reimbursement rate.

24. Chrysler did not increase the amount it was reimbursing plaintiff for parts used by plaintiff in warranty repairs. (Reichert Dep., Doc. No. 24 and Appendix Tab A, at 90-91, 94.)

**RESPONSE:** Chrysler Group admits this proposed fact.

25.    Chrysler continued to reimburse plaintiff for parts used in warranty repairs at the rate of dealer cost plus 40%.  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 73-74; Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 60.)

**RESPONSE:** Chrysler Group denies this proposed fact.  Chrysler Group continued to reimburse Kings for parts used in warranty repairs at dealer cost plus 40% as provided for in the Dealership Agreements and Manual, until Kings requested a specific rate increase in its parts reimbursement rate and provided the necessary supporting documentation.  (Vargo Depo. at pp. 73:17-74:10.) After Kings made that request and provided the necessary documentation (which was after this litigation began), Chrysler Group began reimbursing Kings at a warranty parts reimbursement rate of cost plus 59.13%.  (*See* Chrysler Group's Proposed Facts, ¶¶ 38-40.)

26.    Chrysler had all the information available to it regarding the prices plaintiff actually charged its retail customers for parts on the 200 retail repair orders that Kings Dodge submitted in the Fall of 2011.  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 83; Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 62-64.)

**RESPONSE:** Chrysler Group denies this proposed fact.  Kings failed to declare its parts reimbursement rate to Chrysler Group and therefore Chrysler Group did not have the information necessary to verify the rate Kings charged to its retail customers.

27.    Plaintiff did everything necessary to obtain a parts increase except that Reichert used the word "retail" in his August 30, 2011 letter instead of the words "list" or "MSRP". (Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 60-61.)

**RESPONSE:** Chrysler Group denies this proposed fact.  As described in Chrysler Group's response to Proposed Fact 15 above, Kings did not request a specific rate increase in its parts markup reimbursement rate until after it filed this Complaint.  (*See also* Jankowski Depo. at pp. 60:20-61:20 ("There was no number there that said, you know, he wanted X percentage as he represented in his labor request.").)

28.    In the Spring of 2013, Chrysler permitted plaintiff to submit another series of retail repair orders and, after reviewing those repair orders, Chrysler increased its warranty reimbursement to plaintiff to dealer cost plus 59.13% (an increase of over 19%), effective July 14, 2013.  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 78-79.)

8

**RESPONSE:** Chrysler Group admits this proposed fact.  This request for customer pay repair orders and subsequent increase in warranty parts reimbursement rate happened during the course of this litigation, when Kings first requested a specific rate increase in its part markup reimbursement rate.

29.     Plaintiff has not changed the prices it has charged its retail customers for parts from the Fall of 2011 until the present.  (Reichert Decl., Appendix Tab 1, at ¶ 3).

**RESPONSE:** Chrysler Group does not have sufficient information to either admit or deny this proposed fact.

30.     The difference between the dealer cost, plus 59.13% reimbursement for parts since December 1, 2011 until July 14, 2013, instead of the dealer cost plus 40% which it received from Chrysler during that time period, equals $134,354.00 in damages suffered by plaintiff.  (*Id.* at ¶ 6; Ex. 1.)

**RESPONSE:** Chrysler Group denies this proposed fact.  As described in Chrysler Group's responses to Proposed Facts 15, 25, 27, and 28 above, Kings did not properly request an increase in warranty parts reimbursement rate until after it filed its Complaint in this case.  Once Kings made this request and provided the necessary support, Chrysler Group increased Kings' warranty parts reimbursement rate.  Accordingly, Plaintiff suffered no damages attributable to the warranty parts reimbursement rate.

31.     Plaintiff utilizes the Alldata/Motor time guide for all its retail repairs (Pittman Dep., Doc. No. 32 and Appendix C, at 29-31, 58; Reichert Dep., Doc. No. 24 and Appendix Tab A, at 78-79, 221).

**RESPONSE:** Chrysler Group admits this proposed fact.

32.     Chrysler does not reimburse plaintiff for the amount of time provided in the Alldata/Motor time guide for plaintiff's warranty repairs.  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 38-39, 57-58.)

**RESPONSE:** Chrysler Group admits this proposed fact.

2566206v4

33.     The Alldata/Motor time guide is one of the most widely used time guides in the automotive industry, having over 80,000 customers (Reichert Dep., Doc. No. __ and Appendix Tab A, at 209-212; Ex. 23).

**RESPONSE:** Chrysler Group admits that Motors/Alldata is used in the automotive industry for certain types of repair and service work.  Chrysler Group has no basis to admit or deny the number of Motors/Alldata customers.

34.     The Alldata/Motor time guide is used by more Ohio Automobile Dealers than any other aftermarket time guide.  (August 13, 2012 Deposition of Robert Reichert, Doc. No. 27 and Appendix Tab J, at 10-11; Ex. 1.)

**RESPONSE:** Chrysler Group denies this proposed fact.  Nothing in the record establishes this proposed fact.  The documents relied on by Kings demonstrate only that some respondents to a biased, informal email survey self-identified as Motor/Alldata customers.

35.     The Alldata/Motor time guide is utilized by Chrysler itself in connection with its service contracts and fleet contracts.  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 85-87; 96-97; Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 32-33; 65.)

**RESPONSE:** Chrysler Group denies this proposed fact.  Chrysler Group does not "utilize" the Motor/Alldata time guide.  In the context of non-Chrysler vehicles with Chrysler service contracts, the Dealer Agreements and Manual provide that dealerships must support their time with an industry-approved and recognized time guide, which can include circumstances in which the dealership relies on the Motor/Alldata guide.  (Vargo Depo. at pp. 85:7-87:1; Jankowski Depo. at pp. 32:25-33:7.)  Chrysler Group does not reimburse for labor based on Motor/Alldata time guides in any other circumstance.  (Vargo Depo. at pp. 87:6-87:18; Jankowski Depo. at p. 33:8-10.)  In the context of certain fleet contracts, Chrysler Group acts as a conduit to ensure payment (but does not itself reimburse any entity) where the dealership supports their time with an industry-approved and recognized time guide, which can include circumstances in which the dealership relies on the Motor/Alldata guide.  (Vargo Depo. at pp. 95:23-97:10.)

36.     Chrysler recognizes that the Alldata/Motor time guide is an "industry-approved and recognized labor time guide".  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at 86-87.)

**RESPONSE:** Chrysler Group admits that some dealerships choose to use the Motors/Alldata time guide; however, as explained by Mr. Merta, "the time allotments published by Alldata/Motor are designed for vehicles post-warranty," and "the time it takes to complete a

10

post-warranty repair is typically longer than the time it takes to complete a warranty repair." (Merta Report, at ¶ 5.) In addition, the flat times published in the Motor/Alldata Manual are not intended to be used for automotive dealership repair and service work. (Carr Depo. at pp. 92:25-93:16, 102:5-104:4.)

37. Chrysler is aware that "dealers throughout the country" utilize the Alldata/Motor time guide. (Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 32.)

**RESPONSE:** Chrysler Group admits that some dealerships choose to use the Motors/Alldata time guide; however, as explained by Mr. Merta, "the time allotments published by Alldata/Motor are designed for vehicles post-warranty," and "the time it takes to complete a post-warranty repair is typically longer than the time it takes to complete a warranty repair." (Merta Report, at ¶ 5.) In addition, the flat times published in the Motor/Alldata Manual are not intended to be used for automotive dealership repair and service work. (Carr Depo. at pp. 92:25-93:16, 102:5-104:4.)

38. Chrysler's expert witness in this matter, David Merta, has "no concern" with a dealer using Alldata/Motor time for retail repairs. (Merta Dep., Doc. No. 33 and Appendix Tab E, at 92.)

**RESPONSE:** Chrysler Group admits this proposed fact.

39. Motor uses a highly qualified board of automotive technicians to develop the repair times it publishes in the Alldata/Motor time guide, and it analyzes a variety of factors in developing these times including: Vehicle component configuration; Operation Procedure Steps; Technician Operation Familiarity; User Input; Motor Historical Database Analysis; Manufacturer Warranty Times; Operation Observance. (Carr Dep., Doc. No. 25 and Appendix Tab H, at 24-26; Ex. 2, p. Motor 04.)

**RESPONSE:** Chrysler Group has no basis to admit or deny whether Motors uses a "highly qualified board of automotive technicians" when developing its repair times. Chrysler Group admits that an Alldata/Motor analyst develops repair times based on the factors listed above and not based on actual time studies.

40. The following facts related to Chrysler's time studies are undisputed:

11

        i.      The time studies are never performed at a dealership.  (Jones Dep., Doc. No. 28 and Appendix Tab D, at 13-14.)

**RESPONSE:** Chrysler Group admits this proposed fact.

        ii.     The time studies are performed at what Chrysler's Warranty Manager describes as a "labor time study lab."  (Jankowski Dep., Doc. No. 34 and Appendix Tab F, at 38.)

**RESPONSE:** Chrysler Group denies this proposed fact.  Mr. Jankowski testified that he "believe[s]" the time studies are performed in a "labor time study lab at Chrysler" but admitted "I'm not certain on that."  (Jankowski Depo. at p. 38:17-22.)  In fact, Chrysler's time studies are performed in two "Time Study garages" in Southeastern Michigan.  (Jones Depo. at pp. 13:22-14:14.)

        iii.    Before the time study begins, the technician already knows the repair he is about to perform.  (Jones Dep., Doc. No. 28 and Appendix Tab D, at 20-21.)

**RESPONSE:** Chrysler Group admits this proposed fact.

        iv.    Diagnosis of the repair to be performed is not a part of the time study.  (*Id.*)

**RESPONSE:** Chrysler Group denies this proposed fact.  Minor on the spot diagnosis is included in the time study.  (Jones Depo. at pp. 20-21; Quick Labor Operations, Exhibit 7 to July 11, 2013 Deposition of Ralph Vargo, attached as Tab B to Kings Motion for Summary Judgment, at CG-KINGS001222.)  Additional diagnostic time is paid separately from the repair times developed through time studies.  (Quick Labor Operations at CG-KINGS001222-23.)

        v.    All of the parts and tools are already in the technician's work area before the time study begins.  (*Id.* at 21-22, 31.)

**RESPONSE:** Chrysler Group denies this proposed fact.  The specialized tools are not in the technician's work area before the time study begins.  (Jones Depo. at p. 21.)  Supplemental time is added to the time study to account for gathering additional tools.  (Quick Labor Operations at CG-KINGS001222.)

        vi.    There is never any time allotted for a technician to leave his work area for any reason.  (*Id.* at 30.)

**RESPONSE:** Chrysler Group denies this proposed fact.  The contingency time added to a time study "includes time to obtain service order, select special service tools, obtain service publications, mechanics personal relief time," and more.  (Quick Labor Operations at CG-KINGS001222.)

12

      vii.   The vehicle on which the repair is to be performed is already in the garage before the time study begins, and that vehicle is backed out of the garage only after the time study ends.  (*Id.* at 24.)

**RESPONSE:**  Chrysler Group admits this proposed fact.

      viii.   Road testing to ensure that the vehicle was correctly repaired is almost never part of a time study.  (*Id.* at 22-23.)

**RESPONSE:**  Chrysler Group denies this proposed fact.  Road test time is included in the time allotments whenever a service bulletin identifies "issues such as lead or vibration . . . ."  (Jones Depo. at p. 22:10-15.)  In such cases, road testing is part of the "diagnostics for that particular issue . . . ."  (*Id.* at p. 22:20-22.)  Road testing is only excluded from the time allotment if road testing is not identified as part of the operation being performed.  (*Id.* at pp. 22:23-23:2.)

      ix.   All initial time studies are performed on "pre-production" vehicles; meaning those vehicles that are so new that they have not yet even been delivered to dealers.  (*Id.* at 24-25.)

**RESPONSE:**  Chrysler Group denies this proposed fact.  The only time studies that take place on pre-production vehicles are those where it is a brand new vehicle with new components that have never been time studied.  (Jones Depo. at pp. 24-25.)

    41.   When a dealer performs repairs, its technicians must do all of the following: drive vehicles in and out of the service area; diagnose what is wrong with the vehicle; obtain the necessary tools and retrieve the necessary parts from the parts department; and then road test the vehicle to ensure that the problem with the vehicle has been repaired.  (*Id.* at 28-29.)

**RESPONSE:**  Chrysler Group admits this proposed fact.  Chrysler Group states further that the contingency time it adds to time studies accounts for these actions, which may vary tremendously from dealer-to-dealer.

    42.   Chrysler's "supplemental time" does not adequately compensate dealers for all of the activities normally associated with warranty repairs.  (Vargo Dep., Doc. No. 31 and Appendix Tab B, at Ex. 7, CG-Kings 001222.)

**RESPONSE:**  Chrysler Group denies this proposed fact.  As described in Paragraph 32 of Chrysler Group's Proposed Facts, Chrysler Group pays its dealers for the actual completion time for each warranty repair and service, as determined by Chrysler Group's time studies.  In

addition to the working time allowances, Chrysler Group adds a "supplemental time allowance" to reimburse for "time to obtain service order, select special service tools, obtain service publications, mechanics personal relief time and minor on-the-spot diagnosis." (Quick Labor Operations at CG-KINGS001222.) It also provides for additional time allowances in the event of "abnormal and unusual conditions" or the need for diagnostic time "over and above minor on-the-spot diagnosis." (*Id.* at CG-KINGS 001222-23.)

43.     Chrysler believes that the costs associated with typical activities related with

warranty repairs such as diagnosis, road testing, and moving vehicles in and out of the service

area should be "built into the dealership's labor rate." (*Id.* at 100-01.)

**RESPONSE:** Chrysler Group denies this proposed fact.  As described in Chrysler Group's response to Proposed Facts 42 above, Chrysler Group reimburses for diagnosis (both "minor on-the-spot diagnosis" as well as diagnosis "above minor on-the-spot diagnosis").  Other described activities, such as major diagnosis, road testing, processing claims, parts packaging, shuttling vehicles, service management, etc., are covered under Chrysler Group's Plan 2 formula labor rate.  Under Plan 1, the Dealer Agreements and Manual explicitly provide that Chrysler Group expects that "the dealer's calculation of his retail rate takes into account the reimbursement for these cost items."  Kings chose to elect reimbursement at the Plan 1 rate.

44.     Because of the warranty policies promulgated by Chrysler, the dealers must either

absorb a significant loss on the warranty side of the business, or they must pass the cost onto

their retail customers. (*See id.*; *see also* Reichert Dep., Doc. No. 24 and Appendix Tab A, at

269-70; Ex. 23.)

**RESPONSE:** Chrysler Group denies this proposed fact.  As described in Paragraph 32 of Chrysler Group's Proposed Facts, Chrysler Group pays its dealers for the actual completion time for each warranty repair and service, as determined by Chrysler Group's time studies.

45.     Technicians make less money performing warranty repairs than retail repairs

since they do not have the same amount of time to perform warranty repairs as retail repairs.

(Reichert Dep., Doc. No. 24 and Appendix Tab A, at 271-72; Jones Dep., Doc. No. 28 and

Appendix Tab D, at 50-51.)

**RESPONSE:** Chrysler Group denies this proposed fact.  As set forth in the Dealer Agreements and Manual, technician compensation is "dependent upon the Dealer's specific pay plan and benefits."  (Quick Labor Operations at CG-KINGS001222.)

14

46.    Chrysler instructs its dealers in its Dealer Policy Manual not to pay its technicians less for warranty repairs than customer pay work because "this often leads to poor workmanship, diminished quality . . ., and billing irregularities." (Vargo Dep., Doc. No. 31 and Appendix Tab B, at Ex. 4, p. CG-Kings 001168.)

**RESPONSE:** Chrysler Group admits this proposed fact.

47.    Chrysler has established a warranty reimbursement system which guarantees that the dealer's technicians receive less pay for warranty work than customer pay work, despite Chrysler's admonition to dealers not to engage in that very practice. (*Id.*)

**RESPONSE:** Chrysler Group denies this proposed fact. As described in Chrysler Group's response to Proposed Fact 45 above, its warranty reimbursement system is independent of a dealership's decisions on how to compensate its technicians.

48.    Plaintiff's technicians cannot complete most repairs within the Chrysler warranty time. (Pittman Dep., Doc. No. 32 and Appendix Tab C, at 31-32, 104-07; Reichert Dep., Doc. No. 24 and Appendix Tab A, at 143-45, 271-72; Declaration of Jerry E. Wolf, Appendix Tab K, at ¶ 4; Declaration of James C. Meyer, Appendix Tab L, at ¶ 5).

**RESPONSE:** Chrysler Group admits that Kings' witnesses have represented that Kings' technicians cannot complete some warranty repairs within the times established by Chrysler Group. However, Chrysler Group's time allowances are based on carefully calculated time studies and, as described in the Dealer Manual, they "are sufficient to permit the work to be performed properly in large or small dealerships on all repairs or replacements of factory approved parts." (Quick Labor Operations at CG-KINGS001222.) William Jones, for example, testified that he can perform the repairs within Chrysler's allotted time. (Jones Depo. at p. 40:8-23.)

## DISPUTED ISSUES OF MATERIAL FACT

As set forth in more detail in its Motion for Summary Judgment and its Opposition to Kings Dodge, Inc.'s Motion for Summary Judgment, Chrysler Group maintains that there are no

genuine issues of material fact in this case. However, Kings has injected numerous genuine issues of material fact into its argument that it cannot overcome on summary judgment.

Specifically, Kings attempts to create a reasonableness standard that does not exist in the relevant statute. Kings also erroneously attempts to apply the statute in question to repair time calculations. Finally, Kings has raised questions about the appropriate effective date of the higher parts reimbursement rate it now receives from Chrysler Group.

The following facts material to Kings' argument remain disputed:

1.      Whether Chrysler Group reimburses Kings an assigned amount per repair "regardless of the amount of time it actually takes the technician to perform the repair." (*See* Chrysler Group's Responses to Proposed Facts 8 and 9, *supra*.)

2.      Whether, on August 30, 2011, Kings "expressly placed Chrysler on notice that plaintiff believed Chrysler was not reimbursing it for parts . . . used in warranty work at the same rate as plaintiff charged its retail customers." (*See* Chrysler Group's Response to Proposed Fact 15, *supra*.)

3.      Whether, on August 30, 2011, Kings "expressly placed Chrysler on notice that plaintiff believed Chrysler was not reimbursing it for" the appropriate amount of repair time for services and repairs. (*See* Chrysler Group's Responses to Proposed Facts 15 and 20, *supra*.)

4.      Whether the 200 repair orders provided by Kings to Chrysler Group to support its labor rate reimbursement request "provid[ed] Chrysler with verification" of Kings' repair times. (*See* Chrysler Group's Response to Proposed Fact 21, *supra*.)

5.      Whether the 200 repair orders provided by Kings to Chrysler Group to support its labor rate reimbursement request included "all the information . . . regarding the prices plaintiff

16

actually charged its retail customers for parts . . . ."  (*See* Chrysler Group's Response to Proposed Fact 26, *supra*.)

6.      Whether Kings "did everything necessary to obtain a parts increase except that Reichert used the word 'retail' in his August 30, 2011 letter instead of the words 'list' or 'MSRP'."  (*See* Chrysler Group's Response to Proposed Fact 27, *supra*.)

7.      Whether Kings has "changed the prices it has charged its retail customers for parts from the Fall of 2011 until the present."  (*See* Chrysler Group's Response to Proposed Fact 29, *supra*.)

8.      Whether the Motors/Alldata time guide is a widespread industry standard, whether it is used by Chrysler Group itself, and the degree of its adoption by dealerships across Ohio and "throughout the country."  (*See* Chrysler Group's Responses to Proposed Facts 33-37, *supra*.)

9.      Whether the Motors/Alldata time guide is developed in a reliable or arbitrary manner.  (*See* Chrysler Group's Response to Proposed Fact 39, *supra*.)

10.      Whether the Motors/Alldata time guide is appropriate to rely on for the purposes of warranty services and repairs.  (*See* Chrysler Group's Responses to Proposed Facts 36 and 39, *supra*.)

11.      Whether Chrysler Group's time studies are performed in a reliable or arbitrary manner.  (*See* Chrysler Group's Response to Proposed Fact 40, *supra*.)

12.      Whether Chrysler Group's time studies are appropriate to rely on for the purposes of warranty services and repairs.  (*See* Chrysler Group's Response to Proposed Fact 40, *supra*.)

13.      Whether Chrysler Group's repair times, as calculated in its time studies and adjusted as described in the time documentation (by, *e.g.*, adding supplemental time, extended

17

diagnostic allotments, and allotments for abnormal and unusual conditions), properly compensates Kings for warranty services and repairs.  (*See* Chrysler Group's Responses to Proposed Facts 41-43, *supra*.)

14. Whether Chrysler Group's warranty reimbursement system "guarantees that the dealer's technicians receive less pay for warranty work than customer pay work . . . ."  (*See* Chrysler Group's Responses to Proposed Facts 45 and 47, *supra*.)

15. Whether Kings' "technicians cannot complete most repairs within the Chrysler warranty time."  (*See* Chrysler Group's Response to Proposed Fact 48, *supra*.)

Respectfully submitted,

/s/  Kurt R. Hunt
Patrick D. Lane (0012704)
Kurt R. Hunt (0084362)
DINSMORE & SHOHL LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio  45202
Telephone:  (513) 977-8200
Fax:  (513) 977-8141
Email:  pat.lane@dinsmore.com
Email:  kurt.hunt@dinsmore.com

and

Robert D. Cultice (*pro hac vice* 8/15/12)
Lucy Heenan Ewins (*pro hac vice* 8/15/12)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Defendant Chrysler Group, LLC*

## <u>CERTIFICATE OF SERVICE</u>

       I certify that on October 30, 2013, a true and correct copy of the foregoing was filed electronically via the United States District Court for the Southern District of Ohio's CM/ECF electronic filing system, which will send notification of the filing to the following:

Curtis L. Cornett, Esq.
CORS & BASSETT, LLC
537 East Pete Rose Way, Suite 400
Cincinnati, OH  45202


                           /s/ Kurt R. Hunt

2567243v2

19

2566206v4