UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KINGS DODGE, INC. d/b/a,      :      Case No. 1:12-cv-445
KINGS DODGE/CHRYSLER/JEEP,    :
                              :
      Plaintiff,              :      Judge Timothy S. Black
vs.                           :
                              :
CHRYSLER GROUP, LLC,          :
                              :
      Defendant.              :

**ORDER: (1) DENYING DEFENDANT'S MOTION IN LIMINE (Doc. 38);
(2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 36);
(3) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 39); and (4) CLOSING THIS CASE**

This civil action is before the Court on the parties' cross-motions for summary

judgment (Docs. 36, 39) and responsive memoranda (Docs. 45, 46, 52, 53). Also before

the Court is Defendant's motion *in limine* (Doc. 38) and the parties' responsive

memoranda (Docs. 42, 47). Two *Amicus Curiae* briefs (Docs. 29 and 51) were also filed,

one from The Ohio Automobile Dealers Association[1] (in support of Plaintiff) and the

Alliance of Automobile Manufacturers[2] (in support of Defendant).

---

[1] The Ohio Automobile Dealers Association ("OADA") represents approximately 830 franchised automobile dealers throughout Ohio. The OADA has served the franchised motor vehicle dealer industry since 1932, promoting the common interests of the retail automotive industry. (Doc. 29 at 2).

[2] The Alliance is a nonprofit trade association comprised of twelve members who are manufacturers and/or distributors of passenger cars and light trucks and who collectively account for over 75% of all car and light truck sales in the United States. The purpose of the Alliance is to advance the common interests of its members engaged in manufacturing, importing, and/or selling motor vehicles in the United States. The Alliance also articulates and advocates its members' interests before the public as well as the legislative, administrative, and judicial branches of local, state, and national governments. (Doc. 51 at 2-3).

# I.   BACKGROUND FACTS

Plaintiff brought this action pursuant to Ohio Revised Code Section 4517.52 to compel Defendant to pay Plaintiff more money for warranty repairs and servicing of Chrysler's vehicles.  Plaintiff is seeking to recover damages for alleged violations of Ohio Revised Code Section 4517.52 (Count I) and unjust enrichment (Count II).  Plaintiff maintains that Defendant violated Section 4517.52 in three ways: (1) by failing to pay Plaintiff the same hourly rate for warranty labor that Plaintiff charges its retail customers for nonwarranty labor; (2) by failing to pay Plaintiff the same amount for parts used in warranty work that Plaintiff charges its retail customers for nonwarranty work; and (3) by failing to pay Plaintiff "fixed time" for each warranty repair and service that Plaintiff provides its warranty customers.  (Doc. 1 at ¶ 7).  Conversely, Defendant maintains that the plain language of the statute provides nothing about repair and service times, and, therefore, Defendant is entitled to summary judgment.

## II. PLAINTIFF'S UNDISPUTED FACTS[3]

1. The Franchise Agreement, as well as Chrysler's Dealer Policy Manual, requires all Chrysler dealers to perform warranty repairs on behalf of Chrysler on all vehicles manufactured by Chrysler, regardless of whether the dealer sold the particular vehicle on which the warranty repairs must be performed.  (Doc. 31 at 59-60, Ex. 4 at CG-Kings 001177).

2. Chrysler's policies further prohibit the dealer from charging the customer for these warranty repairs.  (Doc. 31 at 59-60, Ex. 4 at CG-Kings 001177).

---

[3]  *See* Doc. 36, Ex. 1 and Doc. 46, Ex. 2.

3. Chrysler arrives at the flat times that it assigns to each warranty repair based on time studies that it performs on its vehicles.  (*Id.* at 37-38).

4. To calculate the flat time Kings Dodge charges for repairs to its retail customers, Kings Dodge utilizes a time guide published by two companies: Motor Information Systems ("Motor") and Alldata, Inc. ("Alldata").  (Doc. 24 at 78-79, 221; Doc. 32 at 58).

5. The labor times in both the Motor time guide and the Alldata time guide are identical.  (Doc. 35 at 21-22, 27; Doc. 25 at 41-45).

6. The times allotted for repairs by the Alldata/Motor time guide average approximately twice as long as the Chrysler warranty times.  (Doc. 24 at 33-34; Ex. 23; Doc. 32 at 31).[4]

7. Defendant's own outside expert, retained for purposes of this litigation, agrees that the Alldata/Motor time guide provides, on average, twice as much time for the dealer to perform repairs than Chrysler's warranty time.  (Doc. 33 at 86-87, Ex. 2).[5]

8. In response to Plaintiff's August 30, 2011 letter, Defendant required Plaintiff to verify the hourly labor rate it charged its retail customers by submitting 200 consecutive retail repair orders to Defendant and by completing a spreadsheet that Defendant provided Plaintiff.  (*Id.*, Exs. 3, 10).[6]

9. After reviewing the materials submitted by Plaintiff, Defendant determined what Plaintiff's "average effective retail labor rate" equaled, and Defendant increased Plaintiff's warranty hourly labor rate accordingly.  (Doc. 31 at 38).

---

[4]  Defendant states that the flat times published in the Motor/Alldata Manual are not intended to be used for automotive dealership repair and service work.  (Doc. 25 at 92-93, 102-104).

[5]  Mr. Merta also explained that "the time allotments published by Alldata/Motor are designed for vehicles post-warranty," and "the time it takes to complete a post-warranty repair is typically longer than the time it takes to complete a warranty repair."  (Doc. 33, Ex. 2 at Section VI ¶ 5).

[6]  Defendant admits that it asked Plaintiff to provide 200 consecutive customer pay service repair orders, as agreed in the Dealer Agreements and Manual, to support Plaintiff's request for an increased labor rate of $92.00.

10. Defendant did not adjust the time it allotted for warranty repairs in any respect. (*Id.* at 31).

11. On November 18, 2011, Robert Reichert, Kings Dodge's majority owner, president, and general counsel, again wrote Defendant after he was notified of the hourly rate increase and expressly informed Defendant that its practice in this regard still violated Ohio law, even after the hourly increase was given.  (Doc. 34, Ex. 19).[7]

12. As noted in Reichert's November 18, 2011 letter, the 200 consecutive repair orders provided to Defendant by Plaintiff contained the labor times that Plaintiff charged for its retail repairs, thereby providing Defendant with verification that Plaintiff does, in fact, charge those times.  (Doc. 31 at 22).[8]

13. Defendant did not increase the amount it was reimbursing Plaintiff for parts used by Plaintiff in warranty repairs.  (Doc. 24 at 90-91, 94).

14. In the Spring of 2013, Defendant permitted Plaintiff to submit another series of retail repair orders and, after reviewing those repair orders, Defendant increased its warranty reimbursement to Plaintiff to dealer cost plus 59.13% (an increase of over 19%), effective July 14, 2013.  (Doc. 31 at 78-79).[9]

---

[7]  Defendant admits that in the email in question, Mr. Reichert informed Defendant that it was his position that "[t]he labor rate meets part of the requirement," but that "[i]n order to fully comply with Ohio law we must use the retail time for warranty repairs."  (Doc. 39, Ex. 6). Defendant disagrees with Mr. Reichert's interpretation of the law, and to the extent this proposed fact suggests that Plaintiff previously notified Defendant that it believed that Defendant's repair times violate Ohio law, Defendant denies this suggestion.  Defendant maintains that November 18, 2011 was the first time Plaintiff objected to the labor repair times it received from Defendant.

[8]  Defendant admits that consecutive repair orders provided by Plaintiff contain information related to time charged to retail customers.  However, Defendant denies that this information "provid[ed] Chrysler with verification that plaintiff does, in fact, charge those times."  Because Plaintiff had not requested any alteration to repair time calculations, Defendant had nothing to "verify."  Furthermore, proper verification of specific repair times may have required more information than was present in that limited set of repair orders, such as multiple repair orders related to specific kinds of repairs.

[9]  Defendant further states that this request for customer pay repair orders and subsequent increase in warranty parts reimbursement rate happened during the course of this litigation, when Plaintiff first requested a specific rate increase in its part markup reimbursement rate.

15. Plaintiff utilizes the Alldata/Motor time guide for all of its retail repairs. (Doc. 32 at 29-31, 58; Doc. 24 at 78-79, 221).

16. Defendant does not reimburse Plaintiff for the amount of time provided in the Alldata/Motor time guide for Plaintiff's warranty repairs. (Doc. 31 at 38-39, 57-58).

17. The Alldata/Motor time guide is one of the most widely used time guides in the automotive industry. (Doc. 24 at 209, 212, Ex. 23).

18. Defendant recognizes that the Alldata/Motor time guide is an "industry approved and recognized labor time guide." (Doc. 31 at 86-87).[10]

19. Defendant is aware that "dealers throughout the country" utilize the Alldata/Motor time guide. (Doc. 34 at 32).[11]

20. Defendant's expert witness in this matter, David Merta, has "no concern" with a dealer using Alldata/Motor time for retail repairs. (Doc. 33 at 92).

21. The following facts related to Chrysler's time studies are undisputed:

    i.  The time studies are never performed at a dealership. (Doc. 28 at 13-14).

    ii.  Before the time study begins, the technician already knows the repair he is about to perform. (Doc. 28 at 20-21).

    iii. The vehicle on which the repair is to be performed is already in the garage before the time study begins, and that vehicle is backed out of the garage only

---

[10] Defendant admits that some dealerships choose to use the Motors/Alldata time guide; however, as explained by Mr. Merta, "the time allotments published by Alldata/Motor are designed for vehicles post-warranty," and "the time it takes to complete a post-warranty repair is typically longer than the time it takes to complete a warranty repair." (Doc. 33, Ex. 2 at ¶ 5). Additionally, the flat times published in the Motor/Alldata Manual are not intended to be used for automotive dealership repair and service work. (Doc. 25 at 92-93, 102-104).

[11] Defendant admits that some dealerships choose to use the Motors/Alldata time guide; however, as explained by Mr. Merta, "the time allotments published by Alldata/Motor are designed for vehicles post-warranty," and "the time it takes to complete a post-warranty repair is typically longer than the time it takes to complete a warranty repair." (Doc. 33, Ex. 2 at ¶ 5). In addition, the flat times published in the Motor/Alldata Manual are not intended to be used for automotive dealership repair and service work. (Doc. 25 at 92-93, 102-104).

after the time study ends. (*Id.* at 24).

22. When a dealer performs repairs, its technicians must do all of the following: drive vehicles in and out of the service area; diagnose what is wrong with the vehicle; obtain the necessary tools and retrieve the necessary parts from the parts department; and then road test the vehicle to ensure that the problem with the vehicle has been repaired. (*Id.* at 28-29).

23. Defendant instructs its dealers in its Dealer Policy Manual not to pay its technicians less for warranty repairs than customer pay work because "this often leads to poor workmanship, diminished quality . . ., and billing irregularities." (Doc. 31, Ex. 4 at CG-Kings 001168).

24. Plaintiff's technicians cannot complete most repairs within the Chrysler warranty time. (Doc. 32 at 31-32, 104-07; Doc. 24 at 143-45, 271-72; Doc. 36, Appx. K at ¶ 4; Doc. 36, Appx. L at ¶ 5).[12]

### III.   DEFENDANT'S UNDISPUTED FACTS[13]

1. Plaintiff and Defendant are parties to a Chrysler Sales and Service Agreement effective as of September 1, 2007; a Jeep Sales and Service Agreement effective as of September 1, 2007 and a Dodge and RAM Sales and Service Agreement effective as of March 3, 1988. (Doc. 39-3).

2. Subject to the terms of the Dealer Agreements, Plaintiff is engaged in the retail sale and service of new Chrysler, Dodge, Jeep, and RAM motor vehicles from a location and dealership facility at Kings Auto Mall, 4486 Kingswater Drive, Cincinnati, Ohio. (Doc. 1 at ¶ 1; Doc. 39-3).

3. The Dealer Agreements obligates Plaintiff to provide warranty repair and service work free of charge to its Chrysler, Dodge, Jeep and RAM customers who qualify

---

[12]   Defendant admits that Plaintiff's witnesses have represented that Plaintiff's technicians cannot complete some warranty repairs within the times established by Defendant. However, Defendant's time allowances are based on carefully calculated time studies and, as described in the Dealer Manual, they "are sufficient to permit the work to be performed properly in large or small dealerships on all repairs or replacements of factory approved parts." (Quick Labor Operations at CG-KINGS001222). William Jones, for example, testified that he can perform the repairs within Defendant's allotted time. (Doc. 28 at 40).

[13]   *See* Doc. 39, Exs. 5, 14 and 45.

for repair and servicing under Defendant's warranties.  (Doc. 39-3 at CG-KINGS001593, CG-KINGS001596).

4. The Dealer Policy Manual ("Manual") is incorporated by reference in the Dealer Agreements.  (Doc. 39-4 at CG-KINGS001093).

## A. Payment For Labor And Parts To Fulfill Warranty Obligations

5. The Manual provides that Defendant will reimburse Plaintiff for labor and parts provided by Plaintiff in the repair and service of Chrysler, Dodge, Jeep and RAM vehicles under warranty.  (Doc. 39-4 at CG-KING001178).

6. The Manual also provides that a dealer may establish its labor rate for warranty work by requesting a specific rate and supporting that request with 200 consecutive customer pay repair orders showing that this rate is actually charged to its non-warranty repair and service customers.  (Doc. 39-4 at CG-KINGS001180-001185).

7. Each Chrysler, Dodge, Jeep and RAM dealer submits claims to Defendant for compensation for its warranty work.  (Doc. 39-4 at CG-KINGS00178).[14]

8. Plaintiff has submitted thousands of claims to Defendant for compensation for warranty work over the years that Plaintiff has operated under the Dealer Agreements and the Manual and Defendant has paid those claims to Plaintiff pursuant to the terms of the Dealer Agreements and Manual.  Plaintiff has accepted these payments.  (Doc. 39, Ex. 1 at ¶ 5).

9. Dealers, including Plaintiff, do not submit claims to Defendant when they perform repairs for their nonwarranty customers; Plaintiff's retail customers pay Plaintiff for nonwarranty work.  (Doc. 39, Ex. 1 at ¶ 4).

10. Prior to November 27, 2011, Plaintiff's hourly labor rate was $77.00.  (Doc. 1 at ¶¶ 8, 10).

11. By letter dated August 30, 2011 with the subject line of "Kings Dodge, Inc. Warranty Labor Rate," Plaintiff notified Defendant that it was "not compensating [Plaintiff] for warranty work at the rate that the dealership charges

---

[14] Plaintiff admits that it submits claims to Defendant for compensation relating to warranty work.  Plaintiff assumes, but does not know for a fact, that "each" Chrysler dealer everywhere in the world also does so.

retail customers for similar non-warranty work."  (Doc. 1, Ex. A).[15]

12. Plaintiff requested an hourly warranty labor rate increase from $77.00 to $92.00 in its August 30, 2011 letter to Chrysler Group.  (Doc. 1, Ex. A).[16]

13. Upon receipt of Plaintiff's request, in a letter dated September 6, 2011, Defendant asked Plaintiff to provide 200 consecutive customer pay service repair orders, as agreed in the Dealer Agreements and Manual, to support Plaintiff's request.  (Doc. 1 at ¶ 9 and Ex. B; Doc. 5 at ¶ 9).

14. Defendant reminded Plaintiff in this September 6, 2011 letter that it would exclude mandatory state inspections, lube, oil, filter, and tire rotation services from the verification of Plaintiff's declared retail labor rate.  (Doc. 1, Ex. B).

15. On September 30, 2011, Plaintiff submitted 200 consecutive customer pay service repair orders to Defendant, as requested, with an accompanying spreadsheet and cover letter asking that Defendant approve its request for a labor rate increase to $84.78.  Plaintiff did not request an increased labor rate of $92.00 as mentioned in its August 30, 2011 letter to Defendant.  (Doc. 1 at ¶ 10; Doc. 39-5; Doc. 39-6).[17]

16. Plaintiff sent an email to Defendant on November 18, 2011, thanking Defendant for increasing its labor rate to $84.07 per hour.  (Doc. 39-8).[18]

---

[15] Plaintiff admits that its August 30, 2011 communication with Defendant contained the language quoted by Defendant.  However, that August 30, 2011 communication contained additional language relevant to this litigation that is not quoted or referenced by Defendant. (Doc. 1, Ex. A).

[16] Plaintiff admits that its August 30, 2011 communication to Defendant contained the language quoted by Defendant.  However, that August 30, 2011 communication contained additional language relevant to this litigation that is not quoted or referenced by Defendant, including verbiage regarding the prices Plaintiff charges its retail customers for parts.  (Doc. 1, Ex A).

[17] Plaintiff notes that this paragraph fails to mention that it did not request a $92.00 per hour labor rate because the Chrysler spreadsheet that Plaintiff was required to complete indicated that Plaintiff's "average retail labor rate" equaled $84.78 per hour and, according to Chrysler's warranty policies, Chrysler would not consider an increase any greater than Plaintiff's "average effective retail labor rate," regardless of the amount Plaintiff requested.  (Doc. 31 at 34, 108-109, 112-13, Ex. 10).

17. Plaintiff submitted warranty work claims and accepted labor payments at the $84.07 rate. (Doc. 39, Ex. 1 at ¶ 5).[19]

18. Defendant unilaterally increased Plaintiff's warranty labor rate to $84.50 effective as of January 1, 2012 pursuant to the automatic annual labor rate increase provided in the Dealer Agreements and Manual. (Doc. 39-1 at ¶ 6).

19. Defendant unilaterally increased Plaintiff's warranty labor rate to $86.19 effective as of January 1, 2013, pursuant to the automatic annual labor rate increase provided in the Dealer Agreements and Manual and has continued to pay Plaintiff at this hourly rate since January 1, 2013. (Doc. 39, Ex. 1 at ¶ 7).

20. Plaintiff commenced this lawsuit on June 7, 2012 by filing its Complaint; Plaintiff requested an hourly labor rate increase to $95.00 for the first time in the Complaint. (Doc. 1 at ¶ 13; Doc. 27 at 184-185).

22. Plaintiff is aware of the procedure for requesting a labor rate increase for warranty work, having requested a labor rate increase using this procedure in September 2011. (Doc. 39-5; Doc. 39-6).

23. Plaintiff submitted documents to support its request for an increased labor rate of $95.00 after Plaintiff filed this Complaint. (Doc. 27 at 226-228).

24. Plaintiff charges its retail customers for a fixed amount of time ("flat time") for each repair and service without regard to how long it actually takes Plaintiff to complete the repair or service. (Doc. 27 at 129-130).

25. The flat time that Plaintiff uses is taken from the Motor/Alldata Manual Published by Motor Information Systems. (Doc. 39, Ex. 6).

26. Plaintiff admits that the flat times published in the Motor/Alldata Manual are considerably higher than warranty times. (Doc. 39, Ex. 6).

---

[18] Plaintiff maintains that this statement fails to mention that, in this same email dated November 18, 2011, Plaintiff informed Defendant that the labor rate increase Defendant granted to Plaintiff still did not comply with Ohio law. (Doc. 31 at Ex. 12).

[19] Plaintiff states that it is unable to submit warranty claims to Defendant at any rate different than that approved by Defendant. (Doc. 31 at 61-62; Doc. 27 at 109-110).

27. The flat times published in the Motor/Alldata Manual are estimates based on the "average" repair technician without special dealership training, specialized skills, or experience working on the same vehicle brand each day.  (Doc. 25 at 35-36, 102-104).

28. Defendant pays its dealers for the actual completion time for each warranty repair and service, as determined by Defendant's time studies.  (Doc. 39-4 at CGKINGS001193-001195; Doc. 28 at 27, 45-46).[20]

29. Until November 18, 2011, Plaintiff had accepted payments for warranty work without objection based on the completion times provided by Defendant.  (Doc. 39, Ex. 1 at ¶ 5).[21]

30. Defendant has provided its repair and service time allotments to its dealers, including Plaintiff, for years.  Each time allotment is easily accessible to dealers via Defendant's online dealer portal known as DealerConnect.  (Doc. 39, Ex. 2 at CG-KINGS001193-001195).

**B. Reimbursement For Parts Used In Warranty Repairs**

31. Prior to July 14, 2013, Defendant reimbursed Plaintiff for parts that were used in warranty repairs in an amount equal to Plaintiff's cost for the part, plus a 40% markup.  (Doc. 39, Ex. 1 at ¶ 9; Doc. 39, Ex. 2 at CG-KINGS001189).

32. Plaintiff submitted thousands of claims annually at the rate of "cost plus 40%" and accepted payments at that rate for years.  (Doc. 39, Ex. 1 at ¶ 5).

33. During the course of the litigation, Plaintiff informed Defendant that "retail price" as referred to in its August 30, 2011 letter to Defendant meant

---

[20] Plaintiff maintains that Chrysler pays its dealers for warranty repairs based solely on Chrysler's time studies, but denies that those time studies are in any way similar to "the actual completion time" for any repairs, as most technicians cannot perform the repair within the time allotted by those time studies.  (Doc. 28 at 37, 40; Doc. 36, Appx. K at ¶ 4; Doc. 36, Appx. L at ¶ 5).

[21] Plaintiff admits that he had accepted warranty payments from Chrysler for years, but had not always accepted those payments without complaint.  (Doc. 27at 45-46).

Defendant's manufacturer suggested retail price ("MSRP") or a rate of cost plus 67%. (Doc. 24 at 87-89).[22]

34. During the course of this litigation, Defendant asked Plaintiff to submit 200 consecutive customer pay repair orders in support of its request for a parts markup increase, and Plaintiff submitted these repair orders. (Doc. 24 at 226-227).

35. Defendant determined that the repair orders submitted by Plaintiff supported a warranty parts reimbursement rate of cost plus a 59.13% markup and, as of July 14, 2013, began paying Plaintiff at this rate. (Doc. 39-11, Doc. 39, Ex. 1 at ¶ 9).

## IV.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

---

[22] Plaintiff further states that it placed Chrysler on notice of the price it charged its retail customer for parts prior to initiating this litigation. (Doc. 27 at 87-89; Doc. 32, Ex. 17).

# V. ANALYSIS

## A. Defendant's Motion in Limine[23]

Defendant maintains that Plaintiff's expert witnesses should be excluded because they are not qualified to testify as experts with respect to the information presented in their reports and they do not possess specialized knowledge that will help the trier of fact understand the evidence or determine a fact in issue. Fed. R. Evid. 702. Specifically, Defendant seeks to exclude: (1) Robert C. Reichert, the majority owner of Kings Dodge and other affiliated auto dealerships and the President and General Counsel for Kenwood Dealer Group, the management company that runs Kings Dodge; and (2) Peter W. Pannier, President of Northgate Chrysler Dodge Jeep, which does business with Mr. Reichert's dealerships.

### 1. Daubert Standard

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

---

[23] The Court has the discretion to rule on an evidentiary motion *in limine* pursuant "to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Courts are generally averse to excluding evidence *in limine* because "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Koch v. Koch Indus., Inc.*, 2 F. Supp.2d 1385, 1388 (D. Kan. 1998); *accord Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court has a "gatekeeping role" to screen expert testimony and judges have discretion to determine whether such testimony is admissible, depending on its reliability and relevance. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589-97 (1993). "[T]he law grants the [court] broad latitude" in analyzing and determining the reliability of proffered expert witness testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 139 (1999). "The inquiry [under Rule 702] is a flexible one[,]" and its focus "must be solely on principles and methodology, not on the conclusions [the expert] generate[s]." *Daubert*, 509 U.S. at 594-95.

Rejection of expert testimony "is the exception rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531 (6th Cir. 2008) (quoting Fed. R. Evid. 702 Advisory Committee's Note, 2000 Amend.). The judge's role as gatekeeper "is not intended to serve as a replacement for the adversary system: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *U.S. v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 597).

### 2. Qualifications

Defendant maintains that neither Mr. Reichert nor Mr. Pannier have any experience or specialized knowledge related to the warranty repairs at issue, and thus

they are not qualified to testify as experts.  Messrs. Reichert and Pannier are business owners relying on their experience in the industry as the basis for their qualifications.

Experience alone may qualify an individual as an expert witness.  *United States v. Cunningham*, 679 F.3d 358, 378 (6th Cir. 2012).  *See also* Fed. R. Evid. 702 and Advisory Committee's notes to 2000 Amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  As long as the witness who is relying on his experience "explains how that experience leads to the conclusion reached…and how that experience is reliably applied to the facts[,]" such testimony is reliable.  Interviews, reports, research data, and field research can all be reasonable sources on which an expert may rely in reaching his opinions.  *Chavez v. Carranza*, 559 F.3d 486, 497 (6th Cir. 2009).

### 3.    *Reliability*

Next, Defendant maintains that Messrs. Reichert and Panneir's opinions should be excluded because they are based on anecdote, speculation, and extrapolation, and therefore are not based on a reliable foundation.

Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S at 592-593.  The Sixth Circuit has identified seven "red flags" that suggest a lack of reliability of expert testimony: "(1) improper extrapolation, (2) reliance on anecdotal evidence, (3) reliance on temporal proximity, (4) insufficient information

14

about the case, (5) failure to consider other possible causes, (6) lack of testing, and

(7) subjectivity." *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 177 (6th Cir. 2009).

This is a flexible test, however, and these enunciated factors do not constitute a

"definitive checklist or test," but must be tailored to the facts of a particular case.

*Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593).  "[W]hether Daubert's

specific factors are, or are not, reasonable measures of reliability in a particular case is a

matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

### a.  Mr. Reichert

Mr. Reichert has been involved in the automobile industry for over 50 years.

(Doc. 24, Ex. 23).  He purchased his first dealership in 1975.  (*Id.* at 14-16).  Today, he is

the dealer principal, majority owner, president, and general counsel for 13 dealerships in

the Greater Cincinnati area.  (*Id.* at 16-25; Ex. 23).  As principal dealer, he is ultimately

responsible for every major operational aspect of each dealership, including warranty

operations.  (*Id.* at 36-37).  When Chrysler audited Plaintiff's warranty submissions in

2011, Reichert became personally involved in that process and learned first-hand the

difference between the amounts Chrysler was reimbursing Plaintiff for warranty work

versus the amounts Plaintiff was charging its retail customers for the same or similar

repair work.  (*Id.*)  Reichert and his warranty administrator, Aaron Plunkett, prepared

various summaries of 35 common warranty repairs performed by Plaintiff, compared that

to comparable retail repairs, and found that Chrysler's warranty time only provided, on

average, one-half the amount of time that the Alldata/Moror time guide allows for the

same or similar repairs.  (*Id.* at 34-35, 267-68, Exs. 13, 14, 24).  Thus, Reichert has

opined that, with respect to warranty repairs, Chrysler is paying Plaintiff approximately

one-half of the amount Plaintiff charges its retail customers.

      As part of his expert report, Reichert opines as to whether technicians can perform

repairs within the Chrysler warranty times.  Reichert maintains that he discussed this

issue with numerous technicians and other dealer principals before opining that

Chrysler's warranty times are unrealistic.  (Doc. 24 at 143-146).  This opinion is

supported by declarations from two of Plaintiff's technicians and a video.  (Doc. 39,

Appx. M).  The opinion is further supported by the testimony of Chrysler's own witness,

William Jones, who worked in Chrysler's time study laboratory and testified that he

frequently received complaints from dealers regarding Chrysler's warranty times being

"inaccurate or low."  (Doc. 28 at 37).

      Reichert also opined that the Alldata/Motor time guide was the standard in the

industry.  This opinion is based on his years of experience in the industry and

conversations with other dealers who also use the time guide.  (Doc. 24 at 211).  A survey

conducted by the OADA also support these findings.[24]  (Doc. 24, Ex. 1; Doc. 25 at 66-

67).  Furthermore, the Alldata/Motor time guide is used by Chrysler itself in connection

with its service contracts and fleet contracts.  (Doc. 31 at 85-87, 96-97; Doc. 34 at 32-33,

65).

---

[24] The survey was conducted to understand "what time guide [Ohio] dealers use to determine the
amount of time they allot for retail repairs."  (Doc. 42, Ex. E).  Defendant maintains that the
OADA survey should be disregarded because it is unreliable.

However, Defendant argues that its Alldata/Motor expert explained that the time guides are not intended for use by dealerships performing warranty repairs and services, but rather for after-market repair shops that perform non-warranty work and that do not "have all the specified training that a Chrysler dealership would have, may not have all the specialized tools."  (Doc. 25 at 92-93).  In fact, Defendant's expert expressly testified that the flat times published in the Alldata/Motor time guide are not intended to be used for automotive dealership repair and service work.  (*Id.* at 92-93, 102-104).

### b.  Mr. Pannier

Mr. Pannier is the owner, general manager, dealer principal, and president to Northgate Chrysler Jeep Dodge ("Northgate").  (Doc. 26 at 6).  Pannier has been in the automobile business since 1987 and has been the owner of Northgate, a Chrysler dealership, since 1992.  (*Id.* at 8-9).  Pannier has also served as the Chairman of the OADA, President of the Cincinnati Automobile Dealer Association, and a member of both the National Automobile Dealer Association's "Dealers 20 Group," as well as Chrysler's National Dealer Council.  (*Id.* at 16, 25-26, 28).  Pannier discussed with other dealers throughout the country and Ohio issues important to dealers, including warranty reimbursement issues.  (*Id.* at 17-19, 28).  Throughout his career, Pannier also received weekly labor reports, talked with technicians, and discussed warranty issues with other dealer principals throughout the country.  (Doc. 38-10 at 47-48, 54).

Defendant claims that Messrs Reichert and Pannier's testimony should be excluded because it improperly seeks to impose a specific statutory interpretation via

expert testimony.[25] Defendant argues that their opinions about the labor rate calculations and warranty parts compensation are based entirely on their belief that Ohio law requires Chrysler Group to adopt different policies.

While leaving open the issue whether Reichert and Pannier's expert reports could ultimately be excluded from trial, the Court will consider them for purposes of the pending dispositive motions. The Court is satisfied that Messrs. Reichert and Pannier's experience and knowledge of the subject area will assist the Court in its analysis. Defendant has, however, successfully challenged the depth and/or breadth of the "experts'" knowledge in the field and their reasoning in reaching conclusions. These challenges go to the weight of the testimony, which is generally for the jury to decide. [26]

### A. Cross-Motions for Summary Judgment

Ohio Revised Code Section 4517.52 governs the rate at which a manufacturer is required to compensate its dealers for labor and parts used to fulfill a manufacturer's warranty obligations. It states:

---

[25] With respect to Reichert's opinion that Chrysler is violating Ohio Revised Code § 4517.52 by not allotting Alldata/Motor time for Plaintiff's warranty repairs, Reichert explains that Chrysler can still violate the statute (which requires the manufacturer to compensate its dealers for warranty repairs at rates "not less than the rates charged by the [dealer] to its retail customers"), even if Chrysler pays the same hourly amount to Plaintiff that Plaintiff charges its retail customers. (Doc. 24 at 261-63; 279-80).

[26] As explained *infra*, whether technicians can or cannot perform repairs within Chrysler's warranty times is irrelevant given the fact that those times are governed not by statute, but by the Dealer Policy Manual and incorporated by reference into the Dealer Agreement to which Plaintiff is contractually bound. This case hinges on the Court's statutory interpretation of Section 4517.52, and, therefore, while Plaintiff may present compelling evidence that Defendant has underpaid for both Plaintiff's warranty repair time and parts, these issues are governed by contract, and thus are not properly before this Court.

> Each franchisor shall compensate each of its franchisees for labor and
> parts used to fulfill warranty and recall obligations of repair and
> servicing at rates not less than the rates charged by the franchisee to
> its retail customers for like service and parts for nonwarranty work.[27]

Ohio Rev. Code § 4517.52(B).  "R.C. Chapter 4517, which sets forth remedies and means

of recovery for franchisees who have been mistreated by their franchisors…, is remedial

and is therefore to be liberally construed to promote said remedies and means."  *Earl

Evans Chevrolet, Inc. v. General Motors Corp*., 598 N.E.2d 1187, 1193 (Ohio App.

1991).  The statute was also intended to incentivize manufacturers to keep consumer

prices low.  *Jim White Agency Co. v. Nissan Motor Corp*., 126 F.3d 832, 836 (6th Cir.

1997).

 To  show a violation of Section 4517.52, Plaintiff must prove, by a preponderance

of the evidence that:

> (1) Defendant reimbursed Plaintiff for parts used in warranty repairs at
> (2) a rate that is less than Plaintiff's retail rate for like parts used in
> nonwarranty repairs; (3) Plaintiff informed Defendant that it believed
> that Defendant was not reimbursing it for parts used in warranty repairs
> at its retail rate for like parts; and (4) Plaintiff provided reasonable
> verification of its claimed retail rate for like parts to Defendant before
> filing a legal action claiming that Defendant violated Section 4517.52.

*R&R Inc. v. Volvo Trucks North America, Inc*., No. 4:06cv287, 2007 U.S. Dist. LEXIS

13583, at *10 (N.D. Ohio Feb. 28, 2007) (citing in part *Jim White Agency Co.*, 126 F. 3d

at 836).

---

[27]  There is no dispute that Chrysler is a "franchisor" and Kings Dodge is a "franchisee" under
Ohio Revised Code Chapter 4517.  *See* Ohio Rev. Code § 4517.01(w) and (x).

Plaintiff makes two arguments with respect to Section 4517.52:  (1) Defendant violated Section 4517.52 when it failed to pay Plaintiff for warranty work at a labor rate of $92.00; and (2) Defendant violated Section 4517.52 by refusing to reimburse Plaintiff at its "retail rate" for parts used in its warranty work.

### 1. *Labor Rate*

Plaintiff maintains that since Defendant assigns a fixed amount of time to each repair for which it charges its nonwarranty customers, Defendant should be compelled to accept the same fixed time when paying Plaintiff for warranty labor.

### a.  Statutory Language

When interpreting statutory language, it is helpful to consider statutory history. *See, e.g., United States v. Coatoam*, 245 F.3d 553, 558 (6th Cir. 2001).[28]  Section 4517.52 provisions regarding the "time of repair" were deleted by the Ohio legislature in the revised version of the statute promulgated in 1987, which is in effect today.  The prior version of Section 4517.52, enacted in 1979, provided the following regarding repair time: "The [warranty and recall reimbursement] schedule or formulas shall include a reasonable allowance of time for the diagnosis and performance of repairs by a technician of ordinary skill."  Am S.B. No. 206 (approved Dec. 14, 1979).  It was this language that

---

[28]  "When, however, a plain meaning analysis of a statute produces an absurd result, in that the interpretation is clearly at odds with Congress's intent in drafting the statute, then the language of the statute must yield to interpretive guidance from legislative history or statutory structure." *Id.*

the Ohio legislature deleted from the 1987 amendment.[29]  In attempting to interpret

Section 4517.52, this Court must refrain from reading the deleted concept of "repair

time" back into the statute, particularly where the legislature expressly deleted the "repair

time" provision from a prior version of the statute.  *Lynch v. Gallia Ct. Bd. of Commrs.*,

680 N.E.2d 1222, 1224 (Ohio 1997) ("When confronted with amendments to a statute, an

interpreting court must presume that the amendments were made to change the effect and

operation of the law.  However, a reviewing court must not construe a statute so as to

supply words that are omitted.").

In addition to deleting the "repair time" provisions from Section 4517.52, the

legislature retained the reference to "repair time" in the succeeding section (Ohio Revised

Code §4517.53), which regulates the delivery and preparation of new vehicles.  Section

4517.53 provides:

> Each franchisor shall specify to its franchisee in writing the delivery
> and preparation obligations of the franchisees prior to the delivery of
> new motor vehicles to retail buyers…The schedule of compensation
> shall be *reasonable with respect to the time and compensation
> allowed*…the board shall determine to be unreasonable any schedule
> that does not compensate the franchisee at the franchisee's customary
> *retail labor rate for the actual time required by a technician of ordinary
> skill to perform each function* that the franchisee is obligated to perform.

---

[29]  In considering the 1987 amendments, the Ohio Legislature heard testimony from the Federal
Trade Commission and others that various aspects of Ohio law hurt consumers by raising prices,
and, in apparent response to such concerns, the Legislature sought to simplify the regulations by
regulating only the labor rates at which such work was performed.  Hearing on S.B. 103, before
the Ohio S. Committee on Highways, Transportation and Local Government, 117th General
Assembly (April 21, 1987) at Doc. 51, Ex. 2.

*Id.* (emphasis added).  The fact that the legislature elected to retain the repair time

language in Section 4517.53, but deleted it from Section 4517.52, is an additional

indication of the legislative intent not to regulate repair time in the context of warranty

reimbursement as set forth in Section 4517.52.  *See* 2A Sutherland Statutory Construction

46:6 (7th Ed.) ("where the legislature has employed a term in one place and excluded it in

another, it should not be implied where excluded").

Under the statute, manufacturers are only required to compensate dealers for labor

and parts "at rates not less than the rates charged by the franchisee to its retail customers

for like service and parts for nonwarranty work."  Ohio Rev. Code § 4517.52(B).

Plaintiff reads the statute to say that a manufacturer shall compensate a dealer at equal

"rates" and also equal "allotments of time" to other work performed, but those terms do

not appear in the statute.[30]  Plaintiff cites no authority to establish that the labor "rate"

means both the rates at which labor is charged (dollars per hour) and the amount of time

_____

[30]  Plaintiff's interpretation of the statute would allow for the reimbursement of claimed work
well beyond the actual time required to perform the work.  *See Jim White Agency*, 126 F.3d at
836 (*quoting State ex rel Dispatch Printing Co. v. Wells*, 481 N.E.2d 632, 634 (Ohio 1985)
("It is an axiom of judicial interpretation that statutes be construed to avoid unreasonable or
absurd consequences.")).

required to perform a specific service.[31]  Moreover, such a reading, based on the plain

language of the statute, would be nonsensical.[32]  "An unambiguous statute must be

applied in a manner consistent with the plain meaning of the statutory language and a

court may not simply ignore or add words."  *Portage County Bd. of Comm'rs v. City of

Akron*, 846 N.E.2d 478, 489 (Ohio 2006).

The Court considers the meaning of the word "rate" as used in the statute.  "Rate"

is typically the ratio between two differing units (here that rate is dollars per hour)

whereas "amount" is defined as a fixed price (here the total charged for a repair).  *See*,

*e.g.,* Webster's Encyclopedia Unabridged Dictionary of the English Language (1989)

(defining "rate" as "certain quantity or amount of one things considered in relation to a

---

[31] Plaintiff misstates the testimony of Ralph Vargo, Defendant's 30(b)(6) witness.  Mr. Vargo never testified that the statute required Defendant to pay Plaintiff's fixed repair times or that repair time was covered by the statute.  (Doc. 31 at 35).  Instead, Mr. Vargo testified that in determining a dealer's hourly labor rate, dollars are the fixed charge and hours are the unit of quantity.  (*Id.*) (Q: "What role, if any does that play, the time element play in the amount that Chrysler reimburses the dealer for warranty work? A:  It would be the total amount charged to a customer divided by the number of hour so on the ROs for like service and parts.").  Defendant made no concession that the meaning of the word "rate" is, as Plaintiff argues, the hourly rate multiplied by the fixed repair time that the dealer selects.

[32]  In fact, Plaintiff's president wrote in an email to Chrysler, copying its counsel and the OADA, noting that "the labor rate [the $84.07 per hour Chrysler agreed to pay for warranty service] meets part of the requirement but does not address the time allowed for non warranty work." (Doc. 39-8).  Plaintiff's use of the term labor "rate" as distinct from "time allowed" only underscores the fact that the two concepts are very different.  As used in Section 4517.52, the labor "rates" do not encompass the time required to perform the services.

23

unit of another thing and used as a standard or measure: at the rate of 60 miles an hour";

definite "amount" as "quantity; measure" or "the full effect, value, or significance").[33]

The Court finds, based on the language of the statute, that if the legislature had

intended to require a manufacturer to pay a dealer for whatever fixed time a dealer

applied to a repair, the legislature would have said so in the plain language of the statute,

particularly since Section 4517.52 previously dealt with the length of time it takes to

complete a repair.[34]  Accordingly, the Court finds, as a matter of law, that while Section

4517.52 governs the rates for labor and parts, Section 4517.52 does not regulate the

length of time that it takes to complete a repair.

### b.  Particularized claim

Even if Section 4517.52 could be interpreted to govern repair time, Plaintiff failed

to submit the type of particularized claim necessary to put Defendant on notice of the

claim and enable Defendant to evaluate and verify the claim.  The only communication

that could qualify as a "claim" related to repair time was Plaintiff's November 18, 2011

email.  (Doc. 39-8).  This email does not, however, include a particularized claim – *i.e.*,

---

[33]  In fact, Ohio courts have interpreted the word "rate," to mean a ratio between the dollars charged per hour worked.  *See, e.g., Crull v. Maple Park Body Shop*, 521 N.E.2d 1099, 1104 (Ohio App. 1987) (body shop owner's affidavit used the term "labor rate" to mean "$16.00 per hour"); *Standard Plumbing & Heating Co. v. Hartman*, 2003-ca-0091, 2004 WL 1688345, at ¶ 94 (Ohio App. July 23, 2004) (plumber's labor rate was $45.00 per hour); *Erie Air Conditioning & Heating Inc. v. S.C. Co.*, No. 63216, 1993 WL 277092, at *1 (Ohio App. July 22, 1993) (finding that "Erie's standard rate for a 'time/material job, as opposed to a contract job, was $32-35/hour.").

[34]  If the Court were to interpret Section 4517.52 as Plaintiff requests, the Court would, in effect, invalidate hundreds, if not thousands of agreements consummated between dealers and automobile manufacturers.

a claim for a specified amount of time per repair, but simply refers to the time estimates published in the Motor/Alldata Manual. Without a specific claim that includes an actual amount of repair time sought, Defendant would be forced to guess as to the repair times Plaintiff sought. *See,e .g, Tom Rice Buick-Pontiac GMC, General Motors Corp.*, 551 F.3d 149, 156 (2d Cir. 2008) (a similar statute in New York "requires that dealers submit claims not in the abstract, but in specific amounts. Otherwise it is hard to fathom how a manufacturer might approve or disapprove the claim.").

Both parties are bound by the Dealer Agreements. As set forth in the Manual, incorporated by reference in the Dealer Agreements, dealers agree to "apply only the time limits published in Defendant's current Labor Operation Time Schedule and authorized Service Bulletins. Published time allowances are developed from repair procedures outlined in the applicable Service Manual, Technical Service Bulletin or Recall." (Doc. 39-4 at CG-KINGS001193). Additionally, as expressly provided in the Manual, dealers are obligated to keep "a full accounting of the actual time spent on warranty and non-warranty work." (*Id*.)

Defendant provides all of its dealers, including Plaintiff, with the completion times that Defendant will pay for each warranty repair. (Doc. 39-4 at CG-KINGS001193). These completion times, as each dealer is advised, are based on time studies performed by a special time study group. (Doc. 28 at 17, 45-46). Since approximately 1988, Plaintiff has submitted claims for warranty labor in accordance with the procedure established in the Dealer Agreements, based on the completion times established by

Defendant, and has received payments based on that completion time.  (Doc. 39, Ex. 1 at

¶ 5).  It was not until November 18, 2011 that Plaintiff claimed Section 4517.52

compelled Defendant to use "flat times"[35] published in the Motor/Alldata guide and

outlawed the use of actual repair times published by Defendant.  (Doc. 39-8).

 Plaintiff, however, argues that on August 30, 2011, its majority owner, president,

and general counsel, Robert Reichert, wrote Chrysler's Parts and Service Area Manager,

Maria Barrow, and expressly placed Defendant on notice that it was not reimbursing

Plaintiff for parts and labor used in warranty work:  Specifically, Reichert wrote:

> It has come to my attention that Chrysler Group LLC is not
> compensating Kings Dodge, Inc. for warranty work at the rate that
> the dealership charges retail customers for similar non-warranty
> work.  Pursuant to ORC Section [4517].52, please take notice, that
> Kings Dodge hereby requests that all warranty repairs completed on
> and after August 30, 2011 be paid at the same rate as Kings Dodge
> charges its retail customers, $92.00 per hour for labor, and retail price
> for replacement parts.

(Doc. 31, Ex. 8).  In response, Defendant required Plaintiff to verify the hourly labor rate

it charged its retail customers by submitting 200 retail repair orders and completing a

spreadsheet.  (*Id.*, Exs. 3, 10).  Plaintiff complied with this request.  (Doc. 31 at 39; Doc.

34 at 29-30, Ex. 18).

---

[35]  "Flat rate time" is a practice utilized throughout the automobile industry and determines all of
the following:  warranty reimbursement amounts to dealers from manufacturers, technician pay,
and consumer retail labor price.  Under flat rate time, the technician is paid the hourly rate that
he has negotiated with his employer but he is paid that rate only for an established time for each
repair, regardless of the amount of time the repair actually takes to perform.  (Doc. 32 at 27-28;
Doc. 28 at 39-30; Doc. 33 at 10).

After reviewing the materials submitted by Plaintiff, Defendant determined what Plaintiff's "average effective retail labor rate" equaled and increased Plaintiff's warranty hourly labor rate accordingly.  (Doc. 31 at 38).  However, Defendant did not adjust the time it allotted for warranty repairs.  (*Id.* at 31).

On November 18, 2011, Reichert again wrote Defendant:

> Thank you for increasing Kings Dodge warranty labor rate to $84.07 per hour.  In order to fully comply with Ohio law the franchisor is required to compensate its franchisees "at rates not less than rates charged…for like services…for non warranty work."
>
> The labor rate meets part of the requirement, but does nto address the time allowed for non warranty work.  Kings Dodge uses Motor/AllData to calculate the labor time for retrial non warranty work.  As I'm sure you know, retail labor times are considerably higher than warranty times.  For example, a water pump replaced on a 3.5 engine pays .8 hrs under warranty and 2.2 hrs at retail.  The repair orders we submitted to Chrysler for the labor rate increase reflect the retail times.
>
> In order to fully comply with Ohio law we must use the retail time for warranty repairs.
>
> Please advise your position with respect to this issue.

(Doc. 34, Ex. 19).  Upon receipt of this letter, Defendant did nothing to adjust its warranty times.

Before a dealer is entitled to an increase in the hourly *rate* for warranty labor, the dealer is required to declare the increased hourly rate that it wants and provide the manufacturer with reasonable verification of that rate.  *Jim White Agency*, 126 F.3d at 836.  The burden is on the dealer to determine its own retail rate and "present the appropriate claim to the manufacturer."  *Id.*  The dealer's declaration and verification

27

must occur before the dealer commences a legal action against the manufacturer seeking an increased labor rate.  *R&R Inc.*, 2007 U.S. Dist. LEXIS 13585 at 4 (a dealer must provide "reasonable verification of its claimed retail rate…before filing a legal action claiming that Defendant violated Section 4517.52.").

The Court finds that neither the August 30, 2011 communication nor the November 18, 2011 communication provided a reasonable verification of Plaintiff's claimed repair time.

### c.  Contractual Agreement

Next, Plaintiff argues that the statute must govern repair time, otherwise Defendant could simply pay Plaintiff "absurdly low and arbitrary time allotments." However, the requisite repair time is expressly governed by the Dealer Agreements. (Docs. 39-3 and 39-4).  The process of paying for warranty repairs is described in the Dealer Policy Manual and incorporated by reference into the Dealer Agreement between the parties.  The process provides that Defendant will reimburse Plaintiff based on the actual time it takes to perform a warranty repair as established by time studies on vehicles conducted by Chrysler.  (Doc. 39-4 at CG-KINGS001178, CG-KINGS001188). Specifically, the Dealer Policy Manual states:

> [The Dealer] must apply only the time limits published in Chrysler Group's current Labor Operation Time Schedule and authorized Service Bulletins.  Published time allowances are developed from repair procedures outlined in the applicable Service Manual, Technical Service Bulletin or Recall.  [The dealer] must also keep a full accounting of the actual time spent on warranty and non-warranty work.

(Doc. 39-4 at CG-KINGS001193).  Defendant provides its dealers, including Plaintiff, with repair times for each warranty repair, as well as the steps a technician should follow when conducting that repair.  (Doc. 31, Ex. 7 at CG-KINGS001222).  In the event that a dealer believes a repair cannot be performed within the time allotted for the repair, there is a procedure where the dealer can request supplemental repair time and/or ask Defendant to re-study the repair time.  (*Id.*, Section V at ¶ 4).[36]

### d.  Motor/Alldata Manual

Next, Plaintiff claims Defendant should use the Motor/Alldata manual in lieu of the repair times provided by Chrysler.[37]  Specifically, Plaintiff maintains that Defendant should be subject to the "flat times" published in the Motor/Alldata Manual.[38]

Alldata/Motor publishes two different categories of repair times – standard times (designed for the aftermarket repair shops) and warranty times (times published by Defendant and licensed to Alldata/Motor), and one is not meant to substitute for the other.  (Doc. 25 at 56-57).  However, Plaintiff claims that times that are not developed for warranty work should nonetheless apply to warranty work.  Specifically, Plaintiff

---

[36]  Plaintiff claims that its technicians cannot perform most warranty repairs within Chrysler's warranty times.  (Doc. 32 at 31-32, 104-107, Doc. 24 at 143-145).  If this is in fact the case, Plaintiff must comply with the requisite steps explained in the Dealer Policy Manual.  Specifically, request supplemental repair time and/or ask Defendant to re-study the repair time.

[37]  Because Section 4517.52 does not govern the length of time it takes to complete a repair, the Court need not determine whether the estimated repair times published by Motor Information Systems in the Motor/Alldata Manual are reasonable and should be accepted in lieu of the actual repair times provided by Defendant.  Nonetheless the Court will address this argument.

[38]  This time guide is published by two companies – Motor Information Systems ("Motor") and Alldata, Inc. ("Alldata").  (Doc. 24 at 78-79, 221; Doc. 32 at 58).

contends that since the steps required to complete warranty repairs and nonwarranty repairs are identical, there is no difference between the two types of repairs.  However, warranty repairs typically occur on vehicles three years and newer, while nonwarranty repairs typically occur on older vehicles with more road grime which are harder to repair and therefore necessarily take longer.  (Doc. 33, Ex. 2 at VI(5)).[39]

Motors' President maintains that the times it publishes are not intended for use by dealerships like Plaintiff, and do not even relate to warranty work.  (Doc. 25, Ex. 8 at 92-93, 102-104).  Rather, these "flat times" are merely estimates to be used by "aftermarket" shops that service various vehicle brands.  (*Id.* at 35-36, 102-104).  Motor's President also emphasized that the "flat times" are merely estimates based on the "average" repair technician who often lacks the special training of dealership service personnel and generally extensive experience of working on the same vehicle brand day after day.  (*Id.*)  The Alldata/Motor Guide adds factors that do not apply to warranty repairs and which increase the length of time of the repair.  (Doc. 25 at 92-104).  These factors are based on the fact that warranty repairs typically occur at dealerships, whereas the nonwarranty repairs are occur at aftermarket repair shops.  (*Id.*)  Motors' President maintains that "our times are predicated on the typical technician out on the field who is seeing a broad range of vehicles, doesn't necessarily have all the specialized training that a Chrysler dealership would have, may not have all the specialized tools.  So it is a much more typical

---

[39] The Court acknowledges that this is a generalization.  However, the Motor/Alldata Manual is irrelevant because Plaintiff entered into a contractual relationship with Defendant which expressly governed the warranty repair time.

experience than a dealership." (Doc. 25 at 93). The lack of vehicle-specific training, experience working with the same vehicle-line, and specialized tools, increases the length of time it takes to perform the steps of the repair, and, therefore, Alldata/Motor labor editors increase the repair times accordingly. (*Id.*) Dealership technicians, by contrast, have specialized training, see the same vehicles day-in and day-out, and have the manufacturer's specialized tools at their disposal. (*Id.*)[40]

Thus, applying nonwarranty time that is developed based on factors that are wholly irrelevant to warranty time would be unreasonable.

### 2. *Parts Rate*

Next, Plaintiff maintains that it is entitled to a higher markup for parts used in its warranty repairs from December 1, 2011 to July 14, 2013. Plaintiff is willing to accept the reimbursement rate of cost plus 59.13% that Defendant has been paying since July 14, 2013. (Doc. 36 at 5-6). Therefore, the only dispute is the effective date of the reimbursement rate. Defendant submits that the reimbursement rate is effective as of July 14, 2013, the date it was able to verify Plaintiff's rate based on retail repair orders

---

[40] Plaintiff's reliance on the cases decided by the Maine courts interpreting the Maine dealer act are misplaced because, unlike the Ohio statute, the Maine statute requires that a dealer inform its customers if it uses "flat rate pricing." *Darling's v. Daimler Chrysler Motors Co*., No. AP-2001-17, 2004 Me. Super. LEXIS 132, at *4 (Me. Super. Ct. May 10, 2004). Maine courts have found it "legally permissible" for a dealer to use the Alldata/Motor time guide. *Id.* The courts reasoned that since consumers are aware they are being charged flat rate pricing, if consumers feel they are being charged too much then "market forces will make the appropriate correction." *Id.* In contrast, Section 4517.52 has no notification requirement and consumers have no knowledge that they are charged – and likely overcharged – for repairs based on a fixed amount of time rather than the actual time it takes to perform the repair.

provided to Defendant.  Plaintiff, however, contends that the effective date should be December 1, 2011, because its August 30, 2011 letter, where it mentioned charging "retail" for parts, was tantamount to a request for a markup.

Section 4517.52 requires a manufacturer to compensate its dealers for parts used to fulfill warranty and recall obligations of repair and servicing at rates not less than the rates charged by the dealer to its retail customers for like parts for nonwarranty work. Ohio Rev. Code §4517.52(B).  However, Section 4517.52 does not "place the burden for determining the appropriate rates on the manufacturer" but instead "first require[s] the dealer to present the appropriate claim to the manufacturer, and then require[s] that the manufacturer pay the presented claim." *Jim White Agency*, 126 F.3d at 836.[41]

The crux of the issue is whether the mere mention of the word "retail" in a letter that focused almost entirely on a request for a labor rate increase can be understood as the type of particularized claim for an increase in parts reimbursement envisioned by Section 4517.52 and the case law construing this statute.  The Court finds that the answer is no.

Plaintiff maintains that its only burden was to "inform" Defendant that it was not reimbursing Plaintiff at its retail rate.  However, the case law indicates that Plaintiff must present its "appropriate retail rate" and then verify its "claimed retail rate."  *R&R Inc*., 2007 U.S. Dist. LEXIS 13585 at 4.  Plaintiff is required to state the specific rate that it requests and then provide certification that it actually charges this rate to its retail

_____

[41] *See also R&R, Inc.*, 2007 U.S. Dist. LEXIS 13585 (finding that under the statute, a dealer must notify the manufacturer of its retail rate and provide reasonable verification of this rate prior to filing a legal action).

customers for nonwarranty work.  Ohio Rev. Code § 4517.52.  Plaintiff's omission of a specific price is even more pronounced in light of the specific $92.00 labor rate demanded by Plaintiff in the same letter.  (Doc. 1, Ex. A).  Despite additional communications concerning labor rate payments, and Defendant's September 5, 2001 letter regarding warranty labor rates, Plaintiff continued to submit and accept payments for parts used in its warranty work at cost plus 40%.  (Doc. 39-1 at ¶ 9).  It was not until this litigation commenced that Plaintiff advised Defendant that its reference to "retail price for replacement parts" in the August 30, 2011 letter was a request for warranty parts payments at MSRP rates which was equal to cost plus 67%.  (Doc. 24, Ex. 7 at 61).

Plaintiff failed to declare its "appropriate retail rate," and, therefore, Plaintiff's claim for retroactive application fails as a matter of law.

## VI.    CONCLUSION

Accordingly, for the foregoing reasons:

(1) Defendant's motion *in limine* (Doc. 38) is **DENIED**;

(2) Plaintiff's motion for summary judgment (Doc. 36) is **DENIED**;

(3) Defendant's motion for summary judgment (Doc. 39) is **GRANTED**; and

(4) The Clerk shall enter judgment accordingly, and this case is **CLOSED**.

**IT IS SO ORDERED**.

Date:  11/27/13                                         */s/ Timothy S. Black*
                                                       Timothy S. Black
                                                       United States District Judge