UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **KINGS DODGE, INC.** | : | Case No. 1:12-cv-445 |
| | : | |
| Plaintiff, | : | (Judge Timothy S. Black) |
| | : | |
| v. | : | |
| | : | **PLAINTIFF KINGS DODGE, INC.'S** |
| **CHRYSLER GROUP, LLC** | : | **MOTION FOR RECONSIDERATION** |
| | : | **PURSUANT TO RULE 59(e)** |
| Defendant. | : | |

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, plaintiff Kings Dodge, Inc. hereby moves the Court to reconsider and alter or amend its Order issued in this action on November 27, 2013 (Docket No. 54) relating to its disposition of the parties' cross-motions for summary judgment, as well as the Clerk's subsequent judgment affirming this Court's Order, which was also issued on November 27, 2013 (Docket No. 55). The grounds for this motion are set forth in the accompanying memorandum and attached exhibits.

Respectfully submitted,

/s/ Curtis L. Cornett
Curtis L. Cornett (0062116)
Cors & Bassett, LLC
537 E. Pete Rose Way, Suite 400
Cincinnati, Ohio 45202
Phone: 513.852.8226
Fax: 513.852.8222
clc@corsbassett.com

Trial Attorney for Plaintiff Kings Dodge, Inc.

**MEMORANDUM IN SUPPORT OF MOTION**

I. **INTRODUCTION**

Although motions for reconsideration are not expressly referenced in the Federal Rules of Civil Procedure, the Sixth Circuit treats such motions as motions to amend a judgment under Civil Rule 59(e).  *E.g., McDowell v. Dynamics Corp of America*, 931 F.2d 380, 382 (6th Cir. 1991).  Plaintiff Kings Dodge, Inc. ("Kings Dodge") understands that motions for reconsideration are disfavored.  However, the Sixth Circuit has held that there are three situations which justify reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or to prevent manifest injustice.  *E.g., Gen Corp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999).  Kings Dodge submits that this Court committed clear error in several areas of its November 27, 2013 Order (Docket No. 54) ("November 27 Order") and that the granting of this motion is necessary to prevent manifest injustice.  Before detailing the various clear errors contained in this Court's November 27 Order, Kings Dodge wishes to make it clear that, by filing this motion and pointing out these errors, Kings Dodge certainly intends no disrespect to this Court.  However, counsel for Kings Dodge would be doing a disservice to both his client and this Court if he did not provide this Court with the opportunity to correct its errors before appealing the November 27 Order to the Sixth Circuit.

II. **ARGUMENT**

A. **All Of The Legislative History Relating To The 1987 Amendments To ORC § 4517.52 Demonstrate That The Regulation Of Time Was Not Intended To Be Eliminated From The Statute.**

Perhaps the most significant error committed by this Court in its November 27 Order was its finding that Ohio Revised Code ("ORC") § 4517.52 does not regulate the

length of time it takes a franchisee to complete warranty repairs. (November 27 Order at p. 24.) The Court's reasoning in this regard hinged on its conclusion that, while the original version of ORC § 4517.52 contained references to the length of time it took for a technician to make repairs, the 1987 amendments to the statute ("the 1987 Amendments") removed all references to the time of repairs. In addition, the following statute in Chapter 45, ORC § 4517.53, kept references to time – not of repairs – but of preparation of new vehicles for delivery to customers. Therefore, this Court reasoned that the amendments to ORC § 4517.52 must mean that the length of time it takes to complete a warranty repair is no longer governed by the statute. (*Id.* at p. 21-22.)

In fact, as demonstrated by all of the attached legislative history of Senate Bill 103 ("S.B. 103"), including the testimony which directly addressed the proposed changes to ORC § 4517.52, this portion of the bill was viewed as actually **strengthening** the obligations of franchisors toward their franchisees and was viewed as "**clearly establishing a statutory standard for compensation in a manner consistent with the intent of the original act**." (Testimony of Richard W. Siehl ("Siehl"); attached as Ex. 1 to the Declaration of James C. Kezele ("Kezele Decl."), attached hereto as Exhibit A.)

In this regard, Mr. Siehl testified as follows to the Ohio Legislature regarding S.B. 103's proposed amendments to ORC § 4517.52:

> **Senate Bill 103 would simplify and strengthen the obligation upon franchisors to compensate its [sic] franchisees for labor and parts used to fulfill warranty and recall obligations at rates not less than the rates charged by the franchisees to its retail customers for like service and parts for non-warranty work**. As presently enacted, Section 4517.52 requires the Board to determine whether the warranty and recall reimbursement

2

> rates are adequate and specifically provides that the compensation of a franchisee shall not be less than the rates charged by the franchisee to its retail customers for like service and parts for non-warranty work.  **In practice, franchisors routinely establish compensation rates less than those rates charged retail customers for non-warranty rates.  Senate Bill 103 removes this issue from the Board and simply states that franchisees will be adequately compensated for warranty and recall work at rates not less than those rates it charges to retail customers for non-warranty work.  This clearly establishes a statutory standard for compensation in a manner consistent with the intent of the original Act.**

(Kezele Decl. at Ex. 1, pp. 1-2; emphasis added.)  Mr. Siehl made it clear in his testimony that the "original Act" was the original version of ORC § 4517.52, which included all of the references to the time it took a technician to perform warranty repairs.  (*Id.* at p. 2).  Accordingly, Mr. Siehl is testifying to the Ohio Legislature that S.B. 103 does not change the compensation scheme of ORC § 4517.52, it simply removed the Dealer Board from any involvement with determining that compensation.  Thus, if the original version of ORC § 4517.52 required consideration of the length of time required to complete warranty repairs, the 1987 Amendments were in no way intended to alter that consideration.  Of course, that is precisely the argument that Kings Dodge made to this Court which this Court rejected in its November 27 Order.

When considering the legislative history, it also bears noting that S.B. 103 amended some 13 different sections of Chapter 45 of the Ohio Revised Code, including provisions of the "lemon law" and provisions relating to relocation of dealerships, and the Bill added another 6 sections to Chapter 45. (The entire text of S.B. 103 is attached as Ex. 2 to Kezele's Decl.)  Significantly ORC § 4517.53, the new car preparation statute, was not addressed in any respect by S.B. 103. (*Id.*)

3

Thus, as argued by Kings Dodge in its earlier briefs to this Court, the legislative history wholly supports a finding that the elimination of references to repair time in the 1987 Amendments to ORC § 4517.52 and the retention of references to repair time in ORC § 4517.53, were in no way intended to absolve manufacturers from having to compensate their dealers in an amount equal to the amount the dealers charged their retail customers for those same repairs, including the consideration of the length of time franchisees charged their retail customers for such repairs. Instead, the distinction in wording between the two statutes was the result of the Dealer Board's involvement being eliminated from all aspects of ORC § 4517.52, yet remaining involved in the oversight of ORC § 4517.53, as well as the fact that there is no comparable service to a dealer's preparation of new cars as there is in the warranty/retail repair context.

For the Court's benefit, Kings Dodge has attached hereto literally all of the legislative history it could locate regarding S.B. 103, which contained the 1987 Amendments to ORC § 4517.52, **and there is literally no testimony whatsoever indicating that the 1987 Amendments were somehow intended to lessen the obligations of manufacturers to fully compensate dealers for warranty repairs or to exclude from that compensation calculation the amount of time that dealers spent in performing the same retail repairs.** (This legislative history is attached hereto as Ex. 3 to Kezele's Decl.) Kings Dodge submits that if the 1987 Amendments truly represented a major change in how manufacturers would be required to compensate their dealers regarding warranty repairs, **someone** would have said **something** about that major change while the Ohio Legislature was considering S.B. 103, especially since many of the major automobile manufacturers, as well as the Ohio

4

Automobile Dealers Association, testified about the bill in front of the Legislature. Instead, virtually all of the testimony regarding S.B. 103 revolved around changes to the lemon law and the dealer relocation provisions.  (*See* Kezele Decl. at Ex. 3.)

This Court's November 27 Order contained an additional significant error resulting from a misleading argument put forth by Chrysler's amicus in this action, who was given leave to file a brief in support of Chrysler on the day plaintiff's final brief in support of its motion for summary judgment was due.  (*See* Docket No. 49.)  In this regard, Chrysler's amicus argued that the testimony of the Federal Trade Commission ("the FTC") to the Ohio Legislature regarding S.B. 103 provided support that the time of repairs should be excluded from the warranty reimbursement scheme.  Specifically, Chrysler's amicus argued, and then this Court subsequently completely accepted, that the FTC's testimony that "various aspects of Ohio law hurt consumers by raising prices," was somehow linked to ORC § 4517.52 and this Court then reached the erroneous conclusion that, "in apparent response to such concerns, the Legislature sought to simplify the regulations [sic] by regulating only the labor rates at which such work was performed."  (November 27 Order at p. 21, n. 29.)  In fact, and as demonstrated by the full testimony of the FTC's witness, **this testimony had nothing whatsoever to do with ORC § 4517.52 or warranty reimbursement**.  (The FTC's entire testimony is attached as Ex. 4 to Kezele's Decl.)  Instead, the FTC's testimony dealt exclusively with, as the witness put it herself: "(1) the establishment or relocation of other dealerships with their relevant market areas (RMA), and (2) the termination or non-renewal of their franchise agreements by the manufacturer or distributor."   (*Id.* at Ex. 4 at p. 1.) Therefore, any concern the FTC expressed about the anti-competitive nature of S.B.

103 necessarily had nothing to do with the amendments to ORC § 4517.52 and the FTC witness did not even reference, much less discuss, ORC § 4517.52 or warranty reimbursement anywhere in her testimony to the Legislature.[1]

In short, there is literally no legislative history to support this Court's finding that the 1987 Amendments somehow weakened the protections provided by ORC § 4517.52. In fact, **all of** the relevant legislative history, including Mr. Siehl's testimony quoted above, indicates the exact opposite. Surely this Court would appreciate the opportunity to revisit this issue before Kings Dodge appeals the November 27 Order to the Sixth Circuit and now that this Court has the complete legislative history in front of it.

### B. The Plain Language Of The Statute Itself Supports Kings Dodge's Position In This Litigation.

Another clearly erroneous aspect of this Court's November 27 Order was its determination that the word "rate," as used in ORC § 4517.52, does not include the time spent by the dealers in performing warranty repairs. (November 27 Order at pp. 23-24.) In support of this finding, the Court cited several Ohio cases interpreting the word "rate" to mean "a ratio between the dollars charged per hour worked." (*Id.* at p. 24, n. 33.) None of the cases cited by the Court had anything to do with warranty reimbursement. But more importantly, if the word "rate," as it is used in ORC § 4517.52, only means "the ratio between two differing units," as this Court held in its November 27 Order (p. 23), then what is the "rate" that the franchisor must pay its franchisee for parts used in warranty repairs? It certainly cannot mean "a ratio between the dollars charged per hours worked." And, in fact, this Court has accepted that the franchisor must pay its

---

[1] It also bears noting that any testimony in opposition to S.B. 103, a bill which already included deletions to all references to time in ORC § 4517.52, could not possibly be supportive of this Court's finding that such opposition testimony caused or led to the deletions of references of time in the amended statute.

franchisees the same "amount" for warranty parts that the franchisee charges its retail customers for the same parts. (*Id.* at pp. 31-32.) Kings Dodge submits that the word "rate" cannot have two different meanings within the same statute.

To further support its finding that the word "rate" could have nothing to do with the time spent in performing warranty repairs, this Court also erroneously stated that Kings Dodge cited "no authority to establish that the labor 'rate' means both the rates at which labor is charged (dollars per hour) and the amount of time required to perform a specific service." (*Id.* at pp. 31-32.) In fact, Kings Dodge cited this Court to three separate cases, including decisions by the Maine Supreme Court and the Seventh Circuit (per an opinion by Judge Posner), which specifically found that the term "labor rate" in the warranty reimbursement context included the time spent in performing specific repairs. *E.g., Darling's v. Ford Motor Co.*, 719 A.2d 111, 115 (ME 1998); *Kronin Motor Sales v. Ford Motor Co.*, 41 F.3d 338, 340 (7th Cir. 1994); *Darling's v. Daimler Chrysler Motor Co.*, 2004 ME Super LEXIS 132 at ** 12-13 (ME Sup. Ct. 2004). If these cases are not enough support for such a position, there is an additional case from Maine in which the court extensively discusses the word "rate" in the context of warranty reimbursement and expressly finds that this term **"means the total amount charged for labor for the repair**." *American Honda Motor Co. v. Darling's Honda/Nissan*, 1997 ME Super LEXIS 225 at * 25 (ME Sup. Ct. 1997). (A copy of this opinion is attached hereto as Ex. B.) As the *American Honda* court reasoned:

> The Legislature certainly understood how to identify a simple hourly charge. It could have but did not use such plain language in § 1176. **This court concludes that it did not do so because it intended the franchisor to reimburse the franchisee for the full amount the franchisee would**

7

> have charged a nonwarranty customer for labor, regardless of the derivation of that amount.
>
> Under the franchise agreements with both Honda and Nissan, the distributors agreed to reimburse Darling's for warranty repairs by a formula consisting of the hourly rate (currently $46.00 per hour) multiplied by a time factor. **The time factor, pursuant to the contracts, may be derived from actual time spent on the repair, from the franchisors' rate manuals, or from more complicated formulas. To the extent that Darling's, in its identical nonwarranty repairs, establishes the total amount of labor cost by multiplying its hourly charge by time manuals not consistent with the franchisors' manuals, or uses a flat rate not used by the franchisors, a discrepancy will exist between the total labor cost charged to its nonwarranty customers and the total labor cost reimbursed by Nissan and Honda. This is exactly the result the Legislature sought to avoid**.
>
> **It is therefore declared that the phrase "retail rate customarily charged" means the total amount charged for labor for the repair, and not merely the hourly charge component of the labor costs.**

(*Id.* at \*\* 24-25; emphasis added.) Granted, the above case was not discussing ORC § 4517.52, **but there is no case law interpreting the word "rate" as it is used in ORC § 4517.52.** Certainly Chrysler has not pointed this Court to any case law in any jurisdiction which has provided a detailed analysis of the word "rate", in the warranty reimbursement context, as meaning solely the hourly charge with no consideration of the time spent performing the repairs. Given the existing case law in other jurisdictions, as well as the statutory history discussed above, it therefore appears to be clear error for this Court to exclude the time spent in performing the repairs as part of plaintiff's "labor rate."

Such a finding is also diametrically opposed to the remedial purpose of Chapter 4517. *E.g., Earl Evans Chevrolet, Inc. v. General Motors Corp.*, 74 Ohio App. 3d 266,

8

276, 598 N.E.2d 1187, 1193 (Lake Cty. 1991); *Lally v. Am. Isuzu Motors, Inc.*, 2006 Ohio 3315, 2006 Ohio App. LEXIS 3248 at ¶ 22 (Franklin Cty. 2006). Indeed, entirely absent from the Court's November 27 Order is any explanation of how its interpretation of ORC § 4517.52 is remedial in nature. In its November 27 Order, the Court did note the Sixth Circuit's finding in *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 836 (6th Cir. 1997), that the statute was intended to "incentivize manufacturers to keep consumer prices low." (November 27 Order at p. 19.) Yet there is no explanation in the November 27 Order regarding how this intention is furthered by allowing the manufacturer to control the time it allots for warranty repairs. Instead, the **undisputed evidence in this action** is that Chrysler's act of allotting approximately 50% of the time for warranty repairs that Kings Dodge is charging its retail customers **is actually driving up the cost of retail repairs to Kings Dodge's retail customers**. (Reichert Dep. at 269-70; Docket No. 27; Pannier Dep. at Ex. 1, p.1; Docket No. 43.) In other words, the undisputed evidence shows that the unlawful discount Chrysler is extracting from Kings Dodge on the warranty side of Kings Dodge's business is harming Kings Dodge's retail customers. What "incentive" does Chrysler ever have to change these consumer prices if the Court's interpretation is correct that ORC § 4517.52 does not govern the time required to perform warranty repairs? As Kings Dodge pointed out to this Court in its earlier briefs, as long as Chrysler controls the length of time for which it will pay its dealers for performing warranty repairs, Chrysler also maintains control over the ultimate reimbursement rate it pays its dealers.

It finally bears noting that this Court's attempt to distinguish all of the Maine case law interpreting Maine's reimbursement statute which, like ORC § 4517.52, contains no

9

reference to the length of time and which, like ORC § 4517.52, requires the manufacturers to compensate dealers at the same labor "rate," was based on this Court's finding that "the Maine statute requires that a dealer inform its customers if it uses flat rate pricing." (November 27 Order at p. 31, n. 40.) This Court then opined that Kings Dodge's retail customers are "likely overcharged for repairs due to Kings Dodge's use of the Alldata/Motor time guide." (*Id.*)

There are several errors with this conclusion. First, the Maine reimbursement statute actually contains no language requiring Maine dealers to notify consumers that they use a flat rate for retail repairs. *See* 10 MRS § 1176. That requirement comes from an entirely different statutory section relating to notices that a dealer must post for its retail customers. *See* 29-A MRS § 1805. Similarly, as Kings Dodge has previously pointed out to this Court, although ORC § 4517.52 does not require that retail customers be told anything about the costs of repairs, OAC § 109:4-3-13 **requires all dealers, upon request, to provide a written estimate to their retail customers for any repair in excess of $25 before performing the repair.** Kings Dodge is at a loss as to how the two states' statutory regimes are substantively any different. Similar to the retail customers in Maine, Kings Dodge's retail customers can make the decision whether they believe the repair estimate is too high and can take their business elsewhere.

Indeed, if Kings Dodge did not utilize some type of flat rate manual for its repairs, it would literally be impossible to provide any consumer with a reliable estimate as no two technicians can perform the same job in the same amount of time. Thus, consumer A could end up paying more than consumer B for the same repair depending on the

relative skill levels of the technicians performing the repairs.  This, of course, is why Chrysler (and every other manufacturer) also utilizes flat rate time when reimbursing dealers for warranty repairs.  There literally is no way to estimate, prior to performing the repair, the "actual time" it will take to perform a given repair as that "actual time" necessarily varies from technician to technician.[2]

Finally, the Court's comment about Kings Dodge "likely overcharging" its retail customers due to its use of the Alldata/Motor time guide, besides being unsupported by any evidence in the record, ignores the testimony of Chrysler's expert David Merta, who basically testified that the use of the Alldata/Motor time guide was entirely appropriate in the retail context.  As Merta testified:

> Q: Do you – are you aware that dealerships under most state laws have to give their customers an estimate before they perform a retail repair?
> A: Yes, I am.
> Q: And do you have an opinion as to what the dealer should use as far as a guide to provide that estimate for the consumer?  **In other words, should they just tell them we don't know how long it's going to take, it's going to take as long as it takes or what do they use as a guide?**
> A: **Are you speaking of warranty repairs or nonwarranty?**
> Q: **I'm talking about retail repairs.**
> A: **Retail.  Okay.**
> **I have no concern with using Alldata time.**
> Q: **For retail repairs?**
> A: **Yes.**

---

[2] It further bears noting that, throughout its November 27 Order, this Court refers to Chrysler's warranty times as the "actual repair times."  (November 27 Order at pp. 26, 29, n. 37.)  Since Chrysler's warranty times indisputably do not contain any time for: diagnosis of the repair needed, backing the vehicle in and out of the garage, the technician leaving his work area to obtain the necessary parts to perform the repair, and road testing the vehicle to ensure that the repair was performed properly, the Court's finding that Chrysler's warranty times are "the actual repair times" can only be correct if none of the above activities are part of an automobile repair.  Since all of the above activities are in fact necessary portions of every repair, both in the warranty and retail context, Kings Dodge **proved** that plaintiff's technicians cannot perform most repairs within Chrysler's warranty times (Compare November 27 Order at p. 29, n. 36.)

11

(Merta Dep. at 92; Docket No. 33; emphasis added.)  Perhaps this is why Mr. Merta agreed that the Alldata/Motor manual is the most popular time guide currently used by dealerships.  (*Id.* at 49.)

Thus, if plaintiff is correct and ORC § 4517.52 incorporates the length of time of warranty repairs, it does not matter whether the Alldata/Motor manual is appropriate for warranty work or not – it is indisputably appropriate for retail work and it is indisputably the manual Kings Dodge uses for all its retail repairs.  Chrysler must therefore compensate Kings Dodge for warranty repairs based on these times.[3]

### C. The Purpose Of ORC § 4517.52 And The Contractual Relationship Between The Parties.

Perhaps the most concerning aspect of the Court's November 27 Order is its holding that the contractual relationship between the parties governs the outcome of this dispute.  (November 27 Order at p. 18, n. 26, pp. 28-29.)  Indeed, this Court summarily rejected Kings Dodge's assertion that Chrysler could simply assign "absurdly low and arbitrary time allotments" to plaintiff's warranty repairs; apparently because it found that "[b]oth parties are bound by the Dealer Agreements."  (*Id.* at p. 25.)  These findings by the Court are clearly erroneous for several reasons.

---

[3] This Court also refers to the testimony of Motor's President Kevin Carr as supportive of its finding that the Alldata/Motor manual "do[es] not even relate to warranty work."  (November 27 Order at p. 30.)  In fact, Motor's President testified that the steps set forth in the Alldata/Motor manual are the steps needed to make an automobile repair, regardless of whether the car is under warranty.  As Carr testified:

> [S]tep procedures are step procedures.  **It would be irrelevant in my mind between warranty and nonwarranty work.  Those are steps you need to do to fix the car regardless of who is paying for it.**

(Carr Dep. at 28-29; Docket No. 25; emphasis added.)  This Court's finding that Mr. Carr's testimony somehow supported its finding that the Alldata/Motor manual was not intended for warranty work is therefore clearly erroneous.

12

First, as Kings Dodge noted in its earlier briefs to this Court, a contract may not be enforced so as to be contrary to a statute. *E.g., Marsh v. Lampert*, 129 Ohio App. 3d 685, 687, 718 N.E.2d 997, 998 (Butler Cty. 1992). Thus, if the word "rate" does include the length of time that a warranty repair entails, as the legislative history and the plain language of the statute shows, it frankly does not matter what the Dealer Agreement provides in this regard.

Just as importantly, the evidence is undisputed that the Dealer Agreement is unilateral in nature. That is, it can be changed by Chrysler at any time and without agreement by Kings Dodge. As the Dealer Agreement states in Section 8, entitled "Amendment":

> **CMC [Chrysler] will have the right to amend this Agreement to the extent that CMC deems advisable, provided that CMC makes the same amendment in Chrysler Motors Corporation Dodge Sales and Service Agreements generally.** Each such amendment will be issued in a notice sent by certified mail or delivered in person to DEALER and signed by the President or a Vice President or the National Dealer Placement Manager of Chrysler Motors Corporation. Thirty-five (35) days after mailing or delivery of such notice to DEALER, **this Agreement will be deemed amended in the manner and to the extent set forth in the notice.**

(Ex. 1 to Affidavit of Kurt Hunt, Docket No. 39; p. CG-Kings 000851, emphasis added.) Chrysler makes it even clearer that its warranty policies can be changed at any time by stating in its Dealer Policy Manual as follows:

> **"Chrysler reserves the right to change any or all of the rules set forth in this Manual and the Warranty Administration Manual. We will do so by means of Bulletins and also be making the amended manual available to you on DealerCONNECT."**

(*Id.* at Ex. 2 pp. CG-Kings 001094; emphasis added.) Thus, as Kings Dodge previously argued, Chrysler is not in fact bound by any particular version of the Dealer Agreement as it changes the Agreement at its pleasure. Therefore, there really is no protection

13

provided by the Dealer Agreement which would prevent Chrysler from modifying its warranty repair times. And the Sixth Circuit has found that it is precisely because of franchisors' economic power and their past abuses that led to the enactment of ORC § 4517.52. *Jim White Agency, supra*, 126 F.3d at 836. Indeed, in addition to the Sixth Circuit, the United States Supreme Court and every United States Circuit Court that has interpreted warranty reimbursement statutes have held that such acts were enacted to protect dealers and/or consumers from the disparity in bargaining power possessed by the manufacturers. As the Supreme Court reasoned in *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 US 96, 101-02 (1978):

> The disparity in bargaining power between automobile manufacturers and their dealers prompted Congress and some 25 states to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers.

*See also Acadia Motors, Inc. v. Ford Motor Co.*, 44 F.3d 1050 (1st Cir. 1995) ("With their superior bargaining position, automakers have in the past forced dealers to accept reimbursement at a rate substantially lower than the dealers' usual retail rate. The net effect has been that, through an inflated labor rate, non-warranty customers have subsidized automakers who were unwilling to pay the fair and full price for repairs made necessary when their automobiles failed to meet warranty standards. This section presents recurrence of this problem.") *Liberty Lincoln Mercury v. Ford Motor Co.*, 134 F.3d 557, 566 (3rd Cir. 1998) (holding that the New Jersey warranty reimbursement statute "is a remedial statute intended to equalize the disparity of bargaining power in franchisor-franchisee relations.")

Thus, this Court's holding that the product of Chrysler's superior bargaining position, the Dealer Agreement, provides Kings Dodge with sufficient protection in the warranty reimbursement arena, is not only ironic, it constitutes clear error.

### D. Kings Dodge Did Everything Requested Of It By Chrysler To Verify Its Retail Labor Rate.

Perhaps the most puzzling finding of this Court in its November 27 Order was its conclusion that Kings Dodge "failed to submit the type of particularized claim necessary to put defendant on notice of the claim and enable defendant to evaluate and verify the claim." (November 27 Order at p. 24.) The Court went on to find that "neither the August 30, 2011 communication nor the November 2, 2011 communication provided a reasonable certification of Plaintiff's claims repair time." What the Court apparently failed to understand is that, when Kings Dodge submitted the 200 consecutive retail repair orders required by Chrysler, **each of those repair orders contained the exact time that Kings Dodge allows and charges for those repairs.**

As Chrysler's 30(b)(6) witness Ralph Vargo testified regarding this issue:

> Q: And when the dealer submits pursuant to Chrysler's request 200 consecutive retail repair orders, both those components are included in all the ROs, that is **you'll see how much, you being Chrysler will see how much the dealer is charging its retail customers, and you'll also see how much time it allows for those retail repairs?**
> A: **Yes.**

(Vargo Dep. at 22; Docket No. 31; emphasis added.) In addition, all of Chrysler's witnesses unequivocally testified that, with respect to plaintiff's request for a labor increase, plaintiff provided Chrysler with all the information Chrysler requested. (Vargo Dep. at 39; Docket No. 31; Jankowski Dep. at 29-30; Docket No. 30.) In short, the undisputed evidence shows that plaintiff provided Chrysler with far more information

15

than the two communications referenced in the Court's November 27 Order and that plaintiff in fact provided Chrysler with all of the information necessary to confirm the amount of time plaintiff was charging its retail customers. This Court's finding to the contrary constitutes clear error.

> **E. Plaintiff Informed Chrysler That Chrysler Was Not Reimbursing Plaintiff At Its Retail Rate For Parts And Then Allowed Chrysler The Opportunity To Verify Its Retail Rate.**

Another erroneous aspect of the Court's November 27 Order was its finding that Kings Dodge failed to declare its "appropriate retail rate" with respect to the prices it charged its retail customers for parts. (November 27 Order at p. 33.) In this regard, the Court found that "plaintiff maintains that its only burden was to 'inform' defendant that it was not reimbursing plaintiff at its retail rate." (November 27 Order at p. 32.)

In fact, plaintiff has always acknowledged that, pursuant to ORC § 4517.52, plaintiff was required to: 1) alert Chrysler to the fact that Chrysler was not properly reimbursing it; and 2) then allow Chrysler the opportunity to verify plaintiff's retail rate. (*See, e.g.* Docket No. 36 at pp. 25-27). Plaintiff submits that, when it notified Chrysler that Chrysler was not reimbursing it for parts used in warranty repairs at its retail rates (*see* Vargo Dep. at Ex. 8), and then followed that notification with the submission of 200 retail repair orders – all of which indisputably contained the retail prices plaintiff charged for parts – plaintiff fully satisfied its obligation under ORC § 4517.52. *See R&R, Inc. v. Volvo Trucks North America, Inc.*, 2007 US Dist. LEXIS 13583, * 10 (N.D. OH 2007). Plaintiff's point to this Court in its earlier briefs was that plaintiff had no obligation to declare a certain percentage rate to obtain a parts price increase; instead, it only had to verify what rate (amount) it was charging its retail customers for parts. Plaintiff indisputably did this in the Fall of 2011 with its submission of 200 consecutive retail

16

repair orders, yet Chrysler did not increase plaintiff's parts reimbursement rate (amount). (*See* Vargo Dep. at 82; Ex. 2.) At a minimum, plaintiff presented a factual question for a jury to decide when plaintiff informed Chrysler, back in August, 2011, that plaintiff charged "retail price" for parts and then submitted 200 consecutive retail repair orders to verify that retail rate.

### III.  CONCLUSION

For the reasons set forth herein, plaintiff Kings Dodge respectfully requests, pursuant to Rule 59(e), that this Court reconsider and alter or amend its November 27 Order and vacate the Clerk's subsequent judgment affirming the November 27 Order.

Respectfully submitted,

/s/  Curtis L. Cornett
Curtis L. Cornett (0062116)
Cors & Bassett, LLC
537 E. Pete Rose Way, Suite 400
Cincinnati, Ohio 45202
Phone: 513.852.8226
Fax: 513.852.8222
clc@corsbassett.com

Trial Attorney for Plaintiff Kings Dodge, Inc.

### CERTIFICATE OF SERVICE

I hereby certify that on December 24, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to Kurt R. Hunt, Esq., DINSMORE & SHOHL LLP, Robert D. Cultice, Esq., and Lucy Heenan Ewins, Esq., WILMER CUTLER PICKERING HALE AND  DORR LLP, attorneys for defendant Chrysler Group, LLC, by operation of the Court's electronic filing system.

/s/ Curtis L. Cornett
Curtis L. Cornett

604010.1