

**AMERICAN HONDA MOTOR COMPANY, Plaintiff v. DARLING'S HONDA/NISSAN, Defendant; NISSAN MOTOR CORPORATION IN U.S.A., Plaintiff v. DARLING'S HONDA/NISSAN, Defendant**

CIVIL ACTION Docket No. CV-95-39, CV-96-668

SUPERIOR COURT OF MAINE, CUMBERLAND COUNTY

*1997 Me. Super. LEXIS 225*

July 27, 1997, Decided

**DISPOSITION:** [*1] Defendant's Motions to Dismiss Honda's count V and Nissan's count XIV DENIED. Defendant's Motion to Dismiss Nissan's count X GRANTED.

**COUNSEL:** For Plaintiff: William W. Willard, Esq., Bornstein, Shur, Sawyer, Portland, ME.

For Defendant: Daniel J. Perry, Esq., Bangor, Maine; WARREN SILVER, Bangor, Maine; Jennifer Begel, Esq., Harold Friedman, Esq. (Inter. Nissan), Portland, ME.

**JUDGES:** Leigh I. Saufley, Justice.

**OPINION BY:** Saufley

**OPINION**

**ORDER**

Before the court are the motions of Nissan Motor Corporation in U.S.A. (Nissan) and American Honda Motor Company (Honda) for partial summary judgment on Counts I, II and III of the consolidated complaints; [1] and Darling's cross-motions for summary judgment on Counts I, II and III and motions to dismiss Counts V, X and XIV. The parties agree that there are no facts in dispute that are material to the matters before the court. For the reasons set out below, the following order is hereby entered.

  1  The Nissan matter originated in the Penobscot Superior Court (Penobscot Docket No. CV-94-118) and was consolidated with the Cumberland County Honda matter for purposes of pre-trial dispositive motions. There is also pending in the Federal District Court, District of Maine, a matter captioned *Darling's, d/b/a Darling's Bangor Ford v. Ford Motor Company* (Docket No. 95-398-P-H) in which similar legal matters have been raised.

[*2] **1. BACKGROUND**

Darling's is a car dealership with an automobile repair facility. It has entered into franchise agreements with certain distributors to obtain vehicles for sale to the public. It then undertakes warranty repairs for those cars sold pursuant to the franchise agreements. It also does repairs for vehicles not under warranty.

Honda and Darling's entered into their most recent franchise agreement on March 22, 1993. Nissan and Darling's entered into their most recent franchise agreement on May 31, 1990. The parties do not dispute that these agreements are franchise agreements and that they are controlled by the provisions of Title 10, Ch. 204 "Regulation of Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers" (hereinafter referred to as the Act). [2]

  2  10 M.R.S.A. § 1171 et seq.

However, the parties dispute the retroactive application of certain changes to that Act which became effective after Nissan and Darling's entered into its most recent contract in [*3] 1990, and the parties dispute the meaning of the term "rate" found in *10 M.R.S.A. § 1176*. At the heart of this proceeding is the amount that Nissan and Honda will be required to reimburse Darling's for its parts and labor on those warranty vehicles falling within their franchise agreements.



### 2. LEGISLATIVE HISTORY

First enacted in 1975, the Act's purpose was to regulate the conduct of motor vehicle dealers and franchisees in order to avoid harm to the public. L.D. 1766, statement of Fact (107th Legis. 1975). Originally, the provision in dispute at bar read as follows:

> Every manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesaler branch or division, shall properly fulfill any warranty agreement and adequately and fairly compensate each of its motor vehicle dealers for labor and parts.

P.L. 1975, ch. 573, § 1176 (emphasis added). In 1979 the legislature added a provision to § 1176 providing that reasonable attorneys' fees would be available if an auto dealer was successful in an action to collect claims illegally disapproved by the manufacturer. P.L. 1979, ch. 498, § 3; L.D. 1610 (109th Legis. [*4] 1979).

In 1980 that provision was further amended to provide the following language:

> Further, the franchisor shall reimburse the franchisee for any labor so performed at the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction of a warranty; provided that the franchisee's rate for labor not performed in satisfaction of a warranty is routinely posted in a place conspicuous to its service customer.

P.L. 1979, ch. 648, § 1 (emphasis added). In 1991, § 1176 was again amended to "require that dealers be compensated for parts in the same manner as labor [at the retail rate customarily charged for non-warranty work] when work is performed under a manufacturer warranty." L.D. 1235, Statement of Fact (115th Legis 1991); P.L. 1991, ch. 459.

It is this amendment to the Act which has created the current controversy regarding its applicability to the Nissan/Darling's 1990 franchise agreement. [3] The 1991 amendment contained no language making it retroactive nor did the statement of facts or any other legislative document contain an expressed intent to make the new provision retroactive. Darling's urges the court to conclude [*5] that the 1991 amendments are retroactively applicable to its contract with Nissan, thereby requiring Nissan, notwithstanding the actual language of the contract, to reimburse Darling's at the retail rate customarily charged by Darling for parts provided under warranty.

> 3  Because Honda's franchise contract with Darling's was entered into after the amendments to § 1176, the question of its retroactive application is not at issue in the Honda matter.

With regard to the reimbursement rate for labor, there is no dispute that the 1980 amendment applies to the contracts with both Nissan and Honda. The labor reimbursement dispute centers on the meaning of the phrase "retail rate customarily charged." Nissan and Honda seek a declaration that the phrase means simply the hourly charge. Darling's argues that the phrase must be interpreted to include a time component as well.

### 3. RETROACTIVE APPLICATION OF THE 1991 AMENDMENTS TO § 1176

#### a. Prospective vs. Retroactive Application

The first [*6] step in the analysis of the dispute regarding parts reimbursement is to determine whether the application urged by Darling's is, in fact, a retroactive application. Concepts of temporal application of statutes date back to early American jurisprudence. One of the earliest principles established regarding effective dates of legislation was clearly set out in *Coffin v. Rich*, 45 Me. 507, 514 (1858) in which the court declared that the legislature has "no constitutional power to enact retrospective laws which impair vested rights or create personal liabilities." This concept precluding impairment of vested rights has survived intact moving into the 21st century.

Reiterating almost 150 years of Maine statutory construction jurisprudence, the Law Court stated, "We are guided [in determining the retroactivity of statutes] by 'the fundamental rule of statutory construction strictly followed by this Court that all statutes will be considered to have a prospective operation only, unless the legislative intent is clearly expressed or necessarily implied from the language used.'" *Terry v. St. Regis Paper Co.*, 459 A.2d 1106, 1109 (Me. 1983) (quoting *Coates v. Maine Employment Sec. Comm'n*, 406 A.2d 94, 97 (Me. 1979) [*7] (quoting *Miller v. Fallon*, 134 Me. 145, 148, 183 A. 416, 417 (1936))). Legislative intent must expressed in "'strong, clear and imperative language,'" *id.* (quoting *Barrett v. Herbert Engineering, Inc.*, 371 A.2d 633, 635 n.1 (Me. 1977)), and will be implied only when the statute would otherwise be "inoperative," *id.*

Contrary to the defendant's contention, this principle was not abandoned in *Sinclair v. Sinclair*, 654 A.2d 438 (Me. 1995). Four members of the court cited to *Miller* or *Terry* and recognized the need for a clear expression of retroactivity from the Legislature. *Sinclair*, 654 A.2d at

*441* (Clifford, J., concurring in result), 441 (Lipez, J., dissenting). Because the two justices on the lead opinion simply concluded, contrary to the conclusions of their colleagues, that the enactment in question would be thwarted without retroactive application, [4] and because retroactive intent if "necessarily implied" when a statute would be inoperative unless applied retroactively, the *Sinclair* lead opinion inferred retroactive intent from an examination of the enactment's purpose. *Id. at 440.* [*8] The lead opinion did not express an intent to abandon the principles of statutory construction and thus did not change the analysis that this court must employ to determine whether the application sought by Darling's would be a retroactive application, and if so whether such an application was clearly expressed or necessarily implied from the language of the enactment or its legislative history. [5]

> 4   "The Legislature must have recognized that a limitation of the section's application to future mortgages would leave some homeowners unprotected for nearly 30 years. That limitation would frustrate the legislative purpose." *Sinclair, 654 A.2d at 440.* The concurring justices agreed that the statute in issue should be applied to preexisting mortgages but believed that its application was not retroactive. *Id. at 441* (Clifford, J., concurring).
> 5   Even if the lead opinion in *Sinclair* can, in fact, be interpreted to have abandoned the principles in *Terry* and *Miller*, that opinion does not represent a majority opinion of the Law Court, and, thus, is not binding precedent in this case. *See Neil v. Biggers, 409 U.S. 188, 192, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972).*

[*9] "Legislation is considered retroactive if its application determines the legal significance of acts or events that occurred prior to the statute's effective date." *Liberty Mut. Ins. Co. v. Superintendent of Ins., 1997 ME 22, P9, 689 A.2d 600* (citing *Terry v. St. Regis Paper Co., 459 A.2d 1106, 1108 (Me. 1983).* In determining whether the legislation effects the legal significance of contracts entered into before the effective date of the changes, the traditionally referenced distinction between procedural and substantive changes does not provide useful guidance. As the *Sinclair* court concluded, use of labels such as procedural, substantive or retroactive and prospective "are subject to manipulation" and therefore of little assistance to the court. *Sinclair, 654 A.2d at 439.* "The issue before us today is a prime example of the limitations of an analysis that relies on the elusive distinction between substance and procedure." *Id.*

The more appropriate inquiry is whether the enactment at issue occurred after the contract was executed and changed in some material way the bargain of the parties reflected in the language of the [*10] contract. [6] Although this inquiry has been framed in terms of "operative events," even the operative events analysis can be misleading where the enactment has an effect on a contract. [7] Where parties have agreed through a contract that certain events in the future, e.g., warranty repairs, will be reimbursed in a specific fashion, legislation that alters the agreement on reimbursement necessarily governs operative events that occurred before the enactment, that is, the specific bargain of the parties as to the method of reimbursement. With few exceptions, contracts are entered into to govern future events and actions of the parties to the contract. To conclude that the effect of an enactment is "prospective" because the act generating the contracted-for reimbursement postdated the enactment would eviscerate the contract clauses of the state and federal constitutions. [8]

> 6   As noted by Justice Lipez:
>
> > In a contract case such as this, the inquiry about the applicability of a statute should be limited to three questions: 1) whether the statute was enacted before or after the contract was executed; 2) if after, whether the Legislature intended that the statute apply retroactively; and 3) if it so intended, whether the statute works an unconstitutional impairment of contract. The substantive/procedural (or remedial) analysis should not be used in a contract case to determine whether a statute applies retroactively or prospectively.
>
> *Sinclair, 654 A.2d at 441* (Lipez, J., dissenting).
>
[*11]
> 7   An enactment will be considered to have only a prospective application "'if it governs *operative events* that occurred *after* its effective date....'" *Barnes v. Comm'r of the Dep't of Human Servs., 567 A.2d 1339, 1341 (Me. 1989)* (quoting *Norton v. C.P. Blouin, Inc., 511 A.2d 1056, 1060 n.5 (Me. 1986)).*
> 8   Article 1, Section 10 of the United States Constitution; Article 1, Section 11 of the Maine Declaration of Rights. The Law court has made no distinction between the state and federal provisions.

Nissan and Darling's explicitly contracted for a method of calculating reimbursement for parts installed under warranty. The 1991 amendment, if applied here, would, without dispute, alter the amount Nissan will be required to reimburse Darling's for such part. The changes, enacted after the execution of the contract, are therefore retroactive. Any other conclusion would result in the vaulting of semantics over substance. Because the application of statute urged by Darling's would constitute a retroactive application, this court must determine whether the [*12] Legislature intended such an application.

**b. Legislative Intent**

The Legislature did not express an intent that the 1991 amendments be applied retroactively. It is therefore incumbent on this court to determine whether such intent is necessarily implied from the language used. Nothing on the face of the amendments carries such an implication.

Darling's relies heavily on the fact that the Federal District Court in Maine has, on more than one occasion, held that the amendments to the Act were intended to apply retroactively. *Acadia Motors, Inc. v. Ford Motor Co., 844 F. Supp. 819, 824-26 (D. Me. 1994)* (ruling that 1991 amendments to § 1176 applied to pre-1991 contracts), *aff'd in part, rev'd in part, 44 F.3d 1050 (1st Cir. 1995); N.A. Burkitt, Inc. v. J.I. Case Co., 597 F. Supp. 1086, 1088 (D. Me. 1984)* (adopting magistrate's conclusion that 1981 amendments to Act intended to apply to agreements already in effect). [9] Judge Carter found that a contrary conclusion would create "grave problems of enforcement." *Burkitt, 597 F. Supp. at 1088*. Judge Brody agreed with Judge Carter and added, 'A contrary conclusion [*13] would allow manufacturers to shield themselves from future state regulation altogether simply by entering into contracts with open-ended termination provisions." *Acadia Motors, 844 F. Supp. at 826*.

> 9  In *Burkitt*, Judge Carter adopted then Magistrate, now Judge, Hornby's conclusion. With the *Acadia* case, all three current federal district court judges have concluded that the § 1176 amendments were intended to apply retroactively. It is not surprising therefore that the Federal District Court (Hornby, J.) has recently reached a similar conclusion in the *Darling's v. Ford Motor Company* matter. However, the District Court's decision is not final and is subject to appellate review. *Cf. Scuncio Motors, Inc. v. Subaru of New England, Inc., 715 F.2d 10 (1st Cir. 1983)* (declining to give retroactive application to amendments to franchise statute which would affect existing rights between contracting parties); *Joe Dwyer, Inc. v. Jaguar Cars, Inc., 167 Mich. App. 672,*

*423 N.W.2d 311 (Mich. 1988)* (holding that franchise statute will be applied prospectively "where a new law interferes with express contract rights"); *Coulter Pontiac, Inc. v. Pontiac Motor Div., 4 Ohio App. 3d 169, 446 N.E.2d 1128 (Ohio 1981)* (court declined to apply statute retroactively to pre-existing franchise agreements); *Northwood AMC Corp. v. American Motors Corp., 139 Vt. 145, 423 A.2d 846 (Vt. 1980)* (declining to give retrospective application of amendment to statute similar to that at bar).

[*14] While this court agrees that either concern may render the statute disparately enforceable, *section 1176* is not rendered "inoperative" to the extent that a legislative intent of retroactive application should be implied. Different application of a statute and its amendments based on the time a person comes within the statute does not render it inoperative. *See Terry, 459 A.2d at 1109*. In contrast to the contract at issue in *Sinclair*, the franchise contracts involved here are of varying lengths, and may contain provisions allowing termination upon notice by the franchisee. [10]

> 10  While some agreements are "perpetual" such as the current Nissan/Darling's contract, the contract terms of the perpetual agreement at bar allow Darling's to terminate the agreement "at any time," *see*, Nissan Dealer Sales and Service Agreement Standard Provisions, § 12 (E.).

Moreover, the Legislature has the power to cause the statute to be applied retroactively, and thus prevent manufacturers from circumventing [*15] legislative intent and regulation should it decide that such a goal warrants interference in contracts already in existence. It is after all the Legislature, rather than the court, which "is uniquely equipped to discern the impact of its action and to insure the accomplishment of its purposes." *459 A.2d at 1110* (Roberts, J., concurring).

Not only did the Legislature not provide the strong, clear, and imperative language of retroactivity in either the 1980 or 1991 amendments as it did with the 1995 technical amendments, P.L. 1995, ch. 65, § C-15, but the legislative history also suggests that the amendments were to have a prospective application.

> With their superior bargaining position, automakers have in the past forced dealers to accept reimbursement at a rate substantially lower than the dealers' usual rate. The net effect has been that, through an inflated labor rate, nonwarranty customers have subsidized automakers who were unwilling to pay the fair and full price for repairs made necessary when the

automobiles failed to meet warranty standards. This *section [1176]* prevents the recurrence of this problem... .

L.D. 1878, Statement of Fact [*16] (109th Legis. 1980) (emphasis added). This language, while regrettably not without ambiguity, evinces the Legislature's intent to control the bargaining positions of the franchisee and franchisor at the point of contract negotiations. The Business Legislation Committee also referenced the pressures brought to bear on the local franchisee as a result of the greater bargaining strength of the national distributors.[11] All of this language can be read to demonstrate the Legislature's intent to address the process of future contract negotiations. To the extent Darling's would urge the court to find a contrary meaning in the language referenced, it is certainly not so clear as to necessarily imply an intent to affect existing contracts. As much as the Legislature wanted to right a wrong, its language demonstrated only an intent to level the playing field for future contract negotiations between commercial parties.

> 11   In its report on the 1980 amendments, the Joint Standing Committee on Business Legislation stated, "Intervention in the contractual affairs of commercial parties is not normally advisable nor justified. Under the circumstances, however, we think that the only equitable method of express warranty reimbursement is reimbursement at regular retail rates. Further, no automaker ought to be permitted to pressure its dealers into accepting less." Report of the Joint Standing Committee on Business Legislation 4 (Jan. 25, 1980).

[*17] The fact that the Legislature knows how to make a statute retroactive has been noted in *Terry* and *Sinclair*. *Sinclair, 654 A.2d at 442* (Lipez, J., dissenting) (referring to Maine Legislative Drafting Manual); *Terry, 459 A.2d at 1109* (same). It is significant that, in enacting a few purely technical amendments, the Legislature provided for retroactivity of the 1995 amendments to *§ 1176* by stating, "This Act applies retroactively to January 1, 1995." P.L. 1995, ch. 65, § C-15. The presence of those words in 1995 speaks volumes about the absence of any similar language in 1991.

Ultimately, this court concludes that implying a legislative intent of retroactivity in this matter would be improper legislating on the part of the court. Because no legislative intent has been expressed or implied which would make the 1991 amendments to *§ 1176* retroactively applicable to the contract between Nissan and Darling's, the constitutional issue is not reached.[12]

> 12   If reached, it is likely that this issue would be decided in Darling's favor. This is a highly regulated area in which the legislature had already required reimbursement of a part of the warranty work (labor) at rate identical to the non-warranty work. If applied retroactively, even if *§ 1176* substantially impaired the plaintiffs' rights, there are significant and legitimate state interests which are appropriately and reasonably served by the adjustment of the plaintiffs' contracted rights. *Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 411-13, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983)*; *Acadia, 844 F. Supp. at 826-28*; *Sinclair, 654 A.2d at 440*.

[*18]   4.  "RETAIL RATE CUSTOMARILY CHARGED"

The parties' dispute regarding reimbursement for labor centers not on temporal applicability of the statute but rather on the interpretation of the language added to the statute by the 1980 amendment. The applicable provision in dispute reads as follows:

> If a motor vehicle franchisor requires or permits a motor vehicle franchisee to perform labor . . . in satisfaction of a warranty created by the franchisor . . . . The franchisor shall reimburse the franchisee for any labor so performed at the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction of a warranty; provided that the franchisee's rate for labor not performed in satisfaction of a warranty is routinely posted in a place conspicuous to its service customer.

*10 M.R.S.A. § 1176* (emphasis added).[13]

> 13   As originally proposed, the 1980 amendment used the phrase "in an amount equal to the retail price." L.D. 1878, § 1 (109th Legis. 1980). A committee amendment to the bill changed the phrasing to "retail rate" with a brief statement of fact indicating that the purpose of the amendment was to make a "technical change in the wording." Comm. Amend. A to L.D. 1878, No. H-877 (109th Legis. 1980). No further discussion of the reason for the change occurred.

[*19] The question presented is whether that "retail rate customarily charged" references only a standard hourly charge, as Nissan and Honda claim, or includes

the entire amount charged for labor, inclusive of a time factor. The manuals used by Nissan and Honda to establish the time component for labor reimbursement provide different (allegedly shorter) times for particular repairs than does the manual used by Darling's. Therefore the total amount charged to nonwarranty customers for labor may vary from the total amount reimbursed by the distributors. If "retail rate customarily charged" refers only to the hourly charge, no conflict exists between the statute and the contracts. If the phrase means the total labor cost, the contracts are in violation of the statute and "shall be void and unenforceable." *10 M.R.S.A. § 1182*.

The trial court's first task in interpreting a statute is to look to the plain meaning of the words. The purpose of reviewing the plain language of a statute is to give effect to the legislative intent. *Daniels v. Tew Mac Aero Servs., Inc., 675 A.2d 984, 987 (Me. 1996)* (citing *Thibeault v. Larson, 666 A.2d 112, 114 (Me. 1995))*. "It [*20] is also a well established principle of statutory construction that a statute must be interpreted in light of the real purpose of the legislation." *Eagle Rental, Inc. v. City of Waterville, 632 A.2d 130, 131 (Me. 1993)* (citing *State v. Niles, 585 A.2d 181, 182 (Me. 1990))*. Where a statute is unambiguous, it will be given its plain, ordinary meaning. *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co., 513 A.2d 283, 286 (Me. 1986)*. It is only when the plain language is ambiguous that the court may go behind that plain language to examine other indicia of legislative intent. *Berube v. Rust Engineering, 668 A.2d 875, 877 (Me. 1995)*. The court will then look to the "'history of the statute, the policy behind it, and the contemporary related legislation.'" *Maine Beer & Wine Wholesalers Ass'n v. State, 619 A.2d 94, 97 (Me. 1993)* (quoting *State v. Edward C., 531 A.2d 672, 673 (Me. 1987))*.

The language at issue here is susceptible of at least two meanings. The common ordinary meanings of the term "rate" include both of the concepts urged by the competing parties at bar. It [*21] may reference a single specific value or it may connote a number representing a calculation. Among the accepted definitions are "[a] quantity measured in terms of another measured quantity... [or] [a] charge or payment calculated by means of a particular ratio or formula." *Webster's II New Riverside University Dictionary* 975 (1994). Because the plain ordinary meaning of the term could support either party's interpretation, the court must look beyond those words to the legislative history of the provision and the Act itself.

From a review of the legislative history, it is clear that the overall intent of the legislature was to assure that costs borne by nonwarranty customers would be the same as those paid in reimbursement for warranty work. Although Nissan and Honda make a cogent argument that the legislature did not undertake any intricate analysis of the term "rate" when it determined to amend § 1176 in 1980, and therefore, most likely were referring simply to the hourly rate used by the franchisee, the legislative history simply does not bear out that conclusion. [14]

> 14  A comment by the First Circuit in the *Acadia* matter demonstrates a similar understanding of legislative intent: "We think that an objective reading of the legislative history indicates the legislature decided that warranty reimbursement levels would be at retail rates, in order to prevent non-warranty customers from being charged prices much higher than the customary retail rates. Therefore, if anything, the statute was arguably meant to protect *non-warranty consumers* from inflated prices charged by dealers who are attempting to maintain their average profit margins in the face of a manufacturer's below-retail reimbursement rates." *Acadia Motors, Inc. v. Ford Motor Co., 44 F.3d 1050, 1056 n.9* (emphasis in original).

[*22] The report of the Joint Standing Committee on Business Legislation found, as noted above, that historically franchisors had used their superior bargaining power to coerce dealers into accepting reimbursement for labor at a "rate significantly below what dealers routinely charge ordinary retail customers." Report of the Joint Standing Committee on Business Legislation 5 (Jan. 25, 1980). It therefore recommended that the language of the statute be amended to require reimbursement at the retail rate customarily charged to non-warranty customers. The report contained no discussion of the issue at bar, that is, whether that "rate" was intended to represent simply the amount charged per hour, or was intended to represent a combination of hourly charge and time component.

The Statement of Fact attached to L.D. 1878 went somewhat further, repeating the concern of the Committee and going on to find that "nonwarranty customers have subsidized automakers who were unwilling to pay the full and fair price for repairs made necessary when their automobiles failed to meet warranty standards." L.D. 1878, Statement of Fact (109th Legis. 1980) (emphasis added). From this language it becomes clear [*23] that, although the Legislature did not address with specificity the components of the phrase "retail rate customarily charged," its goal was to assure that repairs made under warranty were reimbursed in total amounts that would be identical to the amounts paid by nonwarranty customers. [15]

> 15  Addressing concerns that such a requirement could motivate the franchisee to increase its rates across the board, the Committee noted that

competition in the marketplace would have a legitimizing effect on the "rates" charged by the franchisee. Business Legislation Report, *supra*, at 5.

This reading of legislative intent is consistent with the enactment, simultaneously with the enactment of the 1980 changes to § *1176*, of a requirement that information regarding charges to nonwarranty customers be posted conspicuously by the dealer. P.L. 1979, ch. 698, *codified as* 29 M.R.S.A. § 2605. [16] That mandated notice, intended to advise consumers of their rights, was spelled out with specificity in the statute. Among the [*24] statements required to be included in the notice are the following:

> WE CHARGE $ ___ PER HOUR FOR LABOR. . .
>
> . . . .
>
> We also charge a flat rate for some repairs. Our service manager will explain what a flat rate is and show you how much it may cost you.

*Id.* The reference to hourly charge is clearly and unambiguously set out. It evinced a clear recognition of different methods for determining labor charges.

> 16  Repealed and replaced by P.L. 1993, ch. 683, § A-2 (effective Jan. 1, 1995) and *codified* at 29-A M.R.S.A. § 1805.

That amendment to then Title 29 was contained in the same bill, L.D. 1878, as the disputed amendment to § *1176* and was intended to address the same consumer protection related concerns. The Legislature certainly understood how to identify a simple hourly charge. It could have but did not use such plain language in § *1176*. This court concludes that it did not do so because it intended the franchisor to reimburse the franchisee for the full amount the franchisee [*25] would have charged a nonwarranty customer for labor, regardless of the derivation of that amount.

Under the franchise agreements with both Honda and Nissan, the distributors agreed to reimburse Darling's for warranty repairs by a formula consisting of the hourly rate (currently $ 46.00 per hour) multiplied by a time factor. The time factor, pursuant to the contracts, may be derived from actual time spent on the repair, from the franchisors' rate manuals, or from more complicated formulas. To the extent that Darling's, in its identical nonwarranty repairs, establishes the total amount of labor cost by multiplying its hourly charge by time manuals not consistent with the franchisors' manuals, or uses a flat rate not used by the franchisors, a discrepancy will exist between the total labor cost charged to its nonwarranty customers and the total labor cost reimbursed by Nissan and Honda. This is exactly the result the Legislature sought to avoid.

It is therefore declared that the phrase "retail rate customarily charged" means the total amount charged for labor for the repair, and not merely the hourly charge component of the labor costs.

### 5. DARLING'S MOTION TO DISMISS COUNTS [*26]  V, X AND XIV

Count V of Honda's complaint requests a declaration that Darling's use of a commercial flat rate manual in determining labor charges is a deceptive trade practice and as such is prohibited under Maine law. Similarly, Count XIV of Nissan's complaint alleges that the use of the commercial flat rate manual is a deceptive trade practice. Both Nissan and Honda assert that the times or rates established by the commercial rate manuals relied upon by Darling's are inflated rates not consistent with the amount of time actually spent in repair and therefore the use of such manuals constitutes an illegal act on the part of Darling's.

Pursuant to *10 M.R.S.A. § 1211 et seq.* "a person likely to be damaged by a deceptive trade practice of another may be granted an injunction . . . ." *10 M.R.S.A. § 1213* (1997). This court concludes that the declaratory judgment entered previously determining that Nissan and Honda must reimburse Darling's for the total labor cost it would charge its nonwarranty customers does not resolve the issue presented by the franchisors' assertion that the rates used by Darling's constitute deceptive trade practices.

The issues related to the Deceptive [*27]  Trade Practice Act are before the court on Darling's motion to dismiss. This court cannot say that there are no set of facts under which plaintiffs could prevail on their Deceptive Trade Practice Act claims. [17] *Plimpton v. Gerrard, 668 A.2d 882, 885 (Me. 1995)* Therefore, the motions to dismiss Honda's Count V and Nissan's Count XIV must be denied.

> 17  Even the Joint Standing committee on Business Regulations had concerns about the possibility of inflated charges by the franchisee. See n. 15 *supra*.

Nissan's Count X alleges that Darling's committed fraud when it notified Nissan that it intended to seek reimbursement from warranty customers for amounts in excess of the reimbursement provided by Nissan. To prevail on its claim for fraud, Nissan must show "(1) that [Darling's] made a false representation (2) of a material

fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing [Nissan] to act in reliance upon it, and (5) [*28] [Nissan] justifiably relied upon the representation as true and acted upon it to [its] damage." *Mariello v. Giguere, 667 A.2d 588, 590 (Me. 1995).*

In support of its claim in Count X, Nissan alleges that Darling's made statements to Nissan's customers (not to Nissan) which it knew to be false, that is, that it would or could sue the customers to recover amounts not paid by Nissan under the warranty agreement. Nissan furthered alleged that it was harmed by those statements. Nissan does not allege that it justifiably relied on statements made to it by Darling's. This court concludes that Nissan has failed to allege facts which could support a claim of fraud, therefore its request for injunctive relief must be denied, and Count X will be dismissed.

### 6. CONCLUSION

The 1991 amendments to *§ 1176* will not be retroactively applied to the contract between Nissan and Darling's. The phrase "retail rate customarily charged" references the total charge for labor customarily charged to nonwarranty customers. The plaintiffs' claims under the Unfair Trade Practice Act cannot be resolved on defendant's Motion to Dismiss. The plaintiffs have failed to state a [*29] claim of fraud, and therefore its request for injunctive relief must be denied.

Wherefore the entry shall be

1. Defendant's Motions to Dismiss Honda's count V and Nissan's count XIV are DENIED.

2. Defendant's Motion to Dismiss Nissan's count X is GRANTED.

3. It is declared that the 1991 amendments to *10 M.R.S.A. § 1176* do not apply retroactively.

4. It is declared that the phrase "retail rate customarily charged" in *10 M.R.S.A. § 1176* refers to the total labor cost and not simply to the hourly charge component of that cost.

DATED: July 27, 1997

Leigh I. Saufley

Justice, Superior Court