UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KINGS DODGE, INC. | : | Case No. 1:12-cv-445 |
| Plaintiff, | : | (Judge Timothy S. Black) |
| v. | : | |
| CHRYSLER GROUP, LLC | : | **PLAINTIFF KINGS DODGE, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION PURSUANT TO RULE 59(e)** |
| Defendant. | : | |

## I.  INTRODUCTION

In its opposing brief, defendant Chrysler Group, LLC ("Chrysler") inaccurately but repeatedly argues that plaintiff Kings Dodge, Inc.'s (Kings') motion for reconsideration does nothing more than reargue the same points which this Court has already rejected. (Chrysler Brief at pp. 1-4, 11.) In fact, in connection with its motion for reconsideration, Kings provided this Court with all of the legislative history available regarding the 1987 Amendments to ORC § 4517.52 in order to rebut an argument made for the first time by Chrysler's *amicus* the day Kings' Reply Brief was due (an argument subsequently adopted by this Court). As this Court is aware, that argument was that the legislative history supported a finding that the deletion of language regarding the time of repair in the 1987 Amendments to ORC § 4517.52 meant that the legislature intended to reduce the amount of compensation due dealers for warranty repairs even though the post-amendment statute required manufacturers to pay dealers "not less" than the dealers' "retail rate" for labor and parts. Since plaintiff has filed its motion for reconsideration, the Court is now aware that there is literally nothing in the legislative history to support the Court's interpretation of ORC § 4517.52 and that, in fact, the legislative history

supports a finding that the elimination of language relating to time in the 1987 Amendments was not meant to change the meaning of the statutory term "rate" at all. Surely such information, which is not "evidence" at all but is instead simply additional legal support for plaintiff's position, and which the Court apparently did not consider prior to issuing its November 27 Order, justifies another look by this Court at its earlier statutory interpretation, especially considering the misleading argument put forward by Chrysler's *amicus* which apparently led the Court to conclude that testimony **opposing** the 1987 Amendments which already contained the deletions to references of time could somehow support a finding that such opposition testimony **caused** the deletions to references of time in those amendments.

Similarly, Kings used its motion to call this Court's attention to another case (the fourth cited by plaintiff), in which a court outside of Ohio interpreted a warranty reimbursement statute similar to ORC § 4517.52 and which also describes a manufacturer's labor reimbursement obligation by using the term "rate", as requiring manufacturers to compensate their dealers for the total amount charged by the dealers for labor, including the amount of time charged by the dealers. Plaintiff submits that this case law is instructive as Chrysler has not submitted to this Court, nor did this Court cite any case law in its November 27 Order, from any jurisdiction, which has held that the time element of repairs need not be considered in determining the "rate" due to dealers under a warranty reimbursement statute.

Finally, from a factual standpoint, plaintiff utilized its motion to question the Court's factual finding that plaintiff did not submit a "particularized claim" to Chrysler relating to the times plaintiff charges its retail customers when the undisputed evidence

2

shows that, in connection with its request for a labor rate increase in the Fall of 2011, **Kings provided Chrysler with 200 consecutive retail repair orders, all of which contained the exact times that plaintiff charged its retail customers**. In fact, in order for Chrysler to determine plaintiff's "average effective retail rate", Chrysler divided the time plaintiff spent on each repair by the total amount charged to the retail customer. Thus, far from being "forced to guess as to the repair times plaintiff sought" (November 27 Order at 25); Chrysler in fact had in its possession 200 of plaintiff's repair orders, which included even more repair times, and Chrysler actually utilized those repair times to calculate the hourly amount that Chrysler determined was due to plaintiff. Chrysler then substituted its own amount of time (based on its laboratory time studies) and multiplied those times by Kings hourly charge, to determine Kings' overall warranty labor rate-a rate which is approximately 50% less than plaintiff's retail labor rate.

In sum, plaintiff is not merely rehashing or repeating its earlier arguments via its motion. Instead, it is attempting to demonstrate the clearly erroneous legal and factual findings by this Court – an entirely appropriate use of a Rule 59(e) motion.

## II. ARGUMENT

### A. Motions For Reconsideration Can Serve An Important Purpose

At least one federal court in Ohio opined that a motion for reconsideration "serves a legitimate and valuable role in certain situations". *Bridgestone America's Tire Operations, LLC v. Pacific Employees Ins. Co.*, 2013 U.S. Dist. LEXIS 26968 at *3 (N.D. OH 2013). And the Sixth Circuit has repeatedly held that two of those certain situations are to correct "clear error" and to prevent "manifest injustice", both of which plaintiff contends are applicable in this case. *E.g., American Marretta Corp. v. Essroc Cement*

*Corp.*, 59 Fed. Appx. 668, 671 (6th Cir. 2003); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999).

By definition, motions for reconsideration require a Court to take another look at a prior decision and determine whether that decision contained any errors. And, as Kings stated in its initial brief, no offense is intended nor should be taken as a result of Kings filing its motion. Plaintiff simply believes it appropriate to allow this Court the opportunity to rectify its errors instead of immediately appealing to the Sixth Circuit.

  **B. ORC § 4517.52 Necessarily Includes A Time Element.**

    **1. The Protections Provided By ORC § 4517.52 Would Be Eliminated If Time Is Not Part Of The Labor Rate Calculation.**

Any way this case is analyzed, it ultimately revolves around a determination of whether ORC § 4517.52 requires a manufacturer to compensate its dealers for warranty repairs at the same overall amount, or "rate", that the dealers charge their retail repair customers for the same or similar repairs. To be sure, if the time element is not included in this calculation and the manufacturer is allowed, via an ever-changing Dealer Policy Manual, to allocate a time for warranty labor repairs different than that utilized by the dealer for retail repairs, the manufacturer will always maintain control over the ultimate amount it is required to pay its dealers and the dealer's warranty "rate" will never equal its retail "rate". Moreover, if there is no parity in the amount the dealer receives for warranty repairs as compared to the amount it receives for retail repairs, ORC § 4517.52 really does not provide any protection to dealers or their retail customers from possible abuse by manufacturers via the manufacturers' extraordinary bargaining superiority over their dealers resulting in the manufacturers' ability to craft any contractual arrangement which suits them.

Thus, the Sixth Circuit has expressly held that ORC § 4517.52 and statutes similar to it are seen "as promoting public welfare by counteracting the economic power of the automobile manufacturers, and purportedly correcting past abuses." *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 836 (6th Cir. 1997). This, then, is the remedial aspect of ORC § 4517.52. Indeed, what protection is provided by a statute that requires a manufacturer to pay its dealers' hourly retail charges yet allows the manufacturer, via its one-sided contract with its dealers, to pay its dealers only 50% of their retail time for warranty repairs?

Chrysler's primary response to this argument seems to be that, merely because ORC § 4517.52 is a remedial statute, that fact does not mean that the statute means whatever plaintiff says it means. Plaintiff agrees. Yet, there is absolutely no legal support for the proposition that the statute should be read to protect the manufacturer- the only entity protected by the Court's November 27 Order. In this regard, the *Jim White* court has held that, by enacting ORC § 4517.52, "the Ohio legislature sought to benefit all consumers . . . .." *Jim White Agency Co.*, *supra* 126 F.3d at 836. *See also Acadia Motors, Inc. v. Ford Motor Co.*, 44 F.3d 1050, 1056 n. 9 (1st Cir. 1995) (interpreting the Maine warranty reimbursement statute and stating that "the statute was arguably meant to protect non-warranty consumers from inflated prices charged by dealers who are attempting to maintain their average profit margins in the face of manufacturer's below retail reimbursement rates.") Plaintiff is at a loss as to how this Court's interpretation of ORC § 4517.52 protects any Ohio consumers, non-warranty or otherwise, from Chrysler's overreaching. Indeed, the evidence in this case is undisputed that Chrysler's "contractual right" to allocate approximately 50% less time for

5

warranty repairs, and therefore reimburse plaintiff at lower rates then plaintiff charges its retail customers, is absolutely resulting in plaintiff's retail customers subsidizing Chrysler's warranty "discount". (Reichert Dep. at 269-270; Ex. 23, Doc. Nos. 24, 43.) This Court's November 27 Order does nothing to change this fact. Plaintiff submits that this undisputed fact, together with the remedial purpose of the statute, practically compels the conclusion that the term "rate", as it is used in ORC § 4517.52, has to be synonymous with the word "amount", and that therefore Chrysler cannot contract its way out of this requirement.

    **2.**  **There is Nothing "Absurd" or "Unreasonable" about Construing ORC § 4517.52 as Requiring Chrysler to Pay Plaintiff's Total Labor Rate Charged to its Retail Customers**

Chrysler is clearly in denial regarding why plaintiff's retail customers are being harmed. In its opposing brief, Chrysler argues, without the benefit of any factual support, that "[i]t is Kings, not Chrysler Group, who is driving up the cost of retail repairs for consumers by overcharging its retail customers through the use of flat times that have no relationship to the actual length of time it takes to perform a repair." (Chrysler Brief at 5, n. 4.) This statement is troubling for many reasons, not the least of which is that this Court also apparently believes that Kings is "likely overcharging its retail customers." (November 27 Order at 31, n. 40.) Accordingly, plaintiff will demonstrate the numerous flaws with Chrysler's baseless assertion.

First, as noted above, Chrysler cited no factual support for this assertion; perhaps because there is literally no evidence anywhere in the record of this case indicating that the Alldata/Motor time guide utilized by plaintiff is "driving up the costs of

6

repairs" to plaintiff's retail customers.[1]  In fact, the evidence in this case, via the declarations of plaintiff's technicians, who have first-hand knowledge of what it takes to perform repairs in a real-world dealership setting, have testified that "the Alldata/Motor labor times provide much more realistic time allotments [as compared to Chrysler's warranty times] for most of the repairs I am required to do on a regular basis." (Declaration of James C. Meyer, Doc. No. 38, Ex. 6 at ¶ 7; Declaration of Jerry E. Wolf, Doc. No. 38, Ex. 6 at ¶ 6.)  Chrysler has not rebutted that testimony in any way, yet this Court still did not credit this testimony, finding only that "plaintiff **claims** that its technicians cannot perform most warranty repairs within Chrysler's warranty times". (November 27 Order at 29, n. 36; emphasis added).  In fact, plaintiff absolutely proved this point.

Moreover, Motor's president, Kevin Carr, testified that the times in the Alldata/Motor guide, which are developed by his Company's labor editors, represent the amount of time that each labor operation should take "the average technician out in the field".  (Carr Dep. at 74, Doc. No. 25.)  More importantly, Chrysler's expert, David Merta, testified that he has "no concern" with plaintiff using the Alldata/Motor guide for retail repairs and confirmed that the Alldata/Motor guide is the most popular time guide used by automobile dealerships throughout the country due to its comprehensive nature and ease of use.   (Merta Dep. at 49-50, 92, Doc. No. 33.)   Finally, the evidence is undisputed that **Chrysler itself pays Alldata/Motor time for repairs on vehicles which carry Chrysler service contracts and which are associated with Chrysler's**

---

[1] Throughout its brief, Chrysler also misleadingly refers to the Alldata/Motor time guide as being "established by Kings" (Chrysler Brief at 4) and that Kings "unilaterally establishes . . . the length of repair time".  (*Id.* at 4.)  Of course, this is nonsense as plaintiff has absolutely no role in developing the times that are found in the Alldata/Motor time guide.

**fleet leasing program**. (Vargo Dep. at 86-87; 96, Doc. No. 31.) Thus, the undisputed evidence shows that: Kings is using a time manual that even Chrysler's expert admits is appropriate for retail repairs; this manual is used by the majority of other dealers throughout the United States and is even accepted by Chrysler in certain situations; and plaintiff's technicians have testified that the times in this manual more closely resemble the "actual times" necessary to perform most repairs when compared with Chrysler's warranty times.

There is simply no evidence, and thus it is clear error, to conclude that plaintiff's use of the Alldata/Motor time guide is resulting in plaintiff "likely overcharging its retail customers" (November 27 Order at p. 31, n. 40) or that plaintiff's use of this guide "would allow for the reimbursement of warranty work well beyond the actual time required to perform the work." (*Id.* at p. 22, n. 30.) Thus, plaintiff submits that there is nothing "absurd" or "unreasonable" about a construction of ORC § 4517.52 which would require Chrysler to reimburse plaintiff for these times. (*See* November 27 Order at p. 22, n. 30.)

One final aspect of this issue deserves attention given the Court's conclusion that Chrysler's time study times represent the "actual repair times". (November 27 Order at p. 26.) Below is the testimony of Chrysler's time study expert, William Jones, who candidly admitted that numerous aspects of every repair are never a part of Chrysler's time studies. Plaintiff has quoted this testimony, and invites the Court to review this individual's entire testimony, so that there can be no question as to the import of Mr. Jones' testimony in this regard:

> Q: Before the time study begins, before Chrysler actually starts the watch, **the technician performing the time**

| | |
|---|---|
| | study knows what the issue is, correct, the issue to be done, the repairs to be performed? |
| A: | Correct. |
| Q: | Okay. |
| A: | They know if they have to -- they are going to time study the replacement of a cylinder head, they know that's what they are going to do. |
| Q: | **So there would be no diagnosis necessary, right?** |
| A: | **No.** |
| Q: | **No, I am right?** |
| A: | **You are correct.** |

\* \* \*

| | |
|---|---|
| Q: | Before the time study begins, all the necessary tools are present that the technician needs to perform the repair? |
| A: | They are in the facility. |
| Q: | **Not only are they in the facility, they are also in the technician's work area, correct?** |

\* \* \*

| | |
|---|---|
| A: | **The vehicle, service information, and tool box must be in the technician's -- yeah, that's accurate -- before the time study started.** |
| Q: | Before the time study begins? |
| A: | Before it's started, right. **You have a tool box with all your standard tools in it and you have the service information ready.** |
| Q: | Right. **And it is in the work area before the clock starts?** |
| A: | Yeah. |

\* \* \*

| | |
|---|---|
| Q: | **And there is no type of road testing that's ever part of a Chrysler time study, correct?** |
| A: | **No, that's not part of the study, no.** Some -- if you looked at some service bulletins for issues such as lead or vibration, road test is included with that. |

\* \* \*

| | |
|---|---|
| Q: | Is it also true that the time studies always begin -- strike that -- that **with respect to the time studies** |

9

> Chrysler performs, before the stopwatch begins, the car is already in the garage --
> A: M-hum, correct.
> Q: -- correct?
> And that the stopwatch is stopped before the vehicle is even backed out of the garage?
> A: True, correct.
>
> * * *
>
> Q: The parts are always in the work area before the time study begins, right?
> A: It is not -- **it is not part of the time study, that's correct.**
> Q: Right. So the technician knows before he starts the repair that he has all the tools and all the parts necessary to perform that repair in his work area, right?
> A: That's true.
> Q: And that - - **in your experience, did that ever happen at the dealership when you were the technician, did you ever have the right parts in your work area before the repair started?**
> A: **Technicians don't stock or keep parts in their stall. They have to charge them out of the Parts Department.**

(Jones Dep. at 20-22, 31, Doc. No. 28; emphasis added.) Moreover, Chrysler's time studies are never performed at a dealership (*Id.* at 13-14) but are instead performed at what Chrysler Warranty Manager Greg Jankowski referred to as a "labor time study lab". (Jankowski Dep. at 28, Doc. No. 30) Thus, the actual conditions under which warranty repairs are actually performed are never replicated by Chrysler's time studies. Plaintiff submits that, based on the above facts, all of which are undisputed, Chrysler's time studies can in no way accurately be characterized as representing "actual repair times". Indeed, Chrysler itself even recognizes that these times do not represent "actual repair times", as Chrysler adds what it calls "supplemental time" onto its time studies to account for Chrysler's failure to allow for the above procedures, which are necessarily a

10

part of every repair. (Jones Dep. at 30.) In short, the evidence shows that Chrysler's time studies are also at their essence estimates, not unlike the times contained in the Alldata/Motor guide.[2]

Finally, Chrysler argues that its contractual right to assign labor times must take precedence because the dealer agreement between the parties has been in effect for years. (Chrysler Brief at 9). Taken to its logical conclusion, this argument would mean that plaintiff cannot ever assert its rights under ORC § 4517.52 because it has not done so prior to this litigation. Of course, such an argument is meritless. Similarly, this Court opined that, if it ruled as plaintiff is requesting, "the Court would, in effect, invalidate hundreds, if not thousands, of agreements between dealers and automobile manufacturers". (November 27 Order at 24, n. 34). Plaintiff submits that, if in fact those agreements violate Ohio law, far from providing a basis to uphold such contracts, the above fact merely underscores the need for this Court to intervene.

### 3. The Legislative History Also Supports A Finding That "Rate" Means Total Compensation.

As an initial matter, it bears noting that the legislative history attached to plaintiff's Motion for Reconsideration is not "new evidence" as Chrysler asserts in its opposing brief. (Chrysler Brief at 6, n. 5.) Such history is instead simply additional legal support for plaintiff's position, similar to the additional case from Maine which plaintiff included in its brief. This Court has already tacitly acknowledged this fact when it adopted the legislative history attached as an exhibit to the brief of Chrysler's amicus, even though

---

[2] Thus, even if plaintiff utilized Chrysler's warranty times as plaintiff's estimates for retail repairs as Chrysler suggests (See Chrysler Brief at 7, n. 8), Kings would simply be substituting one flat rate estimate for another.

there was no affidavit or declaration authenticating this exhibit. (See Doc. No. 51, Ex. 2.) Thus, the legislative history submitted by plaintiff is appropriately before this Court.

With respect to that legislative history, and as noted in plaintiff's initial brief, **none** of the witnesses who testified to the General Assembly regarding the 1987 Amendments even remotely suggested that the deletion of the references to time in the Amendments meant that the manner in which a dealer's labor rate was calculated (hourly rate x number of hours) was being drastically changed. Instead, as noted in plaintiff's initial motion, Richard Siehl testified to the General Assembly that, other than removing the Dealer Board's involvement in the determination of warranty reimbursement rates, the amendments did not substantively change ORC § 4517.52. (Kezele Decl. at Ex. 1, Doc. No. 56.) Indeed, if Mr. Siehl truly was a "one-time lobbyist and counsel for the Ohio Automobile Dealers' Association" as Chrysler's "online research suggests" (Chrysler Brief at 7, n. 6), and if this Court's interpretation of ORC § 4517.52 is correct, plaintiff submits that Mr. Siehl would be the absolute last person on earth to be a **proponent** of the Amendments that greatly reduced the compensation dealers received from the manufacturers for warranty repairs.

The reality is that Mr. Siehl's testimony to the General Assembly that the Amendments "clearly establish a statutory standard for compensation in a manner consistent with the intent of the Original Act" (Kezele Decl. at Ex. 4), clearly shows that the Amendments were in no way intended to diminish the compensation dealers received for warranty reimbursement, which is why the term "rate" remained unchanged in the statute. As the Court reasoned in *American Honda Motor Co. v. Darling's*

*Honda/Nissan,* 1997 Me. Super. LEXIS 225 (Me. Super. Ct., 1997) in interpreting Maine's warranty reimbursement statute:

> The Legislature certainly understood how to identify a simple hourly charge. It could have but did not use such plain language in § 1176. *** **It is therefore declared that the phrase "retail rate customarily charged" means the total amount charged for labor for the repair, and not merely the hourly charge component of the labor costs.** *Id.* at **24-25 (emphasis added).

Similarly, the Ohio General Assembly chose not to use the term "hourly charge" in the amended ORC § 4517.52. Thus, Mr. Siehl's testimony is entirely consistent with the remedial purpose of ORC § 4517.52, as well as the plain language of the statute.[3]

Mr. Siehl's testimony is also consistent with the manner in which this Court has treated Chrysler's obligation to reimburse plaintiff for warranty parts. Certainly, it cannot be merely coincidental that plaintiff charges its retail customers cost plus 59.13% for parts and that therefore Chrysler is now reimbursing plaintiff cost plus 59.13% for warranty parts. While "cost plus a certain percentage" is certainly a ratio, it also equals the **amount** plaintiff charges its retail customers-which is why Chrysler is required to pay plaintiff that amount. It is not therefore reasonable to conclude that the statutory term "rate" has the same meaning in the labor context?

---

[3] Plaintiff agrees with Chrysler's assertion that the meaning of a statute is most properly derived "from the words of the statute itself". *Isle Royale Boaters Ass'n v. Norton,* 330 F.3d 777, 784 (6th Cir. 2003). Plaintiff also submits that the General Assembly's use of the word "rate" makes it clear that manufacturers must pay the same amount for warranty repairs that plaintiff charges its retail customers. However, since Chrysler's *amicus* felt that the legislative history would be helpful to the Court in construing ORC 4517.52, and this Court subsequently agreed, plaintiff felt it appropriate to demonstrate that the legislative history in no way supports the Court's interpretation of the statute, but instead that history supports the plain meaning of the word "rate". *See Darling's v. Ford Motor Co.,* 1998 ME 232, 719 A.2d 111, 115 (Me. 1998) (reviewing the legislative history of Maine's warranty reimbursement statute and the statute's "underlying policy" and holding that a dealer's "retail rate" can in fact include flat rate pricing to its retail customers.)

13

Finally, plaintiff submits that, if this Court is correct and the reimbursement aspect of the statute changed significantly in 1987, there would at least be some hint somewhere in the legislative record explaining why it changed or how the changes were consistent with the remedial purpose of the statute; especially given the extensive testimony in the legislative record regarding Senate Bill 103.[4] In this regard, the United States Supreme Court has held that testimony before a legislative body can "amply demonstrate the intended scope of the statute" at issue. *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 213 (1980). Thus, when Mr. Shiehl's testimony is considered, together with the utter dearth of testimony indicating that the General Assembly intended to change the meaning of the word "rate", it appears as if the Court's November 27 Order was in error.

### C. Plaintiff Provided Chrysler With All Of The Information Necessary To Verify Plaintiff's Labor Times.

Chrysler continues to argue, and this Court found in its November 27 Order, that plaintiff failed to submit a "particularized claim" to Chrysler so that Chrysler could evaluate and verify the hourly rate charged by plaintiff for its retail repairs. (November 27 Order at p. 24-25; Chrysler Brief at 9-10.) In fact, in conjunction with its labor rate increase request, plaintiff provided Chrysler with 200 consecutive retail repair orders, all of which contained the exact amounts of time plaintiff charged its retail customers for various repairs. Curiously, Chrysler argues that it had no obligation to review these 200 repair orders to verify the times that plaintiff charged its retail customers because it

---

[4] Unbelievably, Chrysler continues to argue that the FTC's witness, Brenda Doubrava, did in fact address the changes to ORC § 4517.52. (Chrysler Brief at 7, n. 9.) Instead of dignifying that meritless assertion with a response, plaintiff simply refers the Court to the entirety of her testimony which accompanies plaintiff's motion and which shows that her objections to Senate Bill 103 had absolutely nothing to do with the amendments to ORC § 4517.52. (Kezele Decl. at Ex. 4.)

14

would be an "extraordinary burden" on Chrysler to do so. (Chrysler Brief at 10). In fact, and as demonstrated below, Chrysler was already reviewing those times in order to calculate plaintiff's "average effective retail labor rate".

As Chrysler witness Ralph Vargo testified regarding these repair orders:

> Q: . . .Am I right that Chrysler considered the first repair on RO 353098 to be a retail repair?
> A: Yes.
> Q: Okay. And it found that for the various repairs and services that were performed under Repair Condition A, that Kings Dodge charged its retail customer four hours for that: is that true?
> A: Yes.
> Q: Okay. And specifically if you look at RO 353098 there are three separate repairs two of which were for an hour each and the third was for two hours; is that correct?
> A: Yes.
>
> * * *
>
> Q: **What I want to know is what, if anything, does Chrysler do with respect to the time allotments that are on the ROs that are submitted by the dealer that show Chrysler how much time is allotted for various - - I'm sorry, for various retail labor operations? What's it do with that time? Does it look at it? Does it consider it?**
> A: As Exhibit Number 3 shows, **we would accept the hour hours for Condition A as the appropriate time as depicted by Exhibit 2.**
> Q: All right. **What role, if any, does that play, the time element play in the amount that Chrysler reimburses the dealer for warranty work?**
> A: **It would be the total amount charged to a customer divided by the number of hours on the ROs for like service and parts.**
>
> * * *
>
> Q: So with respect to the labor rate increase, **did Kings Dodge provide Chrysler with everything Chrysler wanted to see in the fall of 2011?**
> A: **Yes.**

15

(Vargo Dep., Doc. No. 31, at 30-31; 34-35; 39, emphasis added.) In other words, Chrysler had already considered these times in connection with verifying plaintiff's hourly charge; how could it possibly be an "extraordinary burden" (or any burden at all) for Chrysler to review these same times to verify plaintiff's retail labor times?

While it is accurate that Chrysler ultimately replaced all of plaintiff's retail labor times with Chrysler's time study times in order to calculate plaintiff's overall labor rate (a rate that is approximately 50% lower than plaintiff's actual retail labor rate), it is simply error to conclude that plaintiff did not provide Chrysler with sufficient information to enable Chrysler to verify the times plaintiff charged its retail customers.

### D. There Is No Requirement For A Dealer To Provide An Exact Percentage To The Manufacturer Before The Dealer Is Entitled To A Parts Increase Review.

Plaintiff will not belabor this issue. In the Fall of 2011, plaintiff informed Chrysler that plaintiff believed it was not being properly compensated for warranty work and, in that same communication, informed Chrysler that plaintiff charged "retail price" for parts. (Vargo Dep. at Ex. 8.) As noted above, plaintiff then provided Chrysler with 200 retail repair orders which, in addition to containing all of the labor rate information (time and hourly charge), included the exact prices plaintiff charged its retail customers for parts.

Chrysler contends, and this Court has apparently accepted, that plaintiff was required to tell Chrysler that plaintiff wanted an exact percentage increase in its parts reimbursement before Chrysler had any obligation to review the data that plaintiff had submitted to Chrysler regarding this issue. (November 27 Order at 32.) Plaintiff submits that none of the case law construing ORC § 4517.52 requires a dealer to inform the manufacturer of a specific percentage increase before that dealer is entitled to a review of its warranty parts reimbursement. Instead, a dealer need only: inform

"Defendant that [Plaintiff] believed that Defendant was not reimbursing it for parts used in warranty repairs at retail rate for like parts; and . . . [provide] reasonable verification of its claimed retail rate for like parts to Defendant before filing a legal action . . .." *R&R, Inc. v. Volvo Trucks North America*, 2007 US Dist. LEXIS 13583 at * 10 (N.D. OH 2007).

Plaintiff indisputably fulfilled these elements in this case and therefore was entitled to a parts increase long before July, 2013.

### III. CONCLUSION

For all of the reasons set forth herein, and for all of the reasons set forth in its initial motion, plaintiff respectfully requests this Court to reconsider and vacate its November 27, 2013 Order and enter summary judgment in plaintiff's favor.

Respectfully submitted,

/s/ Curtis L. Cornett
Curtis L. Cornett (0062116)
Cors & Bassett, LLC
537 E. Pete Rose Way, Suite 400
Cincinnati, Ohio 45202
Phone: 513.852.8226
Fax: 513.852.8222
clc@corsbassett.com

Trial Attorney for Plaintiff Kings Dodge, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2014, a copy of the foregoing was filed electronically on all counsel of record. Notice of this filing will be sent by operation of the Court's electronic filing system to the following:

>Kurt R. Hunt, Esq.
>DINSMORE & SHOHL LLP
>255 E. 5th St., Suite 1900
>Cincinnati, OH 45202
>kurt.hunt@dinslaw.com
>Attorney for defendant Chrysler Group, LLC
>
>Robert D. Cultice, Esq.
>Lucy Heenan Ewins, Esq.
>WILMER CUTLER PICKERING HALE AND DORR LLP
>60 State St.
>Boston, MA 02109
>robert.cultice@wilmerhale.com
>lucy.ewins@wilmerhale.com
>Attorneys for defendant Chrysler Group, LLC
>
>Jeffrey J. Jones, Esq.
>JONES DAY
>P.O. Box 165017
>Columbus, OH 43216-5017
>jjjones@jonesday.com
>Attorney for Amicus
>
>David A. Brown, Esq.
>STOCKAMP & BROWN, LLC
>5100 Parkcenter Avenue, Suite 100
>Dublin, OH 43017
>dbrown@stockampbrown.com
>Attorney for Amicus

>>/s/ Curtis L. Cornett
>>Curtis L. Cornett